UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,

      Plaintiff,

v.                                                            Case No. 8:08-cv-1893-T-33MAP

THE OHIO WILLOW WOOD
COMPANY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Alps South, LLC ("Alps") is the exclusive licensee of the U.S. Patent No. 6,552,109 ("the

'109 patent"), naming John Y. Chen ("Chen") as inventor for "gelatinous elastomer compositions

and articles," and U.S. Patent No. 6,867,253 ("the '253 patent"), also naming Chen as inventor for

"tear resistant crystalline midblock copolymer gels and articles."  It claims Ohio Willow Wood

("OWW"), a competitor in the business of manufacturing and selling prosthetic liners for customers

who have prosthetic limbs, infringed the '109 and '253 patents.  Because both sides dispute the

meaning of certain claim terms found in the '109 and '253 patents, the parties each move for

construction of those terms (docs. 50 and 52).[1]  *See  Markman v. Westview Instruments, Inc.*, 571

U.S. 370 (1995).  Having the benefit of a *Markman* hearing, the parties' supporting briefs, and a joint

claims construction chart, this report recommends appropriate claims construction for the disputed

terms applying the principles outlined in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*

*Ltd.,* 535 U.S. 722 (2002); *Markman, supra*; and *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir.

_____

[1]  The district judge referred the motions for claim construction to me for a report and
recommendation (doc. 54).  *See*  28 U.S.C. § 636 and Local Rule 6.01.

2005) (*en banc*).

    *A.  Claims Construction Standard*

    Patent infringement actions are composed of two phases.  First, in the claim construction phase, the court determines the scope and meaning of the patent claims as a matter of law, and second, the claims are compared to the allegedly infringing device.  *See Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998 (*en banc*) citing *Markman*, 517 U.S. at 371-73.  This report and recommendation addresses only the claim construction phase.  Claim construction is a question of law for the Court.  *Markman, supra,* 517 U.S. at 372.  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips, supra,* 415 F.3d at 1312.

    The Court's underlying goal in claim construction is to comprehend how a person of ordinary skill in the art would understand the claim terms.  There is no magic formula or catechism for conducting claim construction, nor is the Court required to analyze sources in any specific sequence.  Of upmost import is that the Court attach the appropriate weight to the sources consulted, as certain types of evidence are more valuable than others.  *Phillips, supra,* at 1324, citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is well-settled that proper construction of claims is based primarily on the intrinsic evidence:  the claim language, the specification, and the prosecution history.  Claims should be construed from the point of view of the person of ordinary skill in the field of the invention at the time of the invention.  The claim language itself is first and foremost in importance when construing the meaning and scope of the patent.  Generally, the rule for claim interpretation is that:

    terms in the claim are to be given their ordinary and accustomed meaning.  General

> descriptive terms will ordinarily be given their full meaning: modifiers will not be added to broad terms standing alone.  In short, a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of the claim terms.

*Johnson Worldwide Assoc, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir. 1999).  Thus, if the claim is unambiguous and clear on its face, the court need not consider the other intrinsic evidence in construing the claim.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips, supra,* at 1313 citing *Mutiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  Where the applicability of a common meaning is unclear or where more than one common meaning could be assigned to a claim term, reference to the specification and prosecution history is appropriate to discern the ordinary and accustomed meaning.  "The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics, supra,* 90 F.3d at 1582.  The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.*

"When the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Medical Systems, S.A. v. Cooper Life Services, Inc.*, 34 F.3d 1048, 1054 (Fed.Cir. 1994) citing *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986 (Fed.Cir. 1988).  The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it

would otherwise possess.  In such cases, the inventor's lexicography governs.  *Phillips, supra,* at

1316.  While the specification is the "single best guide to the meaning of a disputed term," claims

are not to be interpreted by adding limitations appearing only in the specification."  *Phillips, supra,*

at 1315 citing *Vitrionics, supra,* 90 F.3d at 1582;  *Electro Medical Systems, S.A., supra,* citing

*Intervet Am. v. Kee-Vet Lab*, 887 F.2d 1050, 1053 (Fed. Cir.1989).  The asserted claims can be

assigned a narrower scope only if there is some indication in the patent or the prosecution history

that the term was meant to have a more restrictive meaning as used in the patent, or a broader

meaning was disclaimed during prosecution.  *Id.* at 1313.  The Federal Circuit has "consistently

adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his

invention, that limitations appearing in the specification will not be read into claims, and that

interpreting what is meant by a word in a claim 'is not to be confused with adding extraneous

limitation appearing in the specification, which is improper.'"  *Laitram Corp. v. NEC Corp.*, 163 F.3d

1342, 1348 (Fed. Cir. 1998) quoting *Intervet Am.,* 887 F.2d at 1053.  Hence, the Federal Circuit has

recognized that "there is sometimes a fine line between reading a claim in light of the specification,

and reading a limitation into the claim from the specification."  *Interactive Gift Exp., Inc. v.*

*Compuserve, Inc.,* 256 F.3d 1323, 1332 (Fed. Cir. 2001) quoting *Comark Comm., Inc. v. Harris*

*Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  In locating this "fine line" it is useful to remember that

we look "to the specification to ascertain the meaning of the claim term as it is used by the inventor

in the context of the entirety of his invention," and not merely to limit the claim term."  *Id.* quoting

*Comark* at 1187.  In other words, although one may look to the written description to define a

disputed term already in a claim limitation, "the resulting claim interpretation must, in the end,

accord with the words chosen by the patentee to stake out the boundary of the claimed property."

*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003)

quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Most of the time, an analysis of the intrinsic evidence will resolve any ambiguity in a

disputed term; however, the court may consider extrinsic evidence "if necessary to aid the court's

understanding of the patent." *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440,

1443 (Fed. Cir. 1997).  Extrinsic evidence is that evidence which is external to the patent and file

history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and

articles.  Extrinsic evidence is general, and expert testimony in particular, may be used only to help

the court come to the proper understanding of the claims, and may not be used to vary or contradict

the claim language.  *Vitronics,* at 1584-85.

### B.  Disputed claims

#### 1.  hydrogenated styrene isoprene/butadiene block copolymer

The parties dispute the meaning of the term "*hydrogenated styrene isoprene/butadiene block

copolymer*" as used in claims 1, 2, 3, 4, 5, 6, and 12 of the '109 patent.  Alps advances this term

should be defined as a block copolymner of the structure poly(styrene-ethylene-ethylene-propylene-

styrene) made from hydrogenation of styrene block polymer with 2-methyl-1,3- butadiene and 1,3-

butadiene.  In short, Alps seeks to use the limiting terms from the patent's abstract and specifications

to narrow the claim term.  In contrast, OWW reads the claim term more broadly, and opposes Alps's

narrow construction.  The pertinent claim language is set out here with the disputed terms italicized.

Claim 1 specifies:

1.  A composite article comprising a thermoplastic, heat formable and heat
reversible gelatinous elastomer composition, G, which is formed into a
composite by heat with one or more of a selected substrate material, M, said

gelatinous elastomer composition formed from

>  (i)  100 parts by weight of one or a mixture of two or more of a *hydrogenated styrene isoprene/ butadiene block copolymer(s)* and from
>
>  (ii)  about 300 to about 1,600 parts by weight of a plasticizing oil; and in combination with or without
>
>  (iii)  a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene),    poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene)$_n$, poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene),    poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene),    poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer, wherein $n$ is greater than one; and wherein said composite formed from the combination $G_n M_{n,}$, $G_n M_n M_n G_n$, $G_n G_n M_n M_n$, $G_n M_n G_n M_n M_n$, $G_n M_n G_n$, $M_n G_n M_n$, $G_n G_n M_n$, $M_n M_n M_n G_n$, $M_n M_n M_n G_n M_n$, $M_n G_n G_n M_n$, $G_n M_n G_n G_n$, $G_n M_n M_n G_n$, $G_n G_n M_n M_n$, $G_n G_n M_n G_n M_n$, $G_n M_n G_n M_n M_n$, $M_n G_n M_n G_n M_n G_n$, $G_n G_n M_n M_n G_n$, $G_n G_s M_n G_n M_n G_n$, a sequential addition or a permutation of one or more of said $G_n$, with $M_n$; wherein when $n$ is a subscript of M, $n$ is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when $n$ is a subscript of G, $n$ denotes the same or a different gel rigidity.

Claim 2 provides:

>  2.  A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer compositions, G, which is formed into a composite by heat with one or more of a selected substrate material, M, said gelatinous elastomer composition formed from
>
>  (i) 100 parts by weight of one or a mixture of two or more of a *hydrogenated styrene isoprene/butadiene block copolymer(s)* and
>
>  (ii) from about 300 to about 1,600 parts by weight of an [sic] plasticizing oil; in combination with or without
>
>  (iii) a selected amount of one or more polymer or copolymer of poly(styrene-butadiene-styrene),    poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene), poly(styrene-isoprene)$_n$, poly(styrene-ethylene-propylene),    poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene),    poly(styrene-ethylene-

6

butylene), poly(styrene-ehtylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, branched, star-shaped, or multiarm copolymer, and $n$ is an integer greater than one; wherein said composite formed from the combination G$n$M$n$ of said G$n$ with M$n$; wherein when $n$ is a subscript of M, $n$ is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when $n$ is a subscript of G, $n$ denotes the same or a different gel rigidity.

Claim 4 states:

4.  A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G, which is formed into a composite article by heat with a selected substrate material M, said gelatinous elastomer composition form [sic] from

(i) 100 parts by weight of one or a mixture of two or more of a *hydrogenated styrene isoprene/ butadiene block copolymer(s)*, wherein at least one of said block copolymer is a high viscosity copolymer having a viscosity value at 5 weight percent solution in toluene at 30º C. of about 90 cps and higher which corresponds to a viscosity at 10 weight percent of about 5800 cps and higher which corresponds to a viscosity at 20 weight percent solids solution in toluene at 25º C. of at about 80,000 cps and higher, and

(ii) from about 300 to about 1,600 parts by weight of an [sic] plasticizing oil, and in combination with or without

(ii) [sic] a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene), poly(styrene-isoprene-styrene), poly(styrene-isoprene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_{n,}$ poly(styrene-ethylene-butylene)$_{n,}$ polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, branched, radial, star-shaped, or multiarm copolymer; and $n$ is an integer greater than one; wherein said composite formed from the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$, wherein

7

when *n* is a subscript of M, *n* is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when *n* is a subscript of G, *n* denotes the same or a different gel rigidity.

Alps argues the phrase "*hydrogenated styrene isoprene/butadiene block copolymer*" as used in claims 1, 2, 3, 4, 5, 6, and 12 is limited to a block copolymner of the structure poly(styrene-ethylene-ethylene-propylene-styrene) made from hydrogenation of styrene block polymer with 2-methyl-1,3- butadiene and 1,3-butadiene. Alps relies primarily upon certain portions of the specification of the '109 patent to support its narrow interpretation.

novel gelatinous compositions and articles ... formed from an intimate melt blend admixture of one or more of a high viscosity poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene)$_n$, and poly(styrene-ethylene-propylene)*n* triblock and branched copolymers and high levels of a plasticizing oil.

abstract.

a gel rigidity of from about 20 to about 800 gram Bloom; wherein said block copolymers have the general configuration A-B-A wherein A is a glassy polymer end block segment of polystyrene and B is an elastomeric polymer center block segment of (ethylene-ethylene-propylene) ...

specification at column 1, line 64 - column 2, line 2.

More generally, the invention comprises thermoplastic, heat formable and heat reversible gelatinous elastomer compositions and articles formed from (I) 100 parts by weight of one or more hydrogenated styrene block copolymers having 2-methyl-1,3-butadiene and 1,3-butadiene blocks of the formula poly(styrene-ethylene-ethylene-propylene-stryrene) and optionally in combination with (II) a selected amount of one or more selected polymer or copolymer; (III) from about 300 to about 1,600 parts by weight of a plasticizing oil; said gelatinous elastomer compositions being characterized by a gel rigidity of from about 20 to about 800 gram Bloom.

specification at column 2, lines 30-40.

8

The polymers useful in forming the gel compositions of the invention comprises high viscosity triblock and branched copolymers. The triblock copolymers have the general configuration A-B-A wherein each A is a glassy polymer end block segment of polystyrene and B is an elastomeric polymer center block segment of poly(ethylene-butylene), poly(ethylene-propylene) or poly(ethylene-ethylene-propylene)...

specification at column 2, lines 58-64.

The most preferred gels can be prepared by melt blending an admixture comprising: (I) 100 parts by weight of one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene- ethylene- propylene-styrene), (styrene-ethylene-propylene)$_n$, (styrene-ethylene-butylene)$_n$ ...

specification at column 3, lines 11-18.

As used herein, the liner triblock copolymers poly(styrene-ethylene-ethylene-propylene-styrene) is denoted by "SEEPS", poly(styrene-ethylene-butylene-styrene) is denoted by "SEBS", poly(styrene-ethylene-propylene-styrene) is denoted by "SEPS"; and the branched copolymers poly(styrene-ethylene-propylene)$_n$ is denoted by "(SEP)$_n$", and poly(styrene-ethylene-butylene)$_n$ is denoted by "(SEB)$_n$". Branched copolymers are often times conventionally referred to as radial or star-shaped polymers.

specification at column 3, lines 33-41.

The Kuraray SEPTON 4000 series block polymers: 4033, 4055, 4045, and the like useful in making the gels of the instant invention are made from *hydrogenated styrene isoprene/ butadiene styrene block copolymer* or more specifically made from hydrogenated styrene block polymer with 2-methyl-1,3-butadiene and 1,3-butadiene. Such poly(styrene-isoprene/butadiene-styrene) polymers, depending on the butadiene structure, when hydrogenated will result in "(SEB/EPS)" or reading the other way "(SEP/EBS)". In cases where the butadiene structures are controlled, it is appropriate to denote (SEP/EPS) as (SE/EPS) where E/EP is ethylene-ethylene-propylene or more simply as (SEEPS) to indicate that the ethylene (E) of the ethylene-butylene (EB) segment of the midblock (EB/EP) of the (SEB/EPS) block polymer is substantially greater than butylene (B) and the amount of (E) can be sufficient so as to exhibit ethylene crystallinity.

specification at column 7, lines 13-30.

In response, OWW argues that the term as used in the claims means "a block copolymer

9

resulting from the hydrogenation of a styrene isoprene/butadiene block copolymer," and asserts that Alps is attempting to improperly narrow the scope of the term. OWW asserts that the '109 patent does not explicitly define the scope of the phrase "*hydrogenated styrene isoprene/butadiene block copolymer,*" but refers to isoprene as "2-methyl -2,3-butadiene" and butadiene as "1,3-butadiene." OWW further asserts that the '109 patent discloses various materials formed from hydrogenated styrene isoprene/butadiene block copolymers, including SEB/EPS and SEEPS. *See* doc. 81, citing to '109 patent column 7, lines 14-30. OWW also cites to the prosecution history of the '109 patent that indicates that in all instances copolymers made from hydrogenated styrene isoprene/butadiene block copolymer contain EB/EP midblocks and that when the EB segment is substantially more E than B it is conventional to denote the copolymer as SEEPS. OWW explains that the prosecution history indicates that both SEB/EPS and SEEPS notations may be used to describe SEB/EPS wherein the EB segment contains more E than B. *See* doc. 81, p. 16. In sum, OWW counters that its proposed definition comports with the breadth one of ordinary skill in the art would attribute to the phrase "*hydrogenated styrene isoprene/butadiene block copolymer*" and that Alps' proposed definition is too restricted and does not recognize the full scope one skilled in the art would afford the phrase.

Although Alps points to various portions of the specifications in support of its argument that one of skill in the art would necessarily conclude that only a block copolymer of the structure poly(styrene-ethylene-ethylene-propylene-styrene) made from hydrogenation of styrene block polymer with 2-methyl-1,3- butadiene and 1,3-butadiene is within the scope of the disputed claims of the '109 patent, I find that the patentee did not intend such a limitation. While Alps asserts that the only way to ensure the desired features of a "glassy polymer end block," "an elastomeric polymer

10

center block," a "high viscosity triblock or branched copolymers"is through a SEEP structure, the claims themselves contain no such assertion.  In *Phillips*, the Federal Circuit noted that it has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *See Phillips, supra,* at 1323 (holding that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments").  *See also Saunders, supra,* at 1332 quoting *Innova/ Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("Even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope ...").  In *Phillips*, the Federal Circuit explained that "[o]ne of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case.  Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.  *Phillips,* 415 F.3d at 1323.  Recognizing that usually the manner in which the patentee uses a term within the specification is clear, the *Phillips* court noted that in the end there will remain some cases in which it is hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature.  *Id. See Snow v. Lake Shore & M.S. Ry. Co.,* 121 U.S. 617, 630 (it was clear from the specification that there was "nothing in the context to indicate that the patentee contemplated any alternative" embodiment to the one presented).  In *Phillips*, the Federal Circuit ultimately found that specification discussed several purposes served by the "baffles" at issue, and

concluded that "the fact that the written description of the patent sets forth multiple objectives to be

served by the baffles recited in the claims confirms that the term "baffles" should not be read

restrictively to require that the baffles in each case serve all of the recited functions. *Id.* at 1326. A

court may not use the specification to reset the clearly defined boundaries of the different claims.

*See generally Kara Tech., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009) ("The

claims, not the specification embodiments, define the scope of the patent protection"); *RF*

*Delaware,* 326 F.3d at 1264 (finding that to the extent there is any dispute regarding the plain

meaning of the term "filter bed," to interpret it as requiring a filter layer, a flocculation layer, and a

transitional layer runs afoul of the patent boundaries expressly set by the patentee with different

claims); *Electro Medical,*34 F.3d at 1054 (concluding that after review of the specifications and

prosecution history that the district court did not err in determining that the term "adjacent" does not

necessarily mean "separate and independent" and that the term 'converge' does not necessarily mean

"converge at the surface of the tooth," rejecting the accused infringer's reliance on the specifications

that described a device in which streams of liquid and abrasive-laden gas converge at or near the

surface of the tooth unlike the accused infringer's device); *SRI, Int'l v. Matshshita Elec. Corp. of*

*Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("If everything in the specification were required to be

read into the claims, or if structural claims were to be limited to devices operated precisely as a

specification-described embodiment is operated, there would be no need for claims. Nor could an

applicant, regardless of the prior art, claim more broadly than that embodiment.").

　　　In light of *Phillips* and the premise that courts cannot alter what the patentee has chosen to

claim as his invention, I find that the limitations appearing in the specification should not be read

into the claims. Reading the claims in light of the specification, it is clear that in describing "novel

gelatinous compositions and articles" the patentee did not limit his invention to a prosthetic gel liner

for use by customers with prosthetic limbs, the product both ALPS and OWW manufacture and sell.

In fact, the patent makes no reference to a gel liner like that manufactured and sold by Alps and

OWW.   Instead, as explained in the specification, the patentee foresaw and disclosed various

components and formulation ranges.  Indeed, other applications of the patented "novel gelatinous

compositions and articles" may more successfully use different block copolymers than the one most

appropriate and successful to ALPS's gel liner.   More simply stated, different block copolymers

might be more suitable for other gel compositions or applications contemplated by these patents.

*See* specification of '109 patent, column 10, lines 25-49 (suggesting various applications, including

"viscoelastic layers in constrained-layer damping of mechanical structures and goods … as molded

shape articles, for use in medical and sport health care, such use include therapeutic hand exercising

grips, dental floss, crutch cushions, cervical pillows, bed wedge pillows, leg rest, neck cushion,

mattress, bed pads, elbow padding, dermal pads, wheelchair cushions, helmet liner, cold and hot

packs, exercise weight belts, traction pads and belts, cushions for splints, slings, and braces, … and

also for orthopedic shoes… Other uses includes toys, optical uses … as lint removers, … as tips for

swaps, as fishing bate [sic], as a high vacuum seal (against atmospheric pressure) which contains a

useful amount of a mineral oil-based magnetic fluid particles, etc." for the gelatinous elastomer

compositions of the '109 invention).   Before the illustrative embodiments, the '109 patent

specification provides:

> While preferred components and formulation ranges have been
> disclosed herein persons of skill in the art can extend these ranges
> using appropriate material according to the principles discussed
> herein.  All such variations and deviations which rely on the teachings
> through which the present invention has advanced the art are

considered to be within the spirit and scope of the present invention.

'109 patent specification, column 11, lines 14-21.

For these reasons, I reject Alps's restrictive definition of the term "*hydrogenated styrene isoprene/butadiene block copolymer*" as used in claims 1, 2, 3, 4, 5, 6, 11, and 12 of the '109 patent, and adopt OWW's definition, "a block copolymer resulting from the hydrogenation of a styrene isoprene/butadiene block copolymer."

### 2. "Plasticizing oil"

Alps asserts that the term "*plasticizing oil*" as used in all of the asserted claims of the '109 and '253 patents means "a substantially aromatic-free processing oil that extends the elastomeric center block segment of a hydrogenated styrene isoprene/butadiene block copolymer." OWW asserts that the term means "a processing oil that extends the elastomeric portion of a polymer or block copolymer." Alps contends that "the '109 patent teaches, and one skilled in the art would recognize, that to practice the invention of the '109 and '253 patents, the plasticizing oil used must be aromatic-free, or substantially so, in order to be compatible with and extend the elastomeric center block segment of a hydrogenated styrene isoprene/butadiene block copolymer. Were the plasticizing oil aromatic, it would interact with the aromatic, glassy styrene end blocks of the copolymer, disrupting the critical functionality of the glassy polystyrene domains, contrary to the express basis of the invention." *See* doc. 81, p.11. In support of this interpretation, Alps relies upon the specification of the '109 and '253 patents below.

> The B and A portions of the triblock and branched copolymers are incompatible and form a two-phase system consisting of sub-micron domains of glassy polystyrene interconnected by flexible B chains. These domains serve to crosslink and reinforce the structure. This physical elastomeric network structure is reversible, and heating the polymer above the softening point of polystyrene temporarily disrupt the

14

structure, which can be restored by lowering the temperature.

'109 patent specification at column 3, lines 1-10.

Plasticizers particularly advantageous for use in practicing the present invention are well known in the art, they include rubber processing oils such as paraffinic and naphthenic petroleum oils, highly refined aromatic-free paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid oligomers of polybutene, polypropene, polyterpene, etc. The synthetic series process oils are high viscosity oligomers which are permanently fluid liquid nonolefins, isoparaffins or paraffins of moderate to high molecular weight.

'109 specification at column 6, lines 50-59.

The basis of this invention resides in the fact that one or more of a high viscosity triblock or branched copolymers or a mixture of two or more of such copolymers having styrene end block to elastomeric block ratio preferably within the contemplated range of from about 20:80 to about 40:60 and higher, more preferably from between about 31:69 to about 40:60 and higher when blended in the melt with an appropriate amount of *plasticizing oil* makes possible the attainment of gelatinous elastomer compositions having a desirable combination of physical and mechanical properties, notably high elongation at break of at least $5 \times 10^5$ dyne/cm$^2$, substantially about 100% snap back when extended to 1,200% elongation, and a gel rigidity of substantially from about 20 gram to about 700 gram Bloom and higher.

More specifically, the gelatinous composition of the present invention exhibit one or more of the following properties.  The are: (1) tensile strength of about $8 \times 10^5$ dyne/cm$^2$ to about $10^7$ dyne/cm$^2$ and greater; (2) elongation of about 1,600% to about 3,000% and higher; (3) elasticity modulus of about $10^4$ dyne/cm$^2$ to about $10^6$ dyne/cm$^2$ and greater; (4) shear modulus of about $10^4$ dyne/cm$^2$ to about $10^6$ dyne/cm$^2$ and greater as measured with a 1,2, and 3 kilogram load at 23º.; (5) gel rigidity of about less than about 20 gram Bloom to about 700 gram Bloom and higher as measured by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square cm at 23º.; (6) tear propagation resistance of at least about $5 \times 10^5$ dyne/cm$^2$; (7) and substantially 100% snap back recovery when extended at a crosshead separation speed of 25 cm/minute to 1,200% at 23º C. Properties (1), (2), (3), and (6) above are measured at a crosshead separation speed of 25 cm/minute at 23º C.

'109 specification at column 9, line 44- column 10, line11.

The gels of the invention comprises high levels of one or more compatible

plasticizers and one or more high viscosity linear multiblock copolymers and star-shaped (or radial) multiblock copolymers having the general configurations $A^n$-Z-$A^n$ and $(A^n$-Z$)_n$ wherein each $A^n$ is a selected glassy polymer end block of a monoalkenyl arene compounds, more specifically, a monovinyl aromatic compounds such as polystyrene (where subscript n=1), monovinylnaphithalene as well as the alkylated derivatives thereof such as poly(alpha-methylstyrene) (n=2), poly(o-methylstyrene) (n=3), poly(m-methylstyrene) (n=4), poly(p-methylstyrene) (n=5) poly(tertiary-butylstyrene) (n=6), and the like, …

'253 patent specification at column 8, lines 4-15.

The Z and A portions of the linear and star-shaped multiblock copolymers are incompatible and form a two or more-phase system consisting of sub-micron glassy domains (A) interconnected by flexible Z chains. These domains serve to crosslink and reinforce the structure. This physical elastomeric network structure is reversible, and heating the polymer able the softening point of the glassy domains temporarily disrupt the structure, which can be restored by lowering the temperature.

'253 patent specification at column 15, lines 28-36.

Plasticizers particularly advantageous for use in practicing the present invention are will [sic] known in the art, they include rubber processing oils such as parffinic [sic] and naphthenic petroleum oils, highly refined aromatic-free paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid oligomers of polybutene, polypropene, polyterpene, etc. The synthetic series process oils are high viscosity oligomers which are permanently fluid nonolefins, isoparaffins or paraffins of moderate to high molecular weight.

'253 patent specification at column 20, lines 43-52.

This physical elastomeric network structure is reversible, and heating the polymer above the softening point of the glassy domains temporarily disrupt the structure, which can be restored by lowering the temperature. During mixing and heating in the presence of compatible plasticizers, the glassy domains (A) unlock due to both heating and solvation and the molecules are free to move when shear is applied. The disruption and ordering of the glassy domains can be viewed as a unlocking and locking of elastomeric network structure.

'253 patent specification at column 26, lines 7-16.

In general, the basis of this invention resides in the fact that one or more of a high viscosity linear multiblock and star-shaped multiblock copolymers (I) or a mixture of two or more of such copolymers having (A) end block to elastomeric block ratio

16

preferably within the contemplated range of styrene to rubber ratios of from about 20:80 to about 40:60 and higher, more preferably from between about 31:69 to about 40:60 and higher when blended in the melt with an appropriate amount of *plasticizing oil* makes possible the attainment of gels having a desirable combination of physical and mechanical properties, notably high elongation at break of at least 1,600%, ultimate tensile strength of about at least $8 \times 10^5$ dyne/cm$^2$, low elongation set at break of substantially not greater than about 2% tear resistance of at least $5 \times 10^5$ dyne/cm$^2$ and higher, substantially about 100% snap back when extended to 1,200% elongation, and a gel rigidity of substantially from about 2 gram to about 1,800 gram Bloom and higher.

More specifically, the gels of the present invention exhibit one or more of the following properties. These are: (1) tensile strength of about $8 \times 10^5$ dyne/cm$^2$ to about $10^7$ dyne/cm$^2$ and greater; (2) elongation of about 1,600% to about 3,000% and higher; (3) elasticity modulus of about $10^4$ dyne/cm$^2$ to about $10^6$ dyne/cm$^2$ and greater; (4) shear modulus of about $10^4$ dyne/cm$^2$ to about $10^6$ dyne/cm$^2$ and greater as measured with a 1, 2, and 3 kilogram load at 23° C.; (5) gel rigidity of about less than about 2 gram Bloom to about 1,800 gram Bloom and higher as measured by the gram weight required to depress a gel a distance of 4 mm with a piston having a cross-sectional area of 1 square cm at 23° C.; (6) tear propagation resistance of at least about $5 \times 10^5$ dyne/cm$^2$; (7) and substantially 100% snap back recovery when extended at a crosshead separation speed of 25 cm/minute to 1,200% at 23° C. Properties (1), (2), (3), and (6) above are measured at a crosshead separation speed of 25 cm/minute at 23° C.

'253 patent specification at column 33, line 1- column 34, line 29.

OWW's argument, when stripped to its core, is that the term "*plasticizing oil*" as used in the

patents discloses a wide variety of usable plasticizers, namely "rubber processing oils such as

paraffinic and naphthenic food and technical grade white petroleum mineral oils, and synthetic liquid

oligomers of polybutene, polypropene, polyterpene, etc." *See* '109 patent specifications, column 6,

line 50 - column 7, line 13. *See also* '253 patent specifications, column 20, line 43- column 21, line

6. More simply, OWW asserts that in both the '109 and '253 patents, the limitation "aromatic-free"

is only associated with the highly refined paraffinic and naphthenic food and technical grade white

petroleum mineral oils, and that Alps's proposed construction attempts to inject the "aromatic-free"

limitation associated only with the highly refined paraffinic and naphthenic food and technical grade white petroleum grade mineral oils to all of the other plasticizers disclosed in the patents. OWW asserts the '253 patent describes "any compatible plasticizer can be utilized in forming the invention gels." *See* '253 patent specification at column 21, lines 9-10.

Irrespective of the parties' purported differences, the expert testimony the parties presented for evaluating the knowledge of one skilled in the art was remarkably harmonious.[2] The expert testimony of Dr. Atwood (Alps) and Dr. Walker (OWW) revealed that one skilled in the art would recognize, that to practice the invention of the '109 and '253 patents, the plasticizing oil used must be aromatic-free, or substantially so, in order to be compatible with and extend the elastomeric center block segment of a hydrogenated styrene isoprene/butadiene block copolymer.[3] Accordingly, after accepting extrinsic evidence to bolster the Court's understanding of the scientific principles and terms of art in the patents and after considering the intrinsic evidence, the Court adopts Alps's construction of the term "*plasticizing oil.*"[4] Namely, "*plasticizing oil*" means "a substantially

---

[2] *See Phillips,* 415 F.3d at 1319 (extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand the claim terms to mean"); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed.Cir. 1999) ('Thus, under *Vitronics,* it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly appositive, and widely held understandings in the pertinent technical field. This is especially the case with respect to technical terms, as opposed to non-technical terms in general usage or terms or art").

[3] Dr. Walker conceded at the *Markman* hearing that one skilled in the art would know that there is some degree of tolerable aroma but that purely or predominately aromatic oil would not work.

[4] In light of the intrinsic evidence, the Court gives limited weight to the extrinsic evidence. *Phillips,* 415 F.3d at 1319 (extrinsic evidence "may be useful to the court, but it is unlikely to result in a reliable interpretation of the patent claim scope unless considered in the

aromatic-free processing oil that extends the elastomeric center block segment of a hydrogenated styrene isoprene.butadiene block copolymer."

*C. Conclusion*[5]

For the reasons set forth above, it is hereby

RECOMMENDED:

1. "*hydrogenated styrene isoprene/butadiene block copolymer*" as used in claims 1, 2, 3, 4, 5, 6, and 12 of the '109 patent encompasses "a block copolymer resulting from the hydrogenation of a styrene isoprene/butadiene block copolymer."

2. "*plasticizing oil*" as used in the '109 and '253 patents means "a substantially aromatic-free processing oil that extends the elastomeric center block segment of a hydrogenated styrene isoprene.butadiene block copolymer."

IT IS SO REPORTED in chambers on May 19, 2010.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

_____

context of the intrinsic evidence").

[5] Since the filing of the claims construction briefs, the parties have agreed to the meaning of nine terms that they initially disputed.  This Court adopts the parties' agreed upon constructions for these terms.  *See* doc. 81, exhibit 1 Agreed Upon Constructions, doc. 103-104, minutes from tutorial and *Markman* hearings.

19