IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:08-CV-01893 T VMC MAP


ALPS South, LLC,


         Plaintiff,

v.                 April 28, 2010
                 9:30 a.m.

THE OHIO WILLOW WOOD COMPANY,
an Ohio corporation


         Defendant.
_____/



TRANSCRIPT OF TUTORIAL PROCEEDING
BEFORE THE HONORABLE MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For the Plaintiff:      **Ronald A. Christaldi**
                         **John Todd Timmerman**
                         **Mindi M. Richter**
                         Shumaker, Loop & Kendrick,
                           LLP
                         101 E Kennedy Blvd - Ste
                           2800
                         PO Box 172609
                         Tampa, FL 33672-0609

For the Defendant:      **Patrick J. Risch**
                         Hill Ward Henderson, PA
                         101 E Kennedy Blvd - Ste
                           3700
                         PO Box 2231
                         Tampa, FL 33601-2231

**Jeffrey S. Standley**
**F. Michael Speed, Jr**
**Michael R. Stonebrook**
Standley Law Group LLP
6300 Riverside Drive
Dublin, OH 43017


Reported By:          Sandra K. Lee, RPR
                      Official Court Reporter
                      U.S. District Court
                      801 North Florida Avenue
                      Tampa, FL 33602
                      (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

```
 1              P R O C E E D I N G

 2        COURTROOM DEPUTY:  All rise.

 3        THE COURT:  This case is the case of

 4   Alps South, LLC, a Florida limited company versus

 5   Ohio Willow Wood Company, an Ohio corporation,

 6   defendant.  Case No. 08 Civil 1893 T 33 MAP.

 7        Will counsel please announce their

 8   appearances.

 9        MR. CHRISTALDI:  Good morning, Your

10   Honor.  My name is Ron Christaldi from the law

11   firm of Shumaker Loop and Kendrick here for Alps

12   South Corporation with my partner Todd Timmerman

13   and Mindi Richter.

14        THE COURT:  Thank you.

15        MR. RISCH:  Good morning.  Patrick Risch

16   from Hill Ward and Henderson here in Tampa.  Along

17   with us representing The Ohio Willow Wood Company

18   is Jeff Standley, Mike Speed, and Mike Stonebrook

19   from the Standley Law Group from Dublin, Ohio.

20        THE COURT:  All right.  Who's going to

21   be speaking for the defendant?

22        MR. RISCH:  I believe Mr. Speed is

23   probably going to be taking the bulk and

24   Mr. Stonebrook --

25        MR. SPEED:  Then Mr. Stonebrook, Your
```

 1    Honor.
 2                THE COURT:  Mr. Stonebrook?
 3                MR. STONEBROOK:  Yes, sir.
 4                THE COURT:  I initially think -- I
 5    initially wanted to do this by some video or DVD
 6    tutorial.  That way I could examine in my Chambers
 7    at my leisure and play back and not have to
 8    confess to you publicly my lack of organic
 9    chemistry background or whatever chemistry is
10    involved in this case.
11                But since you wanted to do it live,
12    pursuant to your request, I don't have a
13    particular format for this portion of the tutorial
14    in anticipation of the hearing tomorrow.
15                I don't know whether you had worked out
16    a format.  If you have, I'll be glad to listen to
17    it.
18                MR. CHRISTALDI:  Your Honor, can I
19    approach the podium.
20                THE COURT:  Please.
21                MR. CHRISTALDI:  Thank you, Your Honor.
22                We have conferred, and we apologize,
23    Your Honor, if we didn't -- in our conferring if
24    we didn't meet your wishes.
25                We did offer to bring video in today,

1   the videotape, but I think the parties' original

2   thoughts collectively were that we would have both

3   the live presentation and something recorded.

4           But we understand that the Court doesn't

5   particularly want the video equipment here today

6   so we apologize for that.

7           But we did think that it would be a good

8   opportunity for you to ask questions of the

9   expert.

10          THE COURT:  I was kind of confused as to

11  what you wanted by the video equipment.  So --

12          MR. CHRISTALDI:  We -- we -- the

13  stipulation we have today is each side will --

14  will do a PowerPoint presentation, of course, with

15  Your Honor having the ability to interact and ask

16  questions.  Plaintiff's going first.

17          And we've agreed if it's -- pleases the

18  Court to withhold any kind of rebuttal or

19  questioning of the experts by opposing counsel and

20  reserve that for presentation at the Markman

21  hearing itself.

22          THE COURT:  So as to the Markman hearing

23  in our effort at a -- lack of a better term, hot

24  tub approach, are the same experts going to be

25  doing this tomorrow?

1        MR. CHRISTALDI:  Yes, sir.

2        THE COURT:  Okay.

3        MR. CHRISTALDI:  Today's presentation

4   should be limited to background chemistry and

5   background of the information that you need to

6   do -- that you might need to know for the case.

7        A tutorial, if you will.  And the

8   argumentation is reserved for tomorrow.

9        THE COURT:  Okay.

10       MR. CHRISTALDI:  And -- and --

11       THE COURT:  How long do you anticipate

12   today's presentation?

13       MR. CRISTALDI:  Dr. Atwood?  Dr. Atwood

14   anticipates one hour, Your Honor, for -- for his

15   presentation.

16       MR. STONEBROOK:  Approximately the same

17   amount of time for defendants, sir.

18       THE COURT:  Okay.

19       MR. CRISTALDI:  Is it okay if I

20   introduce the witness, Your Honor?

21       Your Honor, our expert witness is

22   Dr. Jerry Atwood.  I'll allow him to talk about

23   his background a little bit more in detail on his

24   own, but he is currently the chair of the

25   department of chemistry at the University of

1    Missouri, has been the chair for 16 years.

2              And previously was at the University of

3    Alabama as a university research professor in

4    chemistry for 26 years.

5              If it pleases the Court, is it okay

6    for -- Your Honor, would it -- would it be

7    appropriate for him to sit in the witness box.

8              THE COURT:  Please.

9              MR. CRISTALDI:  Your Honor -- Your

10   Honor, the presentation will be up on the

11   overhead.  But if I can approach, I have one for

12   you and -- and the law clerk as well.

13             THE COURT:  All right.  Is the witness

14   going to have to stand and move around or --

15             MR. CRISTALDI:  Dr. Atwood, will you

16   need to move?

17             He has a pointer, Your Honor, and I

18   don't think he will need to.  But if there's

19   something you need him to walk up to the screen

20   and show --

21             THE COURT:  Well, the only question or

22   concern I have is -- is to make sure that his

23   voice is amplified in the system.  So if we have

24   to get our portable microphone, we'll have to make

25   sure we --

1           MR. CRISTALDI:  It may be -- Dr. Atwood,

2     are you more appropriate at the podium?  Your

3     Honor, that -- if it pleases the Court, maybe it

4     might be more appropriate for him to be at the

5     podium.  And that way he can move if he needs to.

6           THE COURT:  Okay.  Why don't we do that.

7           MR. CHRISTALDI:  He'll be at the

8     microphone.

9           DR. ATWOOD:  I suspect my voice will

10    carry since I'm used to lecturing to large

11    classes.  But I'll be more comfortable in a

12    position where I can both talk to you and look at

13    the screen.

14          THE COURT:  Well, Dr. Atwood, I would

15    suggest that you presume that I'm a pre freshman.

16          MR. CRISTALDI:  I -- I advised him, Your

17    Honor, that you have more knowledge of chemistry

18    than I do.  But as a history --

19          THE COURT:  And you're in trouble,

20    Mr. Cristaldi.  You may not want to say that in

21    front of your clients.

22          MR. CRISTALDI:  And we chose to -- but

23    we did ask Dr. Atwood to start with the basics.

24          THE COURT:  All right.  Go ahead,

25    please.

1          DR. ATWOOD:  Does this work all right,

2     Your Honor?

3          THE COURT:  Fine.

4          DR. ATWOOD:  Thank you very much for

5     this opportunity.  As Mr. Cristaldi said, what I

6     plan to do is rather quickly go through the basics

7     of chemistry, and then get into the matters which

8     are more relevant under consideration.  I'm not

9     presuming to teach all of chemistry in a one-hour

10    period however.

11         THE COURT:  Neither did my high school

12    chemistry teacher.

13         DR. ATWOOD:  High school chemistry, I

14    think we can build on that effectively.

15         THE COURT:  All right.

16         DR. ATWOOD:  I first put up a slide just

17    entitled Plastics.  And there's some basic

18    information about plastics.  Most relevant I think

19    is that we're no longer in the stone age, the

20    bronze age or the iron age.

21         But most chemists, physicists would now

22    refer to this as the plastics age.  Indeed, in

23    2000 30 million tons of raw plastics were

24    produced.

25         Now, of course, this is an important

1    commercial item.  One thing to note is that

2    plastics are made of polymers.  As we'll see in --

3    in this litigation, a polymer itself is not

4    sufficient to produce a product, which -- a

5    commercial product, which is generally plastic.

6             But rather, if we take the polymer and a

7    second component such as a plasticizing oil in

8    this case, one can then make products.

9             There's a limited number of polymers.

10   But when we add in the ability of different oils

11   and substances to plasticize or to modify the

12   properties of the polymers there's almost an

13   unlimited number of possibilities.

14            On the next slide I've noted uses which

15   we're commonly familiar with.  But in the second

16   sentence in order to understand polymers we have

17   to understand certain aspects of chemistry.  And

18   as you pointed out moments ago, Your Honor,

19   it's -- it's basic organic chemistry.

20            In the next slide I point out here

21   chemistry really is a study of material which

22   makes up the universe.  And what the chemist does

23   is a chemist modifies this material, and then the

24   chemist tests it by weighing it, feeling it,

25   touching it, looking at it in different ways.

1          There's -- I put down here 103 different

2    kinds of elements or different atoms.  I just

3    noticed in Science Magazine last week that element

4    117 had been discovered.

5          However, once one gets to these heavy

6    elements I believe -- even though I'm a chemist, I

7    believe they lose all practicality.

8          On the next slide we're looking at the

9    periodic chart of the elements.  And what we're

10   interested in are hydrogen, carbon and really

11   oxygen in terms of building up polymers and

12   plastics.  And carbon is the key element in this

13   arrangement of elements.

14         In the next slide we'll be talking about

15   compounds.  And we'll find that generally in terms

16   of the polymers we're dealing with here, there'll

17   be just a combination of carbon and hydrogen.  And

18   we'll be looking at starting with small molecules

19   and building these small molecules up into very,

20   very large chains.

21         So a small molecule we're dealing with

22   today might have a weight of 100, but the polymer

23   itself might have a weight of 300,000 in molecular

24   weight units.

25         So we're going to be talking about how

1   to take small molecules and build them up into

2   larger functional polymers.

3            On the next slide.  Chemical bonding may

4   become important.  Chemical bonding generally

5   involves the direct attachment of one element to

6   another.  In this case a carbon to another or a

7   carbon to a hydrogen.

8            Weak interactions are useful for some

9   properties of materials.  They're -- they're

10  useful in living systems.  But in terms of

11  polymers the -- the important concept is how one

12  puts the polymer chain or the polymer backbone

13  together, generally with covalent bonds.

14           On the next slide, organic chemistry.

15  It's just a study of carbon compounds.  But if we

16  look at the number of compounds that are available

17  to us today as a scientist, there's probably 10

18  million carbon containing compounds, and there's

19  probably 100,000 other compounds.

20           So when we say that organic chemistry is

21  the study of carbon compounds, it's the study of

22  most of the compounds we have available to us.

23           THE COURT:  Why don't you give me a

24  working definition of what a compound is.

25           DR. ATWOOD:  A compound is two or more

1   atoms, could be the same or could be different,

2   bonded together in a strong fashion.

3            If we could go to the previous slide.

4            Yes, I have a little note here.

5   Molecules are two or more atoms held together by

6   the force of chemical bonds -- strong chemical

7   bonds.

8            The next slide and the one after that.

9            Now, I'm talking a little bit about

10  families of carbon compounds.  And there are two

11  families that are going to be of importance today.

12           One is what's referred to as alkanes.

13  These are the simplest of all organic compounds.

14  And the simplest alkane is methane here, which is

15  the component of natural gas.

16           I was interested to see -- the

17  commercials on T.V. don't always get the chemistry

18  right, of course.  But a major oil company has a

19  commercial running right now where they state that

20  they've found a way to take carbon dioxide, a

21  greenhouse gas, out of natural gas.  And this is

22  in some fashion going to be a good thing for the

23  environment.

24           But yet natural gas is methane.  And

25  when methane is burned to produce energy, one

1    methane is converted to one carbon dioxide.

2            So it's not clear to me that taking a

3    few parts per million carbon dioxide out of

4    methane, which is going to become a hundred

5    percent carbon dioxide in its normal use -- it's

6    not clear that this is a good thing.

7            THE COURT:  So you're saying it's a bait

8    and switch?

9            DR. ATWOOD:  It's a bait and switch.

10           Now, I have a 17 -- 17 and 19-year old

11   sons.  And my 19-year old son is a chemistry major

12   as a freshman.  And when I was telling him this,

13   he pointed out that in Columbia, Missouri, with

14   about 60 or 70 Ph.D. chemists around, there's

15   probably only 20 people that actually appreciated

16   the subtlety that I was getting at with this

17   commercial.

18           So the commercial is probably very

19   effective.  It's just -- as you pointed out, it's

20   a bait and switch.

21           At any rate, with millions of organic

22   compound there's a systematic way to name these

23   compounds.

24           The next slide.

25           If we increase from one carbon, which

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    was methane or natural gas, to a four-carbon

2    chain -- so this is just four carbons, and then

3    there's 10 hydrogens, we get into a concept I'll

4    call isomers -- called isomers in which these four

5    carbons and 10 hydrogens can exist in two

6    different forms.

7            And although these two molecules have

8    the same number of carbons, the same number of

9    hydrogens, the same number of carbon carbon bonds,

10   the same number of carbon hydrogen bonds, these

11   two compounds are quite different.

12           So this is one of the -- one of the

13   difficulties in dealing with chemistry -- in

14   dealing with organic chemistry.  As we go to

15   longer chains of carbon, the number of ways in

16   which one can arrange these is really quite

17   staggering.

18           In fact, in the next slide I show here

19   down through the nomenclature for methane, natural

20   gas.  I just talked about butane, $C_4H_{10}$.  I've

21   highlighted decane, which is $C_{10}H_{22}$.  The simplest

22   way to string these carbon atoms together would be

23   a ten carbon chain like this.

24           But on the next slide --

25           THE COURT:  The significance of having

1    the -- I guess the suffix A and E would be that

2    that's a hydrogen atom?

3                DR. ATWOOD:  Uhm, that's related --

4    related to that, Your Honor.  The A and E means

5    that --

6                THE COURT:  Alkane?

7                DR. ATWOOD:  It's -- it's an alkane.

8    And alkanes have the formula CH two times the C

9    plus two.  So methane has one carbon and four

10   hydrogens.  That's one carbon times two gives two

11   plus two, gets four.

12               Decane, as we just saw, is $C_{10}$.  That's

13   2 times 10 or 20 plus 2 is 22.  So alkanes have

14   this sort of formula in which each carbon is

15   bonded to four other entities.

16               Now, if we go to -- in this case if we

17   go to pentane, there are three different forms of

18   pentane.  They all have the same number of

19   carbons, the same number of hydrogens.  But

20   they're quite different substances.  They have

21   different boiling points and properties such as

22   this.

23               Now, on the next slide if we go to

24   decane, $C_{10}H_{22}$, there's 75 different compounds which

25   have this formula.  All different compounds.  And

1   if we go to $C_{30}H_{62}$, there's 4 million compounds that

2   have this formula.

3           And what we're getting ready to do with

4   polymers is we're getting ready to string 10,000

5   or 100,000 carbon atoms together.

6           THE COURT:  I presume there's a formula

7   that explains the increase in isomers?

8           DR. ATWOOD:  There is.  There is, Your

9   Honor.  I have to admit I don't have it on the top

10   of my head.

11           THE COURT:  No.  But I would presume

12   that the physical sciences would -- the sciences

13   would have an explanation?

14           DR. ATWOOD:  Yes, yes, indeed, Your

15   Honor.  Given a few minutes we could calculate the

16   number for -- on a $C_{31}H_{64}$.  We could do that

17   calculation.

18           All right.

19           DR. ATWOOD:  It's just -- it gets more

20   difficult as one gets to the --

21           THE COURT:  -- the basic science.

22           DR. ATWOOD:  Yes.  I'm -- I'm much

23   better when we're up at pentane and hexane than

24   when we get down to the $C_{30}$ grouping.

25           But fortunately for us, polymers, where

1    we're going to string tens of hundreds of

2    thousands of carbon atoms together -- fortunately

3    for us there's some simplifying concepts which

4    will keep us from having this unfathomable number

5    of different combinations.

6              The next slide.

7              Now, one of -- one of the key points

8    here is that if a chemist used the term -- uses

9    the term "decane," it could be normal decane,

10   which is that straight chain that I had

11   illustrated on the previous slide, or it could be

12   one of 74 other configurations of $C_{10}H_{22}$.

13             And one of the parts that makes organic

14   chemistry difficult or unifying is that these

15   compounds all have to be named in a systematic

16   fashion so that the chemist can tell that the

17   chemistry refers to one particular form of decane,

18   not just decane in general.

19             The next slide --

20             THE COURT:  So is this the explanation

21   as to how one is to be named differently than the

22   other for identification purposes?

23             DR. ATWOOD:  Yes, yes.  There's a very

24   complicated -- there's an international union of

25   chemists called the International Union of Pure

SANDRA K. LEE, RPR   OFFICIAL UNITED STATES COURT REPORTER

1   and Applied Chemistry.  And this is a governing

2   body that deals with how one names compounds.

3          Initially, if we go back a hundred years

4   the compounds were named in a trivial fashion.

5   For example, if I discovered a new compound, I

6   might shamelessly call it Atwood's compound.

7          And people would know what I was

8   referring to because there'd be a paper published

9   on the properties of that compound.

10          But it became quickly obvious to

11   chemists as we moved through the 1920s into the

12   1930s that there weren't going to be a few hundred

13   or a few thousand of these organic compounds; but

14   there were going to be millions of them.

15          Now, the systematic nomenclature is

16   useful in telling -- in allowing one chemist to

17   communicate to another chemist something about a

18   complicated structure.

19          And we're going to see in this

20   litigation that there's also a nomenclature

21   related to polymers.  The point I would make in

22   the previous slide is that one has to be careful

23   with nomenclature because it's -- it's not as

24   simple as saying it's Atwood's compound.

25          It has to have something that can be

1    recognized and understood by chemists all around

2    the world.

3         Now, if we move to the second family of

4    compounds of relevance to us, these are the

5    so-called alkenes where we have the suffix ENE.

6         The next slide.

7         Like alkanes, but there's one so-called

8    double bond.  So a single bond in chemistry would

9    be just two carbon atoms bonding in a rather

10   strong fashion with each other.  But a double bond

11   is a much stronger interaction.  It's almost two

12   times as strong as a single bond, which means a

13   double bond is hard to break chemically.

14        Now, alkenes are relevant for today and

15   tomorrow's discussion because they're the building

16   blocks I say here of many polymers.  Alkenes are

17   the building blocks of most polymers.

18        The next slide.

19        The simplest alkene is called ethene or

20   commonly ethylene.  And it's just a carbon double

21   bonded to another carbon with two hydrogens off

22   each carbon.  Ethylene is a common feed stock for

23   much of chemistry, and it's a very common feed

24   stock for -- in polymer chemistry.

25        Indeed, polyethylene is probably one of

1    the most useful polymers that mankind has.

2            And polyethylene, depending on how the

3    polyethylene is produced, depending on how many of

4    these units can be strung together, 10,000,

5    100,000, a million, depending on how well these

6    units pack next to each other in the solid state,

7    we can have polyethylene, which is -- which is

8    very flimsy, such as garment bags that we use.

9            Or we can have polyethylene that's --

10   that's a good hard material such as -- well, such

11   as many of the milk or juice containers.

12           So the properties of the polymer can be

13   controlled by the internal structure of the

14   polymer, which we'll talk about in a little bit --

15   in a few minutes, Your Honor, and also by the

16   molecular weight, the overall number of carbon

17   atoms that are strung together to make the

18   polymer.  But the simplest alkene is also one of

19   the dominant building blocks for polymers.

20           The next slide.  I didn't spend long on

21   alkenes.  Straight into polymers.

22           The next slide.

23           There's two words.  One is polymer.  The

24   other is monomer.  The Greek roots are poly for

25   many, and mono for one, and meros for part.  So a

1    polymer is something which has many parts.  And

2    the monomer is one part.

3         The monomer is the basic building block

4    for the polymer.  Just like -- if I can go back to

5    the last slide, Michael.  I'm sorry.  Just like

6    ethylene is the basic building block for

7    polyethylene.

8         So we'll find in the discussion today

9    and tomorrow there are certain molecules which are

10   extremely useful monomers, and which can be strung

11   together to make very useful polymers.

12        If I could move ahead now.  One more.

13   Yes.

14        Now, the term "polymerization" is the

15   chemical process by which we make polymers from

16   monomers.  So the ethylene molecule has two

17   carbons that are strongly bonded together.

18        If we treat this in some fashion by

19   controlling the conditions of temperature,

20   pressure, solvent time, and something called the

21   catalyst, what we -- what we do is we break open

22   the double bond.  And with that broken double bond

23   we're able to affix other monomers together.

24        Now, I use the term "catalyst" here.  A

25   catalyst is something which is important to a

1    reaction, but it doesn't itself end up in the

2    product.  Catalyst is -- is a common term used.

3    Perhaps a catalyst would be an instigator.

4         And this -- this would carry through to

5    chemistry.  The catalyst will allow the reaction

6    to get started.  And then once the reaction is

7    started, it will carry forward to produce large

8    polymers.

9         But we have control over polymerization,

10   and thereby control over the product that we

11   obtain by virtue of controlling the temperature,

12   the pressure, the solvent, that which the

13   polymerization is carried out in, the time, and

14   the catalyst.  Gives us control over the final

15   polymer.

16        The next slide.

17        Now, I'll generally write a molecule

18   like ethylene drawn out in this form.  A chemist

19   would understand if I put $C_2H_4$.  A chemist would

20   understand that that's ethylene.

21        However, as we get to larger alkenes, we

22   run into the same problems we did with the

23   alkanes.  If we -- if we string out ten carbon

24   atoms and put a double bond at the end of one of

25   those, there are many different compounds that

1    would have that general number of carbons,

2    hydrogens in that one double bond.  But for

3    ethylene it's -- it's straightforward.

4           The next slide.

5           I pulled this illustration out a

6    freshman chem text that I use commonly.  It's got

7    ethylene molecules, which are written here as C

8    double bond -- looks like C equals -- $CH_2$ equals

9    $CH_2$.  But that's -- go back to the previous slide,

10   please.

11          Here's the $CH_2$ double bond, $CH_2$.

12          Moving forward.

13          So this double bond is like the person

14   who's bonded -- you know, the arms are bonded

15   together through the torso, and then they're

16   touching like this for the second bond.

17          And in the first step of the process

18   this double bond is broken.  So that leaves us

19   with just a $CH_2$ bonded to a $CH_2$.  In other words,

20   the arms are bonded through the torso.

21          And now, these individual monomers in

22   either cartoon form the man or the $CH_2$, $CH_2$, these

23   individual monomers can bond through the hands to

24   form an organization like this, which is $CH_2$, $CH_2$,

25   $CH_2$, $CH_2$, and so on.

1          And if we had polyethylene, we might

2   have of the order of 10,000 to a million of these

3   $CH_2$ units bonded together in a -- in a string.

4          The catalyst that I mentioned earlier,

5   Your Honor, one -- one thing that the catalyst

6   could do is the catalyst might open up this double

7   bond, moving the ethylene from this position to

8   this.  And then once that happens, the reaction

9   goes quickly.

10          Next slide.

11          THE COURT:  Professor Atwood, let me --

12   and this also applies to the Ohio Willow Wood's

13   expert.  Let -- let me give you some clue as to

14   how I -- I learned.

15          It's helpful to me to have -- if I'm

16   taking a great deal of data in, it -- it's helpful

17   to me to have some context for assimilating this

18   data.

19          And -- and so the data -- I know this

20   case involves polymers, and I know it involves

21   stratification, I guess, of -- of layers of

22   polymers.

23          But I'm having -- I foresee -- maybe I'm

24   wrong, but I foresee that I'm having -- I'm going

25   to have some difficulty in assimilating the

1     information you give me into perhaps what is

2     germane about this particular case.

3            And I know that may take into some --

4     some aspect of tomorrow's hearing.  But if there's

5     some limited discussion as to the -- the issues

6     involved in how the science fits into the issues,

7     I think I will be better served.

8            DR. ATWOOD:  I apologize, Your Honor.

9            THE COURT:  Well, no.  That's -- you --

10           DR. ATWOOD:  I understand exactly what

11    you're saying.

12           MR. CRISTALDI:  Your Honor, without

13    getting into argumentation, the -- the products at

14    issue in this case are composites.  And they're

15    composites essentially of polymers with a -- what

16    are -- what is referred to in the patent as a

17    substrate, like, for instance, fabric.

18           And so what I think Dr. Atwood has

19    gotten to yet is just trying to help distinguish

20    one polymer from another because the particular

21    polymer that's used in these particular patents to

22    form the substrate is unique.  And it's -- it's

23    part of the invention.

24           And so we can maybe speed up if you'd

25    like to kind of get to that.  But I think there

1    will be some connection to the issues as well.

2              THE COURT:  Okay.  Well, just as long as

3    you -- Professor Atwood, as long as you know that

4    that issue is out there for me.  My legal training

5    has far surpassed my high school chemistry

6    training.

7              And I -- I operate in the context of

8    determining what is relevant.  And to -- to figure

9    out what's relevant, I need to know what -- what

10   the issues are so I can make that -- that

11   preliminary determination.

12             MR. CRISTALDI:  If it's okay for me to

13   address Dr. Atwood, Your Honor.

14             Jerry, it might make sense to inform the

15   Court of where you're going up front, and then it

16   might make -- it might be clearer to the Court the

17   relevance of the rest of the presentation.

18             DR. ATWOOD:  Yes, yes.  Thank you,

19   Mr. Cristaldi.

20             Thank you, Your Honor.  This is one of

21   the reasons I'm happy that we're having a live

22   presentation because I would like to be able to be

23   as informative as possible.

24             What I would propose to do is, since you

25   have a copy of these slides, is I'll skip through

1    the next slides and get -- get straight, as you

2    pointed out, to the meat of the matter.

3              If we could go to the next slide.  The

4    next slide.  Okay.  We're now ready to --

5              THE COURT:  Okay.

6              DR. ATWOOD:  -- to get into the meat of

7    the matter.

8              It's a little bit hard for me to see

9    with the light shining on the screen, but there

10   are three monomers that are key to the polymers,

11   which are in turn key to the compositions that

12   we're dealing with in this litigation.

13             The first one is referred to as styrene.

14   The second one is isoprene.  And the third one is

15   butadiene.

16             So we're going to be talking about

17   polymers that will be referred to as styrene

18   isoprene/butadiene block copolymers, polymers that

19   are made of not of just a single monomer, but of

20   three different monomers.

21             The next slide.

22             THE COURT:  If you would go back to the

23   styrene, isoprene, and the butadiene.  And by

24   looking at the -- the diagram of say styrene, how

25   would I determine -- or how would one -- a chemist

1    look to see whether one's looking at a polymer or

2    a monomer?

3             DR. ATWOOD:  Yes.  That's a good

4    question.  It's a monomer because it's a single

5    molecule as in we can fit it onto a postage stamp

6    onto a screen like this.  Whereas if it were a

7    polymer, it would be at least thousands of these.

8             THE COURT:  So styrene, isoprene, and

9    butadiene are all monomers?

10            DR. ATWOOD:  They're all monomers.  And

11   they're monomers which individually can be put

12   together to make polymers.

13            THE COURT:  All right.

14            DR. ATWOOD:  Indeed, natural rubber,

15   Your Honor, is a polymer of isoprene which is --

16   which is naturally produced and was our initial

17   source of rubber -- rubber materials.

18            MR. CRISTALDI:  Not to interrupt, Your

19   Honor, but just to connect the particular polymer

20   at issue in this case is a styrene

21   isoprene/butadiene polymer.

22            THE COURT:  All right.

23            DR. ATWOOD:  Yes.

24            Now, if we go onto the next slide, we'll

25   also be dealing with terms that relate to

1   polyethylene, polypropylene, and polybutylene.  So

2   in the course of making our polymer that we're

3   using in this litigation, we'll start with

4   styrene, isoprene, and butadiene.

5          And then we're going to do something to

6   that resulting polymer, which is called

7   hydrogenation, which I'll talk about in just a

8   minute.  And that will lead us to segments of

9   ethylene, polyethylene in our final product,

10  butylenes in our final product, and propylene in

11  our final product.

12         Next slide.

13         Hydrogenation.  One of the properties of

14  an alkene is it can react with hydrogen to form an

15  alkane.  Now, what we're going to do is we're

16  going to put together polymers which have alkene

17  functionality, and then we'll hydrogenate those

18  polymers and we'll make a polymer that is then

19  essentially an alkane -- an enormous alkane.

20         THE COURT:  What's -- what's -- I

21  suspect that what's involved in this particular

22  case as well, not -- since I have the luxury of

23  being the judge in this case and I can ask

24  questions and not worry about what the

25  ramifications are, if this slides into the Daubert

1    issue -- I mean, excuse me.  Not the Daubert.  The

2    Markman hearing.  I've got a Daubert case that I

3    handled the other day, so pardon me.

4         If -- if this handles into the Markman

5    issues, we can cover it tomorrow as well.  But I

6    suspect that creating these materials involves

7    certain processes.  You've now mentioned adding

8    hydrogen to an alkene to form an alkane; right?

9         DR. ATWOOD:  Yes.

10        THE COURT:  In which I presume is to

11   eventually form a polymer?

12        DR. ATWOOD:  Yes.

13        THE COURT:  Are there different methods

14   in the science -- in the art for adding hydrogen,

15   or is there simply one acceptable or only one

16   physical method of doing so?

17        DR. ATWOOD:  There's many different ways

18   to accomplish this, Your Honor.  What one will

19   typically do is one will typically use hydrogen

20   plus a catalyst, something which will help --

21        THE COURT:  So this -- this catalyst

22   could be heat or it could be some other

23   ingredient?

24        DR. ATWOOD:  Could be, yes, exactly,

25   exactly.  One -- one way of doing this reaction in

1    the chemistry lab -- it's not the way it's done in

2    industry, but in the chemistry lab we take an

3    alkene and put a high pressure hydrogen on it

4    inside a steel container, and then heat the steal

5    container as you suggest, Your Honor.

6              That heating activates or loosens the

7    double bonding, allows the hydrogen to come in and

8    affect its hydrogenation.

9              But there -- there are many ways to

10   accomplish this.  And we've heard I believe some

11   testimony from the -- one of the scientists at

12   Kuraray polymers on how the -- the hydrogenation

13   is actually accomplished for the molecules -- the

14   polymers involved in this litigation.

15             Next slide.

16             MR. CRISTALDI:  Your Honor, if I may

17   approach?  I just wanted to hand you something

18   that's in the record already.

19             This is a joint report that was filed.

20   And there was a chart the parties worked out that

21   had the claims that are at issue.  You've got it

22   in front of you.  Okay, Your Honor.

23             And just so Your Honor knows, you've

24   asked us at the status conference before today to

25   confer and see if we can narrow down the issues.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    And we have reached agreement on the first issue.

2    So the issues -- the claims before you will be the

3    latter three, the hydrogenated styrene

4    isoprene/butadiene block copolymer.

5            The -- the second would be plasticizing

6    oil.  And the third being an average molecular

7    weight of less than about 200 and greater.  The

8    first forming a composite by heat.  The parties

9    have conferred and stipulated to it.

10           THE COURT:  And what's the stipulation

11   as to formed into a composite heat by -- conformed

12   into a -- conformed into a composite by heat,

13   which is the subject of Claims 1, 2, 3, 4, 6, 11,

14   12 of the 109 patent?

15           MR. CHRISTALDI:  The -- the stipulated

16   definition, ALPS stipulated to Ohio Willow Wood's

17   definition, which is heat is used in the

18   manufacture of the composite.

19           THE COURT:  Okay.

20           DR. ATWOOD:  All right.  And -- as we

21   move forward with this, we're getting to the meat

22   rather quickly at this point, Your Honor.  I just

23   want to briefly introduce copolymers and block

24   copolymers.

25           The next slide.

1          So a polymer of ethylene would be

2     polyethylene.  A polymer of propylene be

3     polypropylene.  Be we can also make as chemists

4     what's referred to as a copolymer.  And that's a

5     polymer with more than one type of monomer.  So we

6     can make ethylene and propylene copolymers which

7     have then different properties from just

8     polyethylene and polypropylene.

9          The concept of a block copolymer is that

10    it wouldn't be just random two different or three

11    different kinds of monomers, but rather there

12    would be a long sequence of one monomer, could be

13    ethylene, joined to a second long sequence of a

14    monomer.  Could be propylene.

15         So we could have polyethylene and

16    polypropylene, or we could have a random mixture

17    of the two polymerized together.

18         But with a block copolymer we have a

19    long segment of polyethylene joined to a long

20    segment of polypropylene.

21         Now, in the next slide or two the

22    relevance of this becomes more apparent.  So we're

23    going to indeed find copolymers -- block

24    copolymers in the 109 and the 253 patents composed

25    of thousands of monomers.

1          Next slide.

2          And we're going to be dealing with

3    what's referred to in the chemistry as a tri-block

4    copolymer.  In other words, it's going to be a

5    block of some polymer A, a block of some polymer

6    B, and then a block of the initial polymer, A

7    again.

8          So that would be one polymer joined to a

9    second polymer, with more of the first polymer in

10   the final block.

11         One could look at this -- one could look

12   at this like blocks with the letter A and B on it.

13   To make a tri-block we could join one block with A

14   to B, and then another block of A to B block.

15         THE COURT:  Say that again, please.

16         DR. ATWOOD:  If -- if we envisioned a

17   block that just had the letter A on it and a block

18   that had the letter B on it, now, this is actually

19   going to be a polymer of A and a polymer of some

20   compound B.

21         We join those together, we would have a

22   di-block.  But if we join yet another A to B so

23   we've ABA, we would have what's referred to as a

24   tri-block copolymer.

25         And of particular relevance in -- in

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    science generally and particularly in this

2    litigation is we'll make the A block a sort of a

3    rigid block.  It'll be a polymer that's sort of

4    rigid and hard.

5              And then we'll make the B block a sort

6    of a soft, rubbery material.

7              So we'll have three blocks of polymers

8    joined together which have two hard blocks on the

9    exterior, and then a rubbery block in the middle.

10             This would look a little bit like --

11   like joining two -- two wooden blocks with a

12   spring.  So you'd have block, spring, block, but

13   the material could bend and flex due to the

14   flexibility in the central region.

15             So that's what we're headed for in the

16   polymers in the 109 and 253 patents.

17             MR. CHRISTALDI:  Dr. Atwood, not to

18   interrupt, but it may -- it may make sense to also

19   take one step back and advise the Court of the

20   distinction between the polymerization process and

21   the hydrogenation process.

22             DR. ATWOOD:  I think I'm getting ready

23   to do that perhaps the next slide.

24             MR. CRISTALDI:  I won't interrupt.

25             DR. ATWOOD:  No.  Thank you,

1    Mr. Cristaldi.  I have in mind doing that, but we

2    haven't quite gotten there yet.

3            This -- this is a photo.  I have no idea

4    how it was accomplished.

5            THE COURT:  So you're telling me these

6    poor fools in mid air are polymer blocks?

7            DR. ATWOOD:  Believe me, it's much

8    easier to assemble a tri-block copolymer than it

9    is to affect something like this.  But, you know,

10   if -- if you looked at the people wearing red

11   suits and the people wearing yellow suits and the

12   people wearing white suits, they're all joined

13   together.

14           And this -- this is sort of the way a

15   tri-block copolymer would be.  There'd be a block

16   of one kind, a block of another kind, and a block

17   of a third kind joined together.  And, of course,

18   as I say, it's easier to join hundreds of

19   thousands of one chemical unit to my mind than it

20   is to join these skydivers together.

21           Next slide.

22           Now, the key term that -- that we're

23   going to be talking about tomorrow is hydrogenated

24   styrene isoprene/butadiene block copolymer.  And

25   this is going to be --

1          THE COURT:  Let me stop you there.  I'm

2    looking at the joint claims chart, and Page 4 of

3    Exhibit 2 of Document 81.  And I note the -- the

4    difference in ALPS's proposed construction, OWW's

5    proposed construction.

6          And -- and -- and setting up the science

7    of -- of -- of the explanation that you're going

8    to give me, Dr. Atwood, I think it perhaps

9    somewhat helpful to me if I have some sense of why

10   there is a claim difference in the two versions

11   since to a lay person like me I might not observe

12   any difference.

13         So if I can understand the difference

14   and its relevancy, at least in the parties'

15   viewpoint, as to the issues in the case, and also

16   in very brief fashion, because I know we're

17   extending beyond the time that we've allotted.

18   But that's all right.

19         I'm going to have to look at -- at this

20   to determine whether there's been any -- and I

21   don't know if there's an allegation as to this

22   specific one because I haven't studied it in such

23   detail because I'm not sure I would know what I

24   was reading at the point if I looked at the

25   prosecution history -- but whether there's any --

1   anything was given up during the course of the

2   prosecution history or what the argument is for

3   the proposal by each side.

4         What -- what legal or factual support

5   there is for --  for say ALPS's proposed

6   construction or OWW's proposed construction.  Do

7   you understand?

8         MR. CRISTALDI:  Your Honor?

9         THE COURT:  Yes, sir.

10        MR. CRISTALDI:  We're prepared to do

11  that tomorrow.  We can begin to get into that

12  today if you'd like.

13        But that -- referring back to the

14  specification and the file history and the

15  intrinsic evidence in the record and how one of

16  ordinary skill in the art would construe those

17  things is something that we intend to have

18  Dr. Atwood testify tomorrow and -- and

19  Dr. Loggi (phonetic spelling) --

20        THE COURT:  Well, just give me a slight

21  flavor of it.  That way I can stew on it.

22        MR. CHRISTALDI:  Sure.  So you have

23  three claims, Your Honor.  May I approach the

24  podium?

25        THE COURT:  Certainly.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. CHRISTALDI:  We have three claims

2     that at issue, Your Honor.  The first

3     hydrogenated -- put this up on the screen here --

4     hydrogenated styrene isoprene/butadiene block

5     copolymer.

6          Without fully arguing it today, we

7     believe that the proposed definition of Ohio

8     Willow Wood is just simply a -- a rearranging of

9     those same words.

10         As Dr. Atwood has begun to explain

11    today, those words, hydrogenated styrene

12    isoprene/butadiene block copolymer, could mean

13    different things to a chemist.  And we believe

14    that a chemist would look to the specification and

15    the totality of the patent as a whole to

16    understand more precisely how to reduce that to

17    practice.

18         We believe that the specification

19    supports, as we will put on with evidence tomorrow

20    and as we've briefed in our brief, that the

21    specification supports a specific type of

22    hydrogenated styrene isoprene/butadiene block

23    copolymer that is the polymer used in this

24    particular invention.

25         And I --

1          THE COURT:  Okay.  Let me -- let me stop

2     you.

3          MR. CHRISTALDI:  For the court reporter

4     I might go fast.  I'm sorry for that.

5          THE COURT:  Let me stop you, too.  One

6     of the -- one of the concerns that I think I

7     expressed at our previous hearings, and frankly, I

8     haven't found too much case law on this issue,

9     although the claims instruction is vested to some

10    degree at the Court's discretion, is whether the

11    claims themselves, which are disputed now, in fact

12    need any further explanation than what is already

13    in the patent.  And has that been given some

14    consideration?

15         MR. CRISTALDI:  Absolutely, Your Honor.

16    We did -- you pointed out the Vivid Technologies

17    case to us at the status conference, which we have

18    reviewed.

19         And in this particular instance to be

20    candid ALPS's position -- I'm not sure if Ohio

21    Willow Wood would concede this -- but we believe

22    that there are two components to the case.

23         Essentially, there's an invalidity

24    component, meaning that Ohio Willow Wood has

25    accused the patent of being invalid.

1          And an infringement component.  We have

2     accused their products of infringing these

3     patents -- these two patents.

4          We believe that the infringement could

5     be established on even Ohio Willow Wood's

6     definitions.  We believe that regardless of

7     whether the Court were to -- and the Court is

8     certainly free to choose its own definition.

9          But if it were to choose ALPS's

10    definition over Ohio Willow Wood's definition on

11    the first two of the phrases at issue, the

12    hydrogenated styrene isoprene/butadiene block

13    copolymer, and the plasticizing oil, an

14    infringement would be established under each of

15    those.

16          There may be other arguments that Ohio

17    Willow Wood will assert, but we believe that their

18    products fall even within their own definitions.

19    And so we believe that the crux of the importance

20    in this particular matter is the prior art and the

21    invalidity analysis.

22          And -- and as we are prepared to talk

23    about in more detail tomorrow, case law supports

24    that the Court is to give construction to the

25    claims in a way that presumes that the claims were

1    valid, and that the patent office reviewed the

2    claims and the terminology, and gave a -- an

3    interpretation to those claims that assumes that

4    they're valid in light of the prior art.

5           THE COURT:  I guess I'm even asking a

6    more basic question.  Maybe it's -- it's the trial

7    lawyer in me, but I know that trial lawyers and --

8    and you all now, although doing patent work, are

9    trying a case and trying to convince somebody that

10   your viewpoint is correct, you take a viewpoint

11   for a reason.

12          And the reason here is that you either

13   are arguing for infringement or arguing for

14   invalidity.

15          I also understand the fact that -- that

16   lawyers at times pound a square peg into a round

17   hole, and at times are successful in doing so.  It

18   may be that both of you are pounding a square peg

19   into a round hole or that just one of you is

20   pounding one.  And it -- it's for the jury to

21   decide.

22          But one of the things that I -- I -- I

23   don't have a sense of, and I'm sure that the

24   district judge doesn't have a sense of at this

25   point, is why it is that you are asking for this

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    definition, and why is it relevant to the Court

2    that the Court engage in claims construction so as

3    to make a determination that is relevant to the

4    case, and one that the jury must consider, and --

5    and one that is perhaps plainer and simply and

6    more accurate in the terms of the art than what is

7    already there.

8              MR. CRISTALDI:  That's a good question,

9    Your Honor.  And if I could --

10             THE COURT:  Just a second,

11   Mr. Cristaldi.

12             I want to ask you, give -- give -- give

13   me your name again, please.

14             MR. SPEED:  I'm Mike Speed, Your Honor.

15             THE COURT:  Okay.  Mr. Speed, go ahead.

16             MR. SPEED:  It would be Ohio Willow

17   Wood's position that with respect to the

18   hydrogenated S-I-B-S or the hydrogenated styrene

19   isoprene/butadiene block copolymer you don't need

20   to add any words.

21             And the issue here, Judge, is simply do

22   you claim a car or do you claim an Oldsmobile?  If

23   the claim language says car, why construe it to be

24   an Oldsmobile, a specific car, or -- or a coupe or

25   whatever.

1        And that's kind of what's going on here,

2  Your Honor.

3        In order to make arguments in the future

4  about validity or invalidity, the narrower the

5  claim is, ALPS has more ability to make those.

6        So Ohio Willow Wood's view is a

7  hydrogenated S-I-B-S is taking a styrene

8  isoprene/butadiene block copolymer and putting it

9  through the hydrogenation process.  Very simple.

10  One skilled in the art would know what that meant.

11        MR. CRISTALDI:  And, Your Honor, the --

12  the case law is clear that you have to read a

13  patent as a whole.  And these are complex patents.

14        But to answer your question directly, in

15  reexaminations that have been filed by Ohio Willow

16  Wood against the 109 patent and -- and their

17  invalidity contentions that they've shared with

18  us, they have asserted very specific existing

19  patents as -- as being prior art and invalidating

20  those patents.  And we'll be prepared to talk

21  about those and walk through them tomorrow.

22        But the --

23        THE COURT:  So I take it -- I take it

24  that the claim elements, hydrogenated styrene

25  isoprene/butadiene block copolymer, which are in

1   Claims 1, 2, 3, 4, 5, 6, and 12 of the 109 patent,

2   leaving aside the -- the Markman claim

3   construction issue, the -- the issue on the merits

4   will be whether this is obvious and therefore

5   invalid, or this is sufficiently unique and an

6   advancement in the art so as to be valid, and

7   whether the accused device -- or the accused

8   product infringes on these particular claims?

9       MR. CRISTALDI:  I think that's a fair

10  characterization, Your Honor.  And the concern

11  that ALPS would have would be, as you can see on

12  the tutorial itself, is complicated.

13      If we were to be arguing before the jury

14  as to what specific chemical compound is claimed

15  as the invention, it could get -- could get

16  confusing to a lawyer or a judge and -- and a jury

17  as well.

18      THE COURT:  Well, let me -- just to

19  go -- I know this is far afield from the tutorial.

20  And the patent office is reexamining this precise

21  issue as -- as we speak?

22      MR. SPEED:  Yes, Your Honor.

23      MR. CRISTALDI:  And Ohio Willow Wood has

24  moved the Court to stay this case.  And

25  Judge Covington heard that, heard oral argument,

1    and denied that motion.

2              MR. SPEED:  And if I may, Your Honor,

3    all of the claims in the 109 patent have been

4    rejected initially by the patent office.  And all

5    of the claims in response to that rejection have

6    been amended by the patent owner.  So these claims

7    actually no longer exist.

8              THE COURT:  Say that again.

9              MR. CRISTALDI:  I wouldn't agree with

10   that characterization, Your Honor.  The patent --

11             THE COURT:  Well, just a second.

12             Mr. Speed, if -- if you would say that

13   again, please.

14             MR. SPEED:  Yes, Your Honor.  During the

15   reexamination the patent office has rejected every

16   single claim based upon invalidity in the 109

17   patent.  And -- and that's an initial office

18   action.

19             So the patent owner has the ability to

20   respond.  In response to that office action, the

21   patentee, Mr. Chen, amended every claim.  So as it

22   stands --

23             THE COURT:  Unless I'm mistaken, I heard

24   you to say that the patent examiner rejected

25   invalidity?

1        MR. SPEED:  It rejected every claim in

2    the 109 based upon invalidity.

3              THE COURT:  Okay.

4              MR. SPEED:  And as a -- in response to

5    that, the patentee --

6              THE COURT:  In other words, the patent

7    examiner concluded that the patent was invalid?

8              MR. SPEED:  Initially, Your Honor.  It's

9    an initial --

10             THE COURT:  I know.

11             MR. SPEED:  What we call the first

12   office action.

13             THE COURT:  Right.

14             MR. SPEED:  But in response to that

15   first office action, Mr. Chen amended every claim.

16   So the claims that we arguing over exist in the

17   netherworld as far as I can tell under the law.

18             MR. CRISTALDI:  Obviously, Your Honor,

19   we disagree with the characterization.  The patent

20   office has issued an initial office action.

21   Judge Covington is aware of that.

22             Mr. Chen, the inventor, who is not our

23   client -- our client is the license -- has

24   submitted a response.  It's lengthy.  And as you

25   can imagine, a complex response.

1          There are clarifications to the claims

2    in the patent that were made.  We don't believe

3    that they affect these particular issues before

4    the Court.

5          On the Markman hearing we believe that

6    those claims are still in the patents, and are

7    still going to be relevant at trial.

8          THE COURT:  Let me go -- I'm hesitant to

9    do this, but it helps me decide case management

10   issues.  Let's assume for a moment this case

11   proceeds, the Court defines these claims, these

12   disputed terms, picks one or the other, okay?

13   And the administrative process goes on as well.

14          And let's assume for a moment that a

15   jury were to decide that there's infringement.

16          Obviously, depending on the depth of the

17   financial pockets in this case, this matter goes

18   to the Federal Circuit.  In the meantime the

19   patent office finds the 109 patent invalid.  Then

20   where are we?

21          MR. CRISTALDI:  Your Honor, in the words

22   that Mr. Speed used in another case of ours, the

23   patent is presumed valid until the patent office

24   process is concluded.

25          So the patent that we have here today is

1    presumed valid.  And the -- the claims on their

2    face continue to be valid and able to be

3    prosecuted.

4          A reexamination proceeding can be filed

5    by any person at any time as long as there's

6    legitimacy for the request.  So in any patent case

7    the argument could be made that someone

8    would reexamination the patent down the road.  And

9    the jury's verdict potentially could become a moot

10   issue if the patent is later determined to be

11   invalid.

12         THE COURT:  So why do we want to spend

13   all this money at this point litigating the case?

14   It seems to me that --

15         MR. CHRISTALDI:  That's a good question.

16         THE COURT:  -- if the Court -- let's

17   assume a jury verdict were to be come back.  And

18   I'll just throw out a figure.  Let's say it's, you

19   know, a million dollars.

20         I -- I would presume that -- that both

21   sides might be -- one side is going to have to put

22   up a bond for the appeal.  And it may be a

23   situation where equities would think -- I'm not

24   sure equity has any -- any application here.  But

25   there'd be two bonds.

1          MR. CRISTALDI:  One thing that Ohio

2    Willow Wood hasn't advised you, and part of the --

3    and advising you now of the reexamine is there are

4    two patents at issue with this case.  Only one is

5    the subject of reexamination.

6          Your question as to why ALPS would like

7    to proceed, ALPS believes that those patents will

8    come out of reexamination virtually unchanged.

9    And we have a second patent that's at issue that's

10   not subject to reexamination right now.

11         THE COURT:  So the 253 is not subjected

12   to -- subject to reexamination?

13         MR. CHRISTALDI:  There was a examination

14   request filed, but it was -- the request was

15   rejected by the patent office.  And, to my

16   knowledge, has not been refiled.

17         THE COURT:  Okay.  Well --

18         MR. SPEED:  Your Honor, may I address

19   your question of what happens?

20         THE COURT:  Well, I'm kind of conducting

21   a settlement conference in the middle of

22   Dr. Atwood's tutorial.  So that's probably not

23   fair to him.  But --

24         MR. SPEED:  Your Honor, what happens,

25   can I -- can I just address that issue?

1            THE COURT:  Sure.

2            MR. SPEED:  If there's no change in the

3    patent office with respect to the 109 patent and

4    there's a finding of infringement here, the

5    judgment pretty much becomes -- a 60B motion will

6    be filed.  It will not be enforceable.  That issue

7    will go up to the Fed Circuit.

8            But basically --

9            THE COURT:  Well, no matter what

10   happens, somebody's going to go to the Fed Circuit

11   here.

12           MR. SPEED:  So basically what will

13   happen is there's no patent --

14           THE COURT:  Given that the reversal rate

15   is over 50 percent on claims construction, I'm not

16   particularly confident.

17           MR. SPEED:  Your Honor, I understand.

18   But what will happen is because the patent has

19   changed, there will be a -- what we will litigate

20   is how substantive the change was.

21           The claims have changed.  The words have

22   changed.  They are not exactly the same.

23           There will be litigation in the future

24   as to whether those changes were substantive or

25   whether they were not.  And only then after that

1   determination can it be asserted that they're not

2   moot claims that need to go forward or they get

3   some to go back.  So we won't know.

4           THE COURT:  Well, why don't we continue

5   then and see where we are.  Because it's a quarter

6   of 11:00.  And I've got to give the other side an

7   opportunity as well, obviously.

8           MR. CHRISTALDI:  Thank you, Your Honor.

9           THE COURT:  Thanks for your patience,

10  Dr. Atwood.

11          DR. ATWOOD:  Thank you, Your Honor.

12  Listening to as I have the discussion, it makes

13  this chemistry seem a lot more straightforward.

14          THE COURT:  Well, it is.

15          DR. ATWOOD:  If I could go to the

16  next --

17          THE COURT:  Our world is -- the polymer

18  in our world is gray.

19          DR. ATWOOD:  I have often noted, Your

20  Honor, that while the law may be changing and

21  evolving, the laws of thermodynamics, for example,

22  are the same as I learned them and teach them

23  today.

24          THE COURT:  Lucky you.

25          DR. ATWOOD:  I take solace in that.

1                    So what I point out here is just that

2       styrene, isoprene, butadiene are used to make the

3       copolymer in the 109 and the 253 patents.

4                    The next slide.

5                    Now, what we're producing here, Your

6       Honor, is a tri-block copolymer.  The first block

7       is polystyrene, which I've shown schematically

8       here.  The styrene molecule is -- excuse me.  This

9       shouldn't be a double bond here.

10                    The styrene molecule is just -- it has

11      double bonds within this context here.  And

12      hydrogenation does nothing to this block.

13                    Now, on the other hand, the block which

14      is due to isoprene looks like this.  Here's an

15      isoprene molecule that now instead of having a

16      double bond here and here, there's just one in the

17      middle.  So we've lost one of the double bonds.

18                    And that's the connectivity that allows

19      the polymer to form.  This is a block of isoprene.

20                    When we do hydrogenation on that block,

21      what happens is we add hydrogen here and here and

22      get rid of the double bond.  So it produces

23      something that looks like this.  It produces what

24      appears to be an ethylene unit and a propylene

25      unit.

1          We'll see terminology in the patent,

2    Your Honor, which uses -- I don't know if you can

3    see here, but it uses EP.  EP would mean that when

4    we hydrogenated the polyisoprene butadiene, we

5    produced essentially an ethylene molecule -- an

6    ethylene molecule or a polyethylene molecule and a

7    polypropylene molecule.

8          So the hydrogenation -- first the

9    polymerization occurs, and then the hydrogenation

10   occurs.  And the hydrogenation modifies the

11   properties by adding hydrogen as we see in this

12   reaction.

13         Now, the next slide shows what happens

14   with the butadiene portion.  There's two

15   possibilities here.  We have polybutadiene on the

16   top and another form of polybutadiene on the

17   bottom.

18         In the polybutadiene on the top we

19   produce what is called a 1,4 addition.  So we get

20   effectively just polyethylene.  You see here

21   there's an E and an E.  Now, I apologize.  This

22   should not be a double bond at the top here.  The

23   double bond down here is correct.

24         The hydrogenation of this particular,

25   called a 1,2, produces what's effectively a butyl

1    group.  So I've summarized this as a B here.

2           And what we'll find as we're going

3    forward in dealing with these block copolymers is

4    there'll be terminology E, meaning that we

5    produced ethylene units.  So in the top of the

6    reaction the polybutadiene upon hydrogenation

7    becomes a polyethylene unit essentially or a

8    polyethylene polymer.

9           The next slide.

10          Now, at this point I produced -- I

11   reproduced five figures from the 253 patent.  And

12   the purpose of these five figures is -- is to

13   answer some of the questions that you've had

14   earlier, Your Honor.

15          Here is a polyisoprene -- or

16   polyisoprene unit.  Here is crystalline

17   polyethylene unit.  Here's another polyethylene

18   unit.  And then here are ethylene propylene units.

19          So what we're looking at here is a

20   polymer which is referred to as S-E-E-P-S,

21   polystyrene, polyethylene, polyethylene propylene,

22   polystyrene as a block copolymer.

23          This is a polymer which is a

24   hydrogenated styrene isoprene/butadiene block

25   copolymer.  The butadiene upon hydrogenation in

1    this form of a polymer produces an ethylene unit

2    here.  The hydrogenation of the isoprene polymer

3    produces an ethylene propylene unit.

4              And then we have an unhydrogenated

5    styrene on the front and the styrene on the back

6    of the S-E-E-P-S polymer.

7              So this simplified nomenclature, which

8    means polystyrene polyethylene polyethylene

9    polypropylene polystyrene, this simplified

10   nomenclature means that there is a polymer with

11   certain properties.

12             This polymer may have a molecular weight

13   of 100,000, 200,000, a million, but the interior

14   of the polymer looks as we see in this depiction

15   here.

16             Now, contrasting that -- so this --

17   this is one form of hydrogenated styrene

18   isoprene/butadiene block copolymer.

19             Contrasting that to Figure 6, the 253

20   patent in which we have again this general name,

21   but this is quite a different polymer.  This has

22   the styrene, ethylene butylene, ethylene propylene

23   styrene units.

24             It doesn't have the crystallinity, which

25   will become an important discussion matter

1    tomorrow, I think.  But it also has butylene units

2    similar -- depicted as these dark circles.

3         The point is the internal structure of

4    this polymer in Figure 5, the S-E-B-E-P-S, is

5    quite different from the S-E-E-P-S of the previous

6    depiction.

7         Although their molecular weights could

8    be the same, they might both have a molecular

9    weight of 300,000, a million, the internal

10   structure of the polymer is different.  The

11   properties of the polymer -- of these two polymers

12   are different.

13        But there is a confusion in my

14   estimation because if one ascribes both of these

15   the same title, that would be like saying decane

16   when there's more than one form of decane.

17        Now, just quickly through the next

18   slide --

19        THE COURT:  Well, let me ask you,

20   Mr. Cristaldi and Dr. Atwood, the one skilled in

21   the art, the patentee, inventor, and also the

22   lexicographer of the -- of the patent has

23   hydrogenated styrene isoprene/butadiene block

24   copolymer.

25        Not that the patentee's intent is an

1    issue in this case because it's an objective test.

2    How am I to read -- and I know this goes to

3    tomorrow's hearing --

4              MR. CRISTALDI:  Sure.

5              THE COURT:  -- but Dr. Atwood as -- as I

6    understand his -- his comments to me so far is

7    that the structure envisioned by the claim is a

8    fairly precise structure, I think more along the

9    lines of Figure 6 and Figure 7, but I may be

10   mistaken.

11             And I see that OWW's proposed revision

12   is a more -- I'm not sure I can use this term in

13   this, but amorphous type structure.

14             MR. CRISTALDI:  Sure.

15             THE COURT:  How are you intending to

16   show that -- that the claim language is a

17   precise -- more precise than what hydrogenated

18   styrene isoprene/butadiene block copolymer

19   language is?

20             MR. CRISTALDI:  That's an excellent

21   question, Your Honor.  We believe that

22   Dr. Atwood's testimony and Dr. Loggi's testimony

23   as one of ordinary skill in the art will be that

24   when a chemist sees the words hydrogenated styrene

25   isoprene/butadiene block copolymer they understand

1     that could be mean one of a number of different

2     things.  And so they would read the patent as a

3     whole.

4             These particular figures are figures

5     from the 253 patent that Mr. Chen explains in the

6     specification.  And we will be able to point

7     tomorrow to very -- and we have in our briefing

8     very specific places in the specifications where

9     Mr. Chen has described his invention.  And for

10    purposes of claiming language, he's used those

11    words.

12            But as your -- and I always pronounce

13    the word lexicographer incorrectly, so if I'm

14    doing that incorrectly, forgive me.  But the

15    patent owner can define those words -- or the --

16    not the patent owner.  I'm sorry.  But the

17    inventor can define those terms.

18            And we believe that it's fairly clear

19    when this patent is read in context that what the

20    inventor meant is clearly spelled out in the

21    specifications and the diagrams and the intrinsic

22    evidence.

23            THE COURT:  And I take it OWW's position

24    is that that is not the case, and that one skilled

25    in the art would see it as a rather broad group of

1    items that --

2            MR. SPEED:  Well, Your Honor, it's -- to

3    be honest -- sorry to interrupt -- it's actually

4    much simply than that.  We believe he was his own

5    lexicographer.

6            And if you would look at the 109 patent,

7    specifically Claims 3 and 5 and 6, Mr. Chen does

8    exactly what he wants to do.

9            He defines in Claim 1 a hydrogenated

10   S-I-B-S.  In Claim 3 he describes more -- a more

11   detailed type of hydrogenated S-I-B-S.

12           And that is one with hydrogenated

13   styrene block copolymer with two methyl-1,3

14   butadiene and 1,3 butadiene add.  So in that sense

15   he's more narrowing.

16           And then in Claim 5, which is a

17   dependent claim, he talks about a specific --

18           THE COURT:  Well, isn't the -- the claim

19   construction -- aren't the claim construction

20   rules such that I'm to take the claims as a whole?

21           MR. SPEED:  Take the claims as a whole

22   and make sure they're valid, Your Honor, to the

23   extent that you can.

24           MR. CRISTALDI:  Yes, Your Honor.  The --

25   the case law, particularly the Phillips case, is

1   that Your Honor is to look at the patent as a

2   whole in construing the claims as one of ordinary

3   skill in the art would read the patent as a whole.

4          And we -- we believe that clearly the

5   specification diagrams as a whole, the intrinsic

6   evidence supports our claims construction.

7          And -- and again, Your Honor, to get to

8   your question of why is this relevant, it's

9   relevant because there are other polymer claims

10  in -- in other patents that Ohio Willow Wood is

11  seeking to assert to invalidate this patent that

12  we believe are unrelated to the invention that

13  Mr. Chen has claimed in these patents.

14         And we believe that one of ordinary

15  skill in the art when reading these patents would

16  understand that he wasn't trying to claim a

17  universe of polymers, but rather a specific

18  polymer composition as a composite.  And that's

19  supported by the specification in the file

20  history.

21         THE COURT:  All right.  Why don't you

22  continue, Dr. Atwood, please.

23         DR. ATWOOD:  If I can quickly go through

24  the next slide.

25         THE COURT:  Do you have much -- how much

1    more do you have, do you think, in your

2    presentation?

3                DR. ATWOOD:  I would say ten minutes

4    maximum.

5                THE COURT:  Okay.  We'll take a short

6    break after that.

7                DR. ATWOOD:  I'll -- I'll quickly go to

8    the next slide.  This -- this is Figure 8 from the

9    353.  And, again, what one finds in studying this

10   is that even though the molecular weight might be

11   the same in this polymer as the one in the

12   previous two, the internal structure is quite

13   different.

14           So the hydrogenated styrene

15   isoprene/butadiene block copolymer is not, in my

16   estimation, a specific -- a specific term because

17   it embraces the first two polymers of this one,

18   and then on the next slide it embraces yet the

19   fourth type of polymer in terms of internal

20   structure.

21               Next slide.

22           I put here information from manufacturer

23   of the polymer itself.  This is the general

24   formula, of which this is styrene and this is the

25   P-E.  This is the propane ethane portion.

1    THE COURT:  Let me -- let me interrupt

2    you because you -- I'm truly unsophisticated in

3    this area as to how one goes about manufacturing

4    this.

5    And I'm not talking about the --

6    actually the chemical process.  I'm actually

7    talking about acquiring the ingredients to -- to

8    manufacture this.

9    I take it from your comment -- at least

10   what the inference from your comment is is that

11   you -- you buy these polymers or copolymers from a

12   supply company -- a chemical supply company or a

13   plastic supply company as you would buy nuts and

14   bolts?

15   DR. ATWOOD:  Exactly right, Your Honor.

16   Exactly right.  And -- and what the company then

17   does -- what Chen teaches in his patent -- or what

18   the companies in question here then do is they

19   take this polymer, add to it a mineral oil, treat

20   it in a certain fashion, and produce the product.

21   But you're exactly right, Your Honor.

22   What -- what these companies do and what Chen

23   envisions is buying this particular polymer.

24   THE COURT:  And the polymer is what?

25   DR. ATWOOD:  This polymer is a Japanese

1    company.  And the way they've done this -- I've

2    put the S-E-E-P-S at the top to show how this

3    matches with the Chen patent.  And I don't know if

4    it's an accident or not, but the Japanese write

5    from right to left.  And this read S-E-E-P-S if

6    one reads from right to left on this, which

7    matches the formula for the Figure 5, the first

8    figure that I took --

9             THE COURT:  Mr. Cristaldi?

10            MR. CRISTALDI:  Your Honor, I'm not

11   certainly by far an expert.  But to explain your

12   question in lay terms as I understand it, the

13   chemical reactions that are undertaken to form the

14   polymer are done in an industrial setting.  And

15   they're done with heat and pressure and catalyst,

16   as Dr. Atwood has explained.

17            An end user would typically buy a bag of

18   powder essentially that is -- and I'm probably not

19   using these words precisely -- but a polymer that

20   comes in a powder or a pellet format.  And then

21   would heat that with oil -- with mineral oil to

22   form the -- the polymer that's used in the end

23   products, the prosthetic devices.  And I know

24   you've got some familiarity with those -- with

25   those types of prosthetic devices.

1          THE COURT:  Go ahead.

2          DR. ATWOOD:  Thank you, Mr. Cristaldi.

3          If I could go to the next slide.

4          So the important point here, I summarize

5     polymerization conditions, temperature, pressure,

6     solvent, that which the polymerization is done in

7     the medium, time, and catalyst.  But there's a

8     combination of changes in these can lead to

9     different kinds of polymers from a given starting

10    material.

11          Next slide.

12          I have a riveting example of

13    nomenclature here, Your Honor.  But I think I'll

14    just quickly flash through this in the interest of

15    time.

16          If you just click through this and put

17    it onto the next.  Okay.  If I can go to the next

18    slide.

19          After that brief digression into my

20    family history and nomenclature, I'm ready to talk

21    briefly about plasticizing oil.

22          The next slide.

23          There's generally two types of

24    plasticizing oil.  These are oils that are used to

25    modify the properties of the polymer itself.  So

1    as Mr. Cristaldi points out, one buys a bag or a

2    ton of the polymer and then one adds one of two

3    general types of plasticizing oil.  One is a

4    nonaromatic as it's called, which would be

5    symbolized by the monomer molecule one butene or

6    two butene.

7              If we could go to the next slide.

8              What we see here is my own hands working

9    with some polybutylene which I have in the lab.

10   And it's this viscous material that's dropping

11   down from the -- from the spatula into the bottle.

12             The next slide.

13             The polybutylene I'm working with --

14             THE COURT:  Let me interrupt you for a

15   moment.

16             DR. ATWOOD:  Surely.

17             THE COURT:  What difference does it make

18   whether it's aromatic or not aromatic?

19             DR. ATWOOD:  That's the key question.

20   And if I could skip right --

21             THE COURT:  I assumed it was the key

22   question because the ALPS proposed construction

23   has aromatic in there for a reason.  It's not --

24   you're not just throwing it in.  So --

25             DR. ATWOOD:  Yes.  If we can go through

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    this slide to the next one.  It just defines

2    aromatic molecules as a cyclic hydrocarbon ring

3    such as benzene or styrene.

4              And go to the next slide.

5              Styrene is an aromatic molecule because

6    it has this six-membered ring.

7              Go to the next slide.

8              A typical aromatic plasticizer is a

9    phthalate.  For example here, this is called

10   dipropyl phthalate.  Here's the aromatic group,

11   Your Honor, this six-membered ring.

12             So I said there are two typical types of

13   plasticizers.  One is nonaromatic, such as the

14   polybutylene.  And one is aromatic, such as the

15   phthalate.

16             Now, if we could go to the next slide,

17   we could get to the crux of the question.

18             If we have an aromatic plasticizing oil,

19   the aromatic plasticizing oil is going to be

20   happiest chemically in amongst the poly -- the

21   polystyrene units.  It's -- it's a little bit of

22   the like dissolves like situation.  If you have

23   road tar on a car, you can wash that off with

24   gasoline but not with water.

25             If you have dirt on the car, you can

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    wash that off with water but not with gasoline.

2         The like in this case is the aromatic

3    plasticizer will choose to go in and interact with

4    the aromatic group on the polystyrene.

5         Now, in this Figure 5, this is the

6    polymer which has already had plasticizing oil

7    added to it.  If we added the aromatic

8    plasticizing oil, it would go in and disrupt these

9    chains and effectively tear the polymer apart.

10        But the plasticizing oil which Chen has

11   added in his invention -- in the next slide -- is

12   substantially nonaromatic.  And it's gone into

13   this region -- into these regions.

14        THE COURT:  Well, for tomorrow's

15   session, Mr. Cristaldi, I'm sure there will be

16   rebuttal by -- by the defense.  Be prepared to

17   explain how one can conclude that Mr. Chen's

18   invention infers or dictates a substantially

19   aromatic free plasticizing oil where that

20   apparently is not mentioned, at least in the claim

21   that you've included in the joint claims

22   construction.

23        MR. CRISTALDI:  Yes, Your Honor.

24        THE COURT:  And also I think OWW should

25   frankly look at their proposed construction on

1   this issue and explain why a polymer or a block

2   copolymer should not borrow from the previous

3   construction of hydrogenation of a styrene

4   isoprene/block copolymer, whether in fact you are

5   expanding the definition.  Okay?

6           MR. CRISTALDI:  Yes, Your Honor.  We'll

7   be prepared tomorrow to show two-fold.  One, that

8   the substantially nonaromatic is explained in the

9   specification, and also that the

10  characteristics -- the physical characteristics of

11  the polymer that are explained in the

12  specification and the patent as a whole would be

13  understand by one of ordinary skill in the art to

14  only be achieved by using that.

15          And to answer your other question --

16          THE COURT:  And the third part is why is

17  that important.

18          MR. CRISTALDI:  Yes, sir.  And we'll be

19  prepared to talk about that in detail.

20          THE COURT:  Obviously, you know, we're

21  doing claims construction on a template for --

22  let me go back a second.

23          I don't want people to lose sight of the

24  fact that the claim construction language should

25  be done with a view towards the jury instructions.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    And if this case is going to go all the way down

2    to the edge of the cliff and beyond in the form of

3    a trial, and the Court is going to have to

4    instruct the jury and instruct the jury as to the

5    claims at issue, if the claim language becomes

6    more difficult and more difficult to apply as to

7    the facts of the case, then you haven't served

8    your purpose and neither have I.

9         And you're -- you're asking me, as I

10   told you before, to call balls and strikes to some

11   degree as to what the claim language should be.

12   And if I'm not beating you all up so as to develop

13   claim language that is somewhat understandable and

14   -- and relevant to the jury and easy for the

15   jury -- easier for the jury to apply in this

16   complicated matter, we're not serving our purpose.

17        MR. CRISTALDI:  Yes, Your Honor.

18   We'll -- we'll expand upon that tomorrow.

19        But to address your specific question of

20   the relevance of this particular issue to this

21   particular -- the issues in this case, this

22   particular claim construction, essentially Ohio

23   Willow Wood is arguing a claim construction that

24   would -- polymers are made for a variety of

25   different reasons, as Dr. Atwood has -- has

1    presented.

2              And the physical characteristics and

3    properties, for instance, the softness of them,

4    the tensile strength, those types of things are

5    very important.  And -- and Mr. Chen talks in

6    detail in the specification about the nature and

7    the physical characteristics of his products.

8              And we believe that it would be clear to

9    one of ordinary skill in the art, and it's clear

10   in the specification as to what oils would be used

11   to plasticize for his purposes.

12             What Ohio Willow Wood is trying to do is

13   argue the universe so that they can bring in a

14   universe of prior art.  Again, we think that's

15   inconsistent with the case law, which directs the

16   Court to construe those claims in a way that

17   assumes that the patent office understood the

18   universe of prior patents out there.

19             THE COURT:  Well, we'll take this up

20   then tomorrow.

21             MR. CRISTALDI:  Thank you.

22             THE COURT:  Please continue, Dr. Atwood.

23             DR. ATWOOD:  Thank you, Your Honor.  I'm

24   getting near the end, Your Honor.

25             Next slide.

1          THE COURT:  Questions.  I don't have any

2     questions.  I don't have any questions at this

3     point.

4          DR. ATWOOD:  Thank you, Your Honor.

5          THE COURT:  Well, let me ask.  We didn't

6     get to the last -- you -- you touched on it, and

7     that is the weight.  An average molecular weight

8     of less than 200 and greater, that is a disputed

9     issue or a claim?

10          MR. CRISTALDI:  Yes, Your Honor.  If you

11     recall --

12          THE COURT:  But that's only the 253

13     patent?

14          MR. CHRISTALDI:  That's correct.  It's

15     one claim in the 253 patent.  Ohio Willow Wood, as

16     I understand it, is arguing that the claim is

17     indefinite.  You may recall the periodic table

18     that Dr. Atwood put up there.  This is -- I'm

19     learning this over the past few weeks myself.  But

20     each of those, for instance, hydrogen has a weight

21     of one.

22          When you -- when you gather --

23          THE COURT:  I remember that from my high

24     school.

25          MR. CHRISTALDI:  That's the only one I

1    remember.  When you got gather those things

2    together, they have a molecular weight.

3              As I understand it and what the

4    evidence -- the testimony tomorrow and the

5    evidence and the specification will show that what

6    Mr. Chen was referring to there wa a sort of a --

7    a Bell curve of -- of weights that would be

8    understood by one of ordinary skill in the art.

9    And Ohio Willow Wood is arguing that the claim is

10   indefinite, and therefore should be stricken.

11             THE COURT:  Well, Mr. -- Mr. Speed, let

12   me -- let me go back to that Exhibit 2 of the

13   disputed constructions that's in the claim chart,

14   Document 81.  OWW's proposed construction -- it

15   has no proposed construction.  It says the claim's

16   indefinite.

17             So I take it that that's not an issue in

18   the case, that is the claims construction is what

19   it is and says what it says.  And the question

20   then becomes whether it's too indefinite to be

21   read, and making the patent invalid; right?

22             MR. SPEED:  That's correct, Your Honor.

23             THE COURT:  So I only have to frankly

24   divine the meaning of two particular claims -- or

25   the language of two particular claims.

1  Hydrogenated styrene isoprene/butadiene block

2  copolymer.  In the 109 patent at Claims 1, 2, 3,

3  4, 5, 6, and 12.  And the plasticizing oil, which

4  I take it is in a variety of claims which you

5  haven't specified.

6          MR. SPEED:  It's in every claim.

7          MR. CRISTALDI:  It's in I believe every

8  claim.

9          THE COURT:  Okay.

10          MR. SPEED:  Your Honor, with respect to

11  the last element, it is --

12          THE COURT:  The last element being which

13  one?

14          MR. SPEED:  The last term in dispute,

15  the average molecular weight.  And the reason why

16  we brought this up to your attention, it's been

17  our experience that some judges that look at

18  Markman issues want to address the indefiniteness.

19  But we've had situations where that's reserved for

20  another brief and another time as well.  So that's

21  why we brought it up now.

22          THE COURT:  Well --

23          MR. CHRISTALDI:  Your Honor --

24          THE COURT:  --  I take it that

25  indefiniteness is a question of law?

1          MR. SPEED:  Yes, Your Honor.

2          THE COURT:  And -- and it would be up to

3     the -- given that it's a question of law in this

4     case, there'd be potential testimony at trial that

5     might be relevant to this issue?

6          MR. SPEED:  That's correct, Your Honor.

7          THE COURT:  Judge can reserve ruling on

8     that and give it a whack at the end of the trial,

9     couldn't he?

10         MR. SPEED:  Possibly, Your Honor.

11         THE COURT:  And I take it that the

12    judge -- if it were a judge who liked to let the

13    jury stew on as much as possible, could say give

14    me an advisory verdict on that as well.

15         MR. SPEED:  We have some experience with

16    Courts doing that on indefiniteness as well, Your

17    Honor.

18         THE COURT:  Right.  I mean most judges

19    don't want to make decisions.  So I'm assuming

20    that the jury would be just as good at deciding

21    whether it was indefinite or not at least on a

22    factual -- mixed factual basis -- factual law

23    basis.

24         MR. SPEED:  I'm not sure I would agree

25    with that, Your Honor, with all due respect.

1          THE COURT:  May be the risk you're

2    running though.

3          MR. SPEED:  I understand.  I mean the

4    question is we're prepared tomorrow to address

5    that issue with you.

6          THE COURT:  But that hasn't been

7    referred to me.  I can say that without -- without

8    a doubt, I think.  Whether it will be referred to

9    me in the future, I'm not the confident.

10         MR. CRISTALDI:  Your Honor, ALPS's

11   position seems consistent with the Court.  We

12   believe that the indefiniteness issue really was

13   one of summary judgment or something to be

14   determined later in the case.  But since we were

15   trying to determine claims and we couldn't come to

16   an agreement on the construction of this

17   particular claim.

18         But ALPS would be amenable to Your Honor

19   focusing on the two issues, hydrogenated styrene

20   isoprene/butadiene block copolymer and

21   plasticizing oils, and not considering the other

22   issue.  But we're prepared to argue it tomorrow as

23   well.

24         THE COURT:  Well, if -- if I understand

25   your argument, Mr. Speed, as to the claim being

1     indefinite to the term "an average molecular

2     weight of at least" -- excuse me, "of less than

3     about 200 and greater," that the term -- that term

4     is a term of description and not -- it has to be

5     read in the context of the other -- of the other

6     parts of the claim, does it not?  So really what

7     you're arguing is a particular claim has to be

8     indefinite?

9              MR. SPEED:  Yes, Your Honor.

10             THE COURT:  So if plasticizing -- excuse

11    me.  If -- if in Claim 8 you're -- you're really

12    arguing that that claim in its entirety is

13    indefinite?

14             MR. SPEED:  Right, Your Honor.  The

15    theory being that one of skill in the art because

16    there are four possible interpretations of that

17    particular phrase would not be able to discern the

18    scope of the claim, therefore it's indefinite.

19             MR. CRISTALDI:  And, Your Honor, we --

20    Your Honor may be familiar, for instance, with

21    real estate terminology.  When you buy a hundred

22    acres more or less is the common phrase that's

23    used in real estate.  We believe that this -- and

24    the testimony and the specification will bear out

25    that in the chemistry world it's -- it's

1   essentially like saying a hundred acres more or

2   less in the real estate world.

3          THE COURT:  Kind of like grenades and

4   horseshoes; right?

5          MR. CRISTALDI:  Yes, sir.

6          THE COURT:  Thank you, Dr. Atwood.

7          Why don't we take a five-minute break.

8      (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

9          PROCEEDINGS CONTINUED AS FOLLOWS:)

10         THE COURT:  So who speaks for OWW or

11  Ohio Willow Wood, Mr. Speed?

12         MR. SPEED:  Your Honor, I'm going to let

13  my partner, Mike Stonebrook, because he has an

14  undergraduate in chemical engineering.  He's

15  better at questioning our expert.

16         I did want to address one thing if I

17  might.  And that is when we talked about the

18  reexaminations of the 109 patent, a reexamination

19  request was submitted for the 253.  It was sent

20  back to us for basically clerical reasons.  That

21  will go forward.  There's been no substantive

22  reexamination review of the 253 patent.

23         There's also, Your Honor, as you may be

24  aware, a sister case to this that ALPS brought

25  against Ohio Willow Wood for another Chen patent

1   that's pending in front of Judge Kovachevich.  I

2   believe we -- we refer to her as Judge K.  I don't

3   know if I got the name right.  But it's

4   Judge Kovachevich.

5            That patent, the 568 patent, that's the

6   number, is a patent that has claims that are

7   remarkably similar to the 253 patent.  That

8   patent -- the asserted claims in that patent have

9   also been rejected by the patent office.

10           There's a motion pending in Judge K's

11  court to stay that case pending reexam, which is

12  presently ripe for ruling but has not been ruled

13  on.  So I just wanted to clarify for the record

14  what's going on with the reexamination.

15           THE COURT:  The 109 is currently --

16           MR. SPEED:  The 109 -- the present

17  status of the 109 is all the claims are rejected

18  under initial office action, and have been amended

19  in response to the initial office action.

20           THE COURT:  Is there a reexamination as

21  to that as well?

22           MR. SPEED:  Yes, Your Honor.  That's --

23  so we will refile the 253 reexam imminently.  And

24  we are confident like the similar case, the 568,

25  that those claims will likely be rejected as well.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. CRISTALDI:  Your Honor, one of the

2     things I think that Judge Covington was concerned

3     about was delay and the tactics of Ohio Willow

4     Wood.

5          The 253 reexam, as I recall, was -- was

6     filed back in January.  And as Mr. Speed said, it

7     was rejected for whatever reason, clerical error,

8     as he said.  Since then they've not refiled it and

9     they've not put us on notice that they were

10     refiling it.  And so we wonder what they're

11     waiting for to correct the clerical error and move

12     forward.

13          But Judge Covington was very clear to us

14     in oral argument and in here order that she

15     intended the case to go forward.  She was very

16     aware of the status of the reexams at the time,

17     that the -- we had the hearing.  The 253 had

18     been -- the reexamination had been filed but not

19     yet rejected for the clerical purposes, so it was

20     pending if you will.

21          And Judge Covington took that all into

22     consideration.  If Mr. Speed wants to argue for

23     rehearing, we can do that.  And we're not prepared

24     to argue all the merits of that, Your Honor,

25     but --

 1           THE COURT:  Well, I'm not going to take

 2    any argument on it.  But it's just for

 3    clarification purposes.  I asked the question, and

 4    everybody has given me the information.

 5           MR. SPEED:  And that's the information

 6    I'm providing.

 7           And from this point forward, Your Honor,

 8    I will turn this over to Mr. Stonebrook.

 9           THE COURT:  Mr. Stonebrook.

10           MR. STONEBROOK:  May I approach the

11    podium?

12           THE COURT:  You may.

13           MR. STONEBROOK:  My name is Mike

14    Stonebrook.  I'm with the law firm of Stanley Law

15    Group.  We're here today to present Ohio Willow

16    Wood Company's technology tutorial related to the

17    patents in the suit.

18           THE COURT:  Is there any significance to

19    the willow trees on the side of the slide?

20           MR. STONEBROOK:  Yes.  As I understand

21    it originally, the willow tree produces a very

22    strong but light wood that was used in early

23    prosthetic devices.

24           THE COURT:  Okay.  So -- all right.

25           MR. STONEBROOK:  In the particular case

1    at hand there are gels that are a blend of

2    thermoplastic elastomer and a plasticizer.  Those

3    are both very fancy words that we'll get into

4    shortly.

5              The products at issue in this case are

6    thermoplastic gel liners.  I have brought with me

7    a demonstrative gel liner.  I believe you've --

8              THE COURT:  Seen those.

9              MR. STONEBROOK:  -- seen these

10   previously.

11             Let's discuss some of the basic building

12   blocks of gels.  A gel is a solid jelly-like like

13   material that can have properties ranging from

14   soft and weak to hard and tough, meaning that the

15   rigidity or the feel of the gel can vary over a

16   wide range.

17             Gels are comprised of mostly liquid, but

18   behave like a solid due to a three-dimensional

19   cross-linked network of the polymer within the

20   liquid plasticizer.  The gels in the instant case

21   are constructed from copolymers and mineral oils.

22             THE COURT:  So mineral oil would be the

23   plasticizing oil?

24             MR. STONEBROOK:  Mineral oil is one

25   available plasticizing oil, yes, sir.

1          THE COURT:  Is that considered aromatic

2     or nonaromatic?

3          MR. STONEBROOK:  I believe that the

4     mineral oils are considered a nonaromatic.

5          THE COURT:  Mr. Speed, you're standing

6     up.

7          MR. SPEED:  Your Honor, we've got copies

8     of the presentation if you want to follow along.

9          THE COURT:  Okay.

10          Miss Kanfer, if you would hand me one of

11     those, please.

12          MR. STONEBROOK:  The particular slide at

13     hand presents various grades of a product sold by

14     Kuraray known as the Septon 4000 series.  Listed

15     on the screen are four available grades, Septon

16     4033, Septon 4044, 4055, and 4077.

17          The primary difference between those

18     grades is variation in the molecular weight.  As

19     the last two digits increase, so does the

20     molecular weight.  At least one of these materials

21     was available at least as far back as 1989.

22          Examples of plasticizing oils that one

23     can use with block copolymers includes rubber

24     process oils, mineral oils, and synthetic liquids.

25          How does one make a gel?  Your Honor, in

1   order to help conceptualize this process I brought

2   along with me something you may be much more

3   familiar with.

4            THE COURT:  A pot?

5            MR. STONEBROOK:  Exactly.  A vessel that

6   we can heat.  Into this vessel we add some water.

7   We allow that to come up to a certain temperature.

8   And we take a product that you may know as

9   gelatin.  And once the water is at sufficient

10  heat, we add the gelatin to the pot.  We stir it.

11  And we allow this mixture to cool.  As it cools it

12  solidifies and we get what we know as Jello.

13           There's a very, very similar process

14  that's used to make these types of gels.  You

15  begin with a vessel that you can heat, something

16  perhaps with a mixer as shown in the upper

17  left-hand corner on this slide.  You bring the

18  mixer, the heated vessel up to temperature, and

19  into that you add some mineral oil.

20           You may encounter mineral oil in your

21  daily life if you have baby oil, which is a

22  mixture of mineral oil and a fragrance.

23           That's placed into the pot.  Once the

24  mineral oil comes up to a certain temperature, you

25  add to that the polymer.  This is a small vial of

1    Septon 4055 that we brought with us.  Would you

2    care to see this, Your Honor?

3              THE COURT:  That's all right.

4              MR. STONEBROOK:  That material is then

5    mixed into the heated mineral oil.

6              Once the polymer and the mineral oil

7    have been permitted to imminently mix and the

8    polymer dissolves within the heated mineral oil,

9    it forms a molten gel.  That molten gel is then

10   taken from the pot and can be used to form a

11   variety of materials.  It can be cast into shapes,

12   placed on a substrate or so forth.

13             A gel --

14             THE COURT:  Just a second

15   Mr. Stonebrook, please.  Just a moment.

16             MR. STONEBROOK:  Certainly.

17             THE COURT:  I -- I take it that your

18   reference to -- just a moment -- to the Septon 455

19   or 4 -- excuse me, 4055 or 4033 is an indirect

20   reference to hydrogenated styrene

21   isoprene/butadiene block copolymer?

22             MR. STONEBROOK:  Yes, Your Honor.

23   Septon 4055 -- the Septon 4000 series materials

24   are hydrogenated styrene isoprene/butadiene block

25   copolymers.

```
 1              THE COURT:  Mr. Cristaldi?

 2              MR. CRISTALDI:  Yes, sir.

 3              THE COURT:  I asked Dr. Atwood some

 4     questions with respect to how one purchases the

 5     raw ingredients to manufacture the polymers -- or

 6     the device.  And I'm presuming that a product like

 7     Septon would be one of those types of products

 8     that maybe comes from other manufactures as well?

 9              MR. STONEBROOK:  (Shakes head.)

10              THE COURT:  But how -- how is one

11     skilled in the art -- and this is probably a

12     question for tomorrow.  And so if it's more

13     appropriate to discuss tomorrow, please tell me

14     you would rather discuss it tomorrow.

15              How does one skilled in the art know --

16     or what is it even frankly relevant for purposes

17     of the 109 patent that a specific sack of raw

18     ingredients with a specific number with particular

19     properties is the one to be included within the

20     four corners of the patent?

21              MR. CRISTALDI:  Yes, Your Honor.  It's

22     an excellent point.  And that was part of the

23     reason I stood before you before you asked your

24     question.  I didn't realize that Mr. Stonebrook in

25     addition to Miss Walker -- Dr. Walker were going
```

1    to present today.

2              But you'll notice we did not use the

3    names Septon 4055 or 4033.  And the reason is that

4    those are trade names that are a trademark by a

5    company called Kuraray for products they sell.

6    But to a chemist or one of ordinary skill in the

7    art, they do not connotate a specific type of

8    polymer.

9              The example I would use, Your Honor, is

10   Coca-Cola.  We're talking about a patent that was

11   originally drafted and filed back in the early

12   '90s.  If you were to say Coca-Cola, we all

13   understand generally that it is a soft drink and

14   that the Coca-Cola Bottling Company and the

15   Coca-Cola Company have that as a registered

16   trademark.

17             But if you look at the course of the

18   history of the soft drink, the composition of the

19   beverage has changed over time.  They've

20   introduced new Cokes if you will from the mid

21   1800s to today.

22             And so Septon 4055 is simply a trade

23   name that a company called Kuraray uses to sell a

24   specific polymer.  But we don't believe that it --

25             THE COURT:  Well, that's actually not my

1  question.  My question is -- is as I divine from

2  what Ohio Willow Wood is about to argue is that

3  there are a range of products that you can choose

4  from.  And one skilled in the art would choose a

5  particular product depending upon the amount of

6  rigidity or lack of rigidity one wanted in the

7  product -- the end product.

8      What I'm somewhat confused about and I'm

9  not sure I have grasped what may be the relevance

10  of this because it may go to the invalidity of the

11  patent argument is whether the patent that ALPS

12  is -- is suggesting is so specific that it

13  includes a particular range of sacks of raw

14  ingredients to choose from or whether it's a

15  particularly wide range of sacks of ingredients to

16  choose from.

17      I -- I suspect the argument on -- on the

18  defense side is it's -- there's a number of sacks.

19  And because there's too many sacks, it's invalid.

20  And I think your position probably is that there's

21  a specific finite range of sacks, and as a

22  consequence it's -- it's protected.

23      MR. CRISTALDI:  And so one of ordinary

24  skill in the art in reading the patent in order to

25  practice that invention would call a polymer

1    producer like Kuraray or Shell Oil or someone like

2    that.  And they could describe a specific chemical

3    composition of the polymer they wanted.  It may

4    happen to be that a product -- an off the shelf

5    product like 4055 or something like that does meet

6    those chemical characteristics.

7            And I -- from what I understand of the

8    current state of Septon 4055, it is the chemical

9    composition that's taught in the patent today.  In

10   other words, what is currently being sold and

11   marketed as that.

12           THE COURT:  Well, let me ask you, is

13   the -- despite the -- the narrow approach that you

14   are taking, Mr. Cristaldi, as to what the raw

15   ingredients are, is there anything about

16   necessarily the combination of these ingredients

17   that make this so particularly different than what

18   was done in the art before?

19           MR. CRISTALDI:  Yes, Your Honor.  In

20   fact, what we'll hear tomorrow and what you'll

21   throughout this case is that the physical

22   properties of this particular polymer, which is

23   commonly referred to as styrene ethylene ethylene

24   propylene styrene -- and I use the term "commonly"

25   loosely, at least amongst us lawyers -- if the

1    physical characteristics of that were made into a

2    composite and plasticized in a particular way, add

3    strength, durability, tear resistance, softness

4    that make products, for instance, the product that

5    Mr. Stonebrook showed you, the prosthetic liner

6    that Your Honor is familiar with that are far

7    superior to what was in the industry before

8    Mr. Chen's invention.

9            And so, for instance, silicone as

10   opposed to styrene ethylene ethylene propylene

11   styrene was commonly used in the industry before

12   these types of liners were made.  And the physical

13   properties and characteristics of -- of that

14   polymer if you will were quite a bit different.

15   So it -- it does have uniqueness and novel uses.

16           THE COURT:  Okay.  Please continue.

17           MR. STONEBROOK:  Your Honor, may I

18   address your question about if the claims are

19   broad or specific?  They're actually both in this

20   particular instance.

21           Independent claims were drawn very

22   broadly.  In dependent claims you will see

23   specific references to the Septon bags of

24   material.

25           If I could direct your attention the 109

1    patent to I believe it's Dependent Claim 6.

2            If memory serves correct, Your Honor,

3    the Dependent Claim 6 further specifics that the

4    hydrogenated S-I-B-S of which -- from what's

5    present in the independent claim is further

6    specified to be a polystyrene ethylene ethylene

7    propylene type block copolymer, and a source of

8    that block copolymer being Septon 4055.

9            MR. CHRISTALDI:  Your Honor, just to be

10   clear, I was not referring to the patent in

11   general.  But the issues before the Court do not

12   concern issues -- particularly, the Markman issues

13   before Your Honor now, do not concern Septon 4055.

14           THE COURT:  Let's continue, please.

15           MR. STONEBROOK:  The product at issue

16   involves a --

17           THE COURT:  I'm aware of this part.

18           MR. STONEBROOK:  Okay.

19           THE COURT:  I'm aware of this part as

20   well.

21           MR. STONEBROOK:  Let me move on to --

22           THE COURT:  Familiar with the milking

23   and all that aspect as well.

24           MR. STONEBROOK:  Thank you, Your Honor.

25           Your Honor, we're about to enter a

1    discussion of polymers.  And at this time I would

2    like to ask Dr. Lynn Walker from Carnegie Mellon

3    University, who conducts research and teaches in

4    these areas, to join me for the presentation.

5              THE COURT:  All right.  Please.

6              MR. STONEBROOK:  May she approach the

7    witness stand?

8              THE COURT:  Wherever you want to do it.

9    If you want to do it from --

10             DR. WALKER:  I'll just be over here.

11             THE COURT:  All right.

12             DR. WALKER:  I probably will need the

13   microphone.  I'm sorry.

14             THE COURT:  And please state your name

15   for the record again.

16             DR. WALKER:  Certainly.  Lynn Walker.

17             THE COURT:  Thank you.  Dr. Walker.

18             THE WITNESS:  Yes?

19             THE COURT:  Dr. Walker, why don't you --

20   if you -- either be seated or -- or be at the

21   lectern, one or the other.  But I need you close

22   to a microphone.

23             DR. WALKER:  Just wanted to make sure I

24   wasn't in your way.

25             THE COURT:  No.  You're fine.

1          MR. STONEBROOK:   The first term that the

2    Court needs some familiarity with is the term

3    "monomer."   A monomer is a small molecule that

4    bonds with other molecules to form a polymer.   The

5    monomer is essentially the individual Lego block

6    or individual pearl bead on a pearl necklace, Your

7    Honor.

8          A polymer is a large collection or a

9    large molecule composed of numerous monomers.   If

10   we go back to the pearl necklace example, the

11   individual pearls would represent the monomer.

12   The entire strand of pearls would be the polymer.

13          If all of the pearls are white pearls,

14   we would refer to that pearl necklace as a

15   homopolymer.   And if we make the pearl necklace

16   from different types of pearls, we would refer to

17   that type as a copolymer, co meaning more than

18   one.

19          To help visualize the polymer concept,

20   this particular slide extends out from the single

21   bead concept shown at the top.   In this example

22   we're using styrene.

23          Dr. Walker, would you care to comment on

24   this slide.

25          DR. WALKER:   Sure.   I mean here we're

1    just continuing this analogy of a necklace where

2    the monomer would be this little sphere we've

3    drawn.  And we're using styrene as the example

4    rather than showing the chemical structure.  It's

5    not actually all that important for what we're

6    trying to get across here.

7            And if you then take a large number of

8    those monomers and string them up by bonding them

9    together with chemical bonds, you end up with a

10   polymer of which would be then called polystyrene.

11   It takes its name from the monomer.

12           MR. STONEBROOK:  Because all of the

13   units in the polystyrene strand come from the

14   styrene monomer, the polymer is referred to as a

15   homopolymer.  If you construct the polymer from

16   more than one type of monomer, as depicted at the

17   lower end of the screen, we refer to as a

18   copolymer.

19           DR. WALKER:  And one of the key things

20   that's coming out of this part of the world is

21   that you can combine properties of two very

22   different materials very easily.  So this is the

23   chain.  Architecture becomes extremely important.

24           As Professor Atwood actually alluded to

25   earlier, that you can take something like

1    polystyrene, which is very hard, and polyisoprene,

2    which is very soft, and force them to work

3    together to make a material that has both those

4    properties.

5            MR. STONEBROOK:  And by having both a

6    hard and a soft component to the polymer, you're

7    able to introduce or take advantage of properties

8    of both the hard portion and the soft portion in

9    the polymer.

10           This slide will discuss the

11   polymerization of styrene.  At the top we've

12   written out the chemical formula for styrene

13   showing all the carbons and hydrogens in a linear

14   representation.  That is our monomer, and we've

15   denoted that by the green sphere.

16           The representation that is presented on

17   the screen is more of a graphical representation

18   of certain carbon items of styrene showing that

19   they are bonded to one another in a hexagon ring.

20           And, Dr. Walker, could you explain the

21   polymerization.

22           DR. WALKER:  Certainly.  One group on

23   this becomes polymerizable and is actually the

24   part that's going to link up the different

25   monomers for us.  All we're really trying to show

1     on this slide is four different representations --

2     four polymers, either little beads on a string

3     like we do with the necklace.

4          A string of S's would indicate that it's

5     a string of styrene.  We could actually put out

6     the carbons and hydrogens or we can actually draw

7     the full chemical structure.  A chemist skilled in

8     the art would know the difference between these

9     and recognize all of these as polystyrene.

10          MR. STONEBROOK:  Another term that we've

11     heard discussed today is hydrogenation.

12     Hydrogenation is a process conducted on the

13     polymer once it has been formed.  So the first

14     step in creating a hydrogenated polymer is to

15     conduct the polymerization, then you subject the

16     polymer to hydrogenation.

17          Hydrogenation involves assaulting double

18     bonds that are present in the -- or in the repeat

19     units with hydrogen, reducing those double bonds,

20     and adding hydrogen to it.

21          This particular slide shows two

22     different representations of the chemical repeat

23     unit for polyisoprene.

24          Dr. Walker, could you walk us through

25     the steps.

1          DR. WALKER:  Again, we were just trying

2     to show two different ways of showing this, one

3     without -- one with the hydrogens and one without.

4     Again, one skilled in the art would certainly know

5     that these are similar molecules.

6          One key thing to note here is that this

7     is an isoprene monomer.  It's an isoprene block.

8     And when one hydrogenates it, one ends up with an

9     ethylene block and a propylene block.  So those

10    two will always be paired together if you had

11    isoprene in your original block of polymer.

12          So we might want to ask why we

13    hydrogenate things in the first place.  Well, one

14    of the key reasons is that double bonds are very

15    susceptible to things like radiation, UV radiation

16    specifically.  So we generally hydrogenate things

17    to stop that.

18          You also will find that it changes the

19    mechanical properties.  And how you change those

20    is dependent on the system.  So that's something

21    that we have to learn to tweak.  And so one

22    skilled in the art usually does know how to do

23    that and what hydrogenation will do to the final

24    product that you're making.

25          I can address specifically what'll

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    happen to the materials we're talking about here

2    when we get a little further on.

3              MR. STONEBROOK:  Our next slide presents

4    the polymerization.  And we'll get into the

5    eventual hydrogenation of the polybutadiene.

6              As shown on the slide, we're using red

7    circles to indicate the butadiene monomer.  The

8    representation at this point shows the butadiene

9    monomer without the hydrogens drawn in.  They do

10   exist, but they're not provided because that

11   becomes very cumbersome graphically.

12             Under IUPAC nomenclature the -- what is

13   commonly referred to as butadiene is provided with

14   a name of 1,3 butadiene, the 1,3 signifying that

15   the first and the third carbon atoms are where the

16   double bonds exist.

17             THE COURT:  Explain that again for me,

18   please.

19             MR. STONEBROOK:  The International --

20             THE COURT:  Go a little bit more basic.

21             MR. STONEBROOK:  Certainly.  There's a

22   naming convention provided by an organization

23   known as the International Union of Pure and

24   Applied Chemistry.  They have a convention that

25   says you begin counting at the first end and

1    signify where different double bonds, for

2    instance, occur.

3              So if we begin counting at this end and

4    we label these carbons 1, 2, 3, 4, off the first

5    carbon we hit a double bond, off the third carbon

6    we hit a double bond.  Buta represents the number

7    of carbon atoms in the -- in the monomer, four.

8    Di, two.  And E-N-E signifying double bonds.  So

9    by 1,3 butadiene we can then create this structure

10   solely from this name, 1,3 butadiene, drawing our

11   first carbon, putting a first double bond

12   extending off that carbon to an adjacent carbon

13   atom --

14             THE COURT:  Let me go -- go back a

15   second.  The monomer in this instance is what?

16             MR. STONEBROOK:  Butadiene.  It has a

17   formal name and a common name.

18             THE COURT:  I guess if you would go back

19   to -- you have a hydrogenation of -- of styrene,

20   but I note that the dispute in this case as to the

21   proposed construction of Claims 1, 2, 3, 4, 5, 6,

22   and 12 with respect to hydrogenated styrene

23   isoprene/butadiene block copolymer not only --

24   there is the distinction that ALPS wants a styrene

25   block polymer with 2-methyl-1-13-butadiene and

1    one -- and a 3-butadiene, and you have no such

2    proposed construction.  And -- and I'm having

3    difficulty understanding the basic science of why

4    is there a distinction.  What is the significance

5    of the distinction I guess is probably more

6    accurate to put it.  Does that make any sense?

7              MR. STONEBROOK:  Between using the

8    formal name?

9              MR. CRISTALDI:  Your Honor, is that a

10   question for ALPS or --

11             THE COURT:  That's a question that I'm

12   going to ask both of you.  But since Ohio Willow

13   Wood has the floor at this point -- I am -- I am

14   confused.  And it doesn't take me much to get

15   confused with this subject matter.

16             As to the terms from one skilled in the

17   art to the understanding of one skilled in the art

18   using hydrogenation of the styrene block polymer

19   described further as a 2-methyl-1-1.

20             MR. STONEBROOK:  Certainly.

21             THE COURT:  Does that make some sense to

22   you?

23             MR. STONEBROOK:  2-methyl-1,3-butadiene

24   is the IUPAC name for isoprene.  Just as my name

25   is Mike -- I go in daily life as Mike Stonebrook.

1    My full name is Michael Robert Stonebrook.  1,3

2    butadiene is the IUPAC nomenclature for butadiene.

3              THE COURT:  And IUPAC meaning what?

4              MR. STONEBROOK:  International Union of

5    Pure and Applied Chemistries.

6              THE COURT:  And the 3-butadiene is what

7    now again?

8              MR. STONEBROOK:  Butadiene.

9              THE COURT:  Does the hydrogenation of

10   styrene block polymer always produce -- always

11   produces an -- either an isoprene or butadiene as

12   the isomers that you've described?

13             MR. STONEBROOK:  Isoprene and butadiene

14   are the monomers, the starting materials with

15   which you would make the polymer.  You would then

16   subject the styrene isoprene butadiene block

17   copolymer to a hydrogenation process.  It's a

18   subsequent step after polymerizing the S-I-B block

19   copolymer -- S-I-B-S block copolymer.

20             THE COURT:  Okay.  I understand now.

21             MR. STONEBROOK:  The styrene block

22   polymer is -- is further described as being a

23   particular substance with either isoprene or

24   butadiene components.

25             The identification of styrene isoprene

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  butadiene block copolymer indicated the three

2  monomeric species used to the make the block

3  copolymer, Your Honor.

4           THE COURT:  Could you go back and -- and

5  tutor me again as to, even if it requires going

6  back to a couple slides.

7           MR. STONEBROOK:  If I'm going to make a

8  pearl necklace out of red, blue, and green pearls,

9  the red may be my styrene, the blue the isoprene,

10  and the green the butadiene.  I could call that

11  necklace a red, green, blue necklace.  What I've

12  identified are the three colors being used in the

13  formation of that necklace.

14           THE COURT:  Okay.

15           MR. STONEBROOK:  Does that assist, Your

16  Honor?

17           THE COURT:  It does.

18           MR. STONEBROOK:  Butadiene is capable of

19  polymerization through two positions on its

20  backbone.  And by backbone I'm referring to this

21  carbon chain.  If polymerization occurs by --

22  through the first and fourth carbon atoms so the

23  double bonds break, those carbon atoms reach out

24  and grab adjacent monomers -- grab ahold of if you

25  recall the earlier slide we get 1,4 polybutadiene.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  A linear segment, but a new double bond has to

2  form because of the number of electrons present in

3  the unit.

4         Alternatively, polymerization could

5  occur through the first and the second carbon

6  along this double bond.  When that occurs, you get

7  a side chain in the polymeric unit.  The first and

8  the second carbon, the double bond breaks.  They

9  each reach out, they grab an adjacent monomer.

10  This is the addition of the next bead on the pearl

11  necklace strand.

12         If you recall that there are two types

13  of polymerization that could occur with

14  butadiene --

15         DR. WALKER:  One of the complexities

16  here is that when we put the pearl necklace

17  together in the first place with the butadiene

18  blocks, the way they join up matters, and it can't

19  be changed.  So that when I then hydrogenate it,

20  I'm going to end up with different groups based on

21  how they linked up in the first place.

22         So if I get a 1,4 addition as this one's

23  called -- this is from the same monomer group.  If

24  that 1,4 addition happens, when I hydrogenate it

25  I'm going to get a straight string of carbons,

1    which is actually two ethylene groups.  So I would

2    call that ethylene.  And I'll call that block a

3    polyethylene block if it has created a large

4    number of those.

5              If instead it linked up by 1,2

6    addition -- this is the original block copolymer.

7    We would say it's a 1,3 butadiene monomer that has

8    linked by 1,2 addition.  And I know the numbers

9    get really annoying here.  But if this 1,2

10   addition has happened, you can see that is

11   structurally different than that.  When I

12   hydrogenate that -- and, again, the naming is

13   really annoying here because this will now be

14   called a butylene group.

15             These two groups have very different

16   properties in the final material.  And the way

17   this ended up happening, it's not because of the

18   hydrogenation, it's because of how they linked up

19   in the first place.

20             So during the polymerization of the

21   original block copolymer, the catalyst and the

22   conditions involved will decide -- define whether

23   you have 1,4 addition or 1,2 addition.

24             Once that's done, as soon as you

25   hydrogenate, you're going to end up with either

1    ethylene or butylene groups.  And the ratio of

2    those and how many of them there are in a row

3    depends on how it was originally made, the number

4    of 1,4 and 1,2 additions.

5            I think one of the things that might be

6    confusing is there's two places that we have block

7    copolymers before we hydrogenate them and after we

8    hydrogenate them.

9            MR. STONEBROOK:  And the polymer that

10   comes of hydrogenation is different than the

11   polymer that went into the hydrogenation process,

12   Your Honor.  The reason why this becomes important

13   is tomorrow we expect some discussion obviously

14   about what a hydrogenated styrene

15   isoprene/butadiene block copolymer is.

16           And the variety of polymers that are

17   described there comes from this chemistry because

18   butadiene can go down two roads for

19   polymerization, the 1,4 path or the 1,2 path.  You

20   can get different ratios of ethylene to butylene

21   or butylene to ethylene in the product after

22   hydrogenation.

23           Next slide, please.

24           Shown on the screen is a non

25   hydrogenated block copolymer know as S-I-S.  That

1   would be styrene isoprene styrene block copolymer.

2   In this representation the greenish circles are

3   the polystyrene portions, and they are at the head

4   and the tail of the polymer.

5          The mid block, Your Honor, is formed

6   from polyisoprene, and it's structurally

7   represented in this figure here.

8          When we hydrogenate that, the resulting

9   product is always an ethylene propylene repeat

10  unit.  By repeat unit I'm referring to that

11  portion between the blue brackets.  The little

12  lines extending outward through the blue brackets

13  indicate the handhold to the adjacent unit.

14         When you hydrogenate S-I-S, the isoprene

15  portion in the middle becomes this E-P repeat

16  unit.  And we designate the hydrogenation product

17  of S-I-S as S-E-P-S.

18         Dr. Walker, would you walk him through

19  the S-P-S.

20         DR. WALKER:  Now, we're doing again just

21  the simple tri-blocks where I have polystyrene,

22  polybutadiene.  And this is -- we are specifically

23  talking about 1,3 butadienes that have been

24  polymerized, and polystyrene at the other end.

25         There's the repeat units.  Remember that

1  the polybutadiene block we really could put two

2  colors of beads in there.  But it depends on the

3  connectivity.  You either have ones that are

4  connected by 1,4 addition or ones that are

5  connected by 1,2 addition.  It's just a naming

6  convention that we call them both polybutadiene.

7        When you hydrogenate this, you now keep

8  that sort of locked in structural variation in the

9  hydrogenated product because you're either going

10 to make ethylene groups from the 1,4 addition

11 groups or butylene groups from the 1,2 addition

12 groups.  So we have to keep calling these S-E-B-S

13 or styrene ethylene butylene styrene.

14        MR. STONEBROOK:  So the naming of the

15 product out of hydrogenation refers to the

16 transformed mid block groups.  What was once

17 before polybutadiene after hydrogenation becomes a

18 ratio of ethylene to butylene.  And what was

19 previously polyisoprene before hydrogenation

20 subsequently becomes an propylene unit.

21        There's a third non hydrogenated polymer

22 presented on the screen known as S-I-B-S.  This is

23 a -- has two polystyrene blocks that are at the

24 outer edges of the polymer.  And the mid block is

25 represented by the polyisoprene polybutadiene

1    circles, the purple and the red.

2            To recap, the structure of polyisoprene

3    is shown in this designation.  The polybutadiene

4    will be some mixture of 1,4 polybutadiene and 1,2

5    polybutadiene.  Hydrogenating this --

6    hydrogenation of the S-I-B-S block copolymer

7    converts the polyisoprenes into the E-P units,

8    converts the 1,4 polybutadiene into the ethylene

9    units, and converts the 1,2 polybutadiene into the

10   butylene units.

11           We refer to the hydrogenation product of

12   S-I-B-S as S-E-P-E-B-S.  Or reading from the other

13   end towards the front, S-E-B-E-P-S.

14           DR. WALKER:  We do have to be careful to

15   keep the E and the P together because they've come

16   from the isoprene.  So they're always a pair.

17           The E-B depends on the chemistry of the

18   butylene -- butadiene block in the first place.

19   So we do keep both letters around in general.

20           So we drew on the last case the middle

21   block as two distinct parts just to keep the

22   chemistry straight.  In reality the middle block

23   is actually a mixture of isoprenes and butadiene

24   blocks.  It's kind of hard to make something

25   random with a small set.  But in reality it would

1   be some random mixture of isoprenes and

2   butadienes.  And you have to remember that each of

3   those butadienes could either be a 1,4 or a 1,2.

4       When you hydrogenate this material, each

5   of the polyisoprenes will become an ethylene

6   propylene, and each of the butadienes will have

7   become either an ethylene or a butylene group.  So

8   there's all the possibilities that have come out

9   of hydrogenation of that rubbery middle block and

10  maintaining the E-B-E-P-S.

11      MR. STONEBROOK:  And the importance of

12  this is that the hydrogenated S-I-B-S discussion

13  will lead us eventually tomorrow to a material

14  that's known as S-E-E-P-S, as Mr. Cristaldi

15  referred earlier.

16      Because there are two different types of

17  polymerization of the butadiene monomer you can

18  end up with 1,4 versus 1,2.  Chemists have the

19  ability when the S-I-B-S is polymerized to control

20  which direction the butadiene polymerizes through,

21  either 1,4 or 1,2.

22      And subsequently that gives you control

23  over the relative proportion of the ethylene

24  versus the butylene occurring in the hydrogenation

25  product of the S-I-B-S.

1          S-E-E-P-S is a term that's been used to

2     refer to various S-E-B-E-P-S or hydrogenated

3     S-I-B-S where the formation of the butylene

4     component has been controlled.

5          DR. WALKER:  Which meant that you had to

6     control the number of 1,2 and 1,4 additions back

7     when you made the original block of polymer.

8          MR. STONEBROOK:  This particular slide

9     helps visualize that out of the realm of

10    hydrogenated S-I-B-S or S-E-B-E-P-S that there's a

11    portion of which that we would refer to as -- or

12    that are referred to as S-E-E-P-S.  And that's

13    simply a portion where the butylene content has

14    been controlled.  And that all derives from the

15    base polymerization of the S-I-B-S material, Your

16    Honor.

17          So why does the gel form?

18          DR. WALKER:  So why the gel forms is

19    that we use plasticizers specifically in these

20    situations that want to dissolve the middle

21    rubbery block.  So they want to make it nice and

22    swollen and happy and rubbery.  But they do not

23    dissolve the styrene blocks to any extent.

24          So the mid block gets swollen.  You use

25    a large amount of this plasticizer so that the

1    system is predominantly -- actually, the liquid,

2    the plasticizer, 70 to 98 percent is the range

3    we'll quote.  And we'll explain why more tomorrow

4    I'm sure.

5              MR. STONEBROOK:  Next slide.

6              DR. WALKER:  So the actual details of

7    these types of gels, this is -- this was a really

8    very exciting finding back when this was

9    discovered.  What happens is the middle blocks

10   want to swell and float away and actually

11   dissolve.

12             The end blocks which are polystyrene

13   don't.  So what they do is they find each other.

14   It's a self assembly process.  And they form these

15   little tiny domains which are a submicron.

16   They're actually in the 10 to 100 nanometer range.

17             And these little tiny blocks of

18   polystyrene are not only associated together,

19   they're glassy.  So they're very hard.  They're

20   locked down.  They are actually solid materials.

21             But what's in between them is this large

22   region that is filled with the rubbery material

23   that is trying to flow like a liquid and wants to

24   have liquid like properties, but it's held

25   together because each of those chains is likely

1    bonded to one polystyrene group that's in one

2    little block, and another one that's in another

3    block.  Or at least it's flipping around and

4    tangled up in this back matrix.

5            So this matrix -- all this stuff that

6    looks like empty space is actually the plasticizer

7    and the middle blocks.  So you get the combinated

8    [sic] -- the combined properties are something

9    that wants to try and be a liquid but has solid

10   like functionality because of these locking down

11   polystyrene groups.

12           MR. STONEBROOK:  This particular slide

13   introduces patents addressing gel technologies in

14   the 1970s.  One of these patents, the 387 patent,

15   introduced the notion of using non hydrogenated

16   block copolymers such as styrene butadiene styrene

17   and styrene isoprene styrene block copolymers in

18   gels.

19           The amount of polymer present was in the

20   range of 30 to 5 percent, and the amount of

21   plasticizer was in the range of 70 to 95 percent.

22           Several -- several years later a

23   gentleman by the name of Crossland in the 999

24   patent --

25           MR. CRISTALDI:  Your Honor?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1          THE COURT:  Mr. Cristaldi?

 2          MR. CRISTALDI:  I apologize for

 3   interrupting.  But we're getting into

 4   argumentation on invalidity here.  And we --

 5          THE COURT:  Well, I don't see any

 6   prejudice at this point, Mr. Cristaldi.  You'll

 7   have an opportunity tomorrow.  I'm sure this will

 8   be a feature of tomorrow's case.  Then we are

 9   where we are.

10          MR. CRISTALDI:  Yes, Your Honor.

11          MR. STONEBROOK:  I'm sorry for the

12   interruption, Your Honor.

13          We're turning to the 999 patent.

14   Several years after the 387 patent was introduced

15   in the 1970s, Mr. Crossland identified that by

16   hydrogenating the non hydrogenated polymers you

17   could also create gels.  So he was hydrogenating

18   S-B-S and S-I-S as well as a polymer that had a

19   mixed mid block of isoprene and butadiene.  The

20   hydrogenation product of those polymers resulted

21   in S-E-B-S, S-E-P-S [sic], and what we refer to as

22   S-E-B-E-P-S.

23          Again, the range of polymer to

24   plasticizer 30 to 2 weight percent block copolymer

25   and 70 up to 98 percent by weight plasticizer.
```

1          In the '80s we saw the gel

2     compositions -- at least the formulation shifting

3     to a formula of 100 parts by weight.  P-B-W is

4     parts by weight as we use in our slides, Your

5     Honor, of block copolymer.  And from about 300 to

6     1,600 parts by weight plasticizing oil.

7          If Your Honor was so inclined to convert

8     that recipe into weight percent, the 100 parts

9     block copolymer and a 300 parts by weight

10    plasticizer corresponds to a 25 weight percent

11    block copolymer and 75 weight percent plasticizer.

12         The 100 parts by weight block copolymer

13    to the 1,600 parts by weight plasticizing oil

14    gives you approximately five and a half percent by

15    weight block copolymer with the balance of that

16    being the plasticizer.

17         Gel composites were also recognized in

18    the patent art.  These were comprised of layers of

19    gel on top of fabric or fabric gel, fabric

20    composites as taught in the 931 patent to Zook

21    (phonetic).

22         The early '90s introduced us to gel

23    compositions made from 100 parts weight of

24    Septon's 4000 series materials and at least 300

25    parts by weight plasticizer.  That was published

1   in an international patent application having

2   Pub. No. W09323472.  And various gel composites

3   were also disclosed on a variety of substrates,

4   steel, wood, metals, synthetic materials, and the

5   like.

6           All of those composites had a base gel

7   formulation of 100 parts by weight of a block

8   copolymer and 300 to 1,600 parts by weight of a

9   polymer.

10          The early to mid '90s introduced the

11  concept of the gel liner that Your Honor indicated

12  familiarity with earlier today, such as the liner

13  that we brought as a demonstrative.  These are

14  formed from a block copolymer with mineral oil to

15  create a gel, and there's the fabric exterior.

16          So at the end of the '90s one of

17  ordinary skill in this art knew how to make gels

18  from various block copolymers and various

19  plasticizers, including mineral oil.

20          THE COURT:  Let me ask you, what -- what

21  significance as to the Markman hearing does it

22  have as to the interpretation of the particular

23  claims?

24          MR. STONEBROOK:  Well, you would

25  interpret based on what one of ordinary skill in

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      the art would understand.

2              THE COURT:  I understand that.  But as

3      to the disputed terms, how does that -- that fit

4      in?  I understand that that's -- that's the

5      guidepost that I have.

6              MR. STONEBROOK:  For example --

7              THE COURT:  The mythical -- the mythical

8      one skilled in the art.  But nonetheless, how --

9      how am I to --

10             MR. STONEBROOK:  Certainly, Your Honor.

11             THE COURT:  I understand -- I understand

12     that that applies as to whether the patent is

13     valid or invalid or obvious or not obvious, but as

14     to the interpretation to be given to, for example,

15     hydrogenated styrene isoprene/butadiene block

16     copolymer, what -- what does that add to my basic

17     understanding here today?  How does that fit in?

18             MR. STONEBROOK:  It appears in the prior

19     art, Your Honor, through Crossland, a reference

20     back from the '70s.  And that can provide

21     illumination on the Court's understanding of how

22     that term was viewed.

23             Additionally, with regard to the

24     plasticizer by showing in the prior art the

25     understanding of the use of various plasticizers

1  and perhaps the aromatic content of those, it can

2  guide the Court as to whether or not ALPS's

3  definition would be more appropriate or less

4  appropriate than Ohio Willow Wood's.

5  THE COURT:  Okay.  Well, as I said

6  previously, I want both sides to -- obviously to

7  support their arguments as to their specific

8  proposed claim construction on this particular

9  language appearing in the various claims that I've

10  cited as to the reference in the claim itself and

11  the patent language itself.  What the distinction

12  is between the two, that is the chemical

13  significance that one skilled in the art would --

14  would deduce from the separate constructions.  Or

15  whether we are really essentially talking about

16  the flip side of the coin and both are so related

17  that there is no distinction to be drawn from

18  either construction.

19  I'm somewhat confused as to -- as to

20  whether someone reading this would have -- take

21  such significance of it that one would be able to

22  see the difference between one proposed

23  construction and the other proposed construction.

24  Do you understand what I'm saying,

25  Mr. Stonebrook?

1        MR. STONEBROOK:  I'm not quite certain

2   that I do, sir.

3        THE COURT:  I am presuming because you

4   are proposing a construction that is different

5   than ALPS that your proposed construction has some

6   particular meaning not only to your case,

7   obviously, but to one skilled in the art.

8        MR. STONEBROOK:  Yes, sir.

9        THE COURT:  Okay.  I do not understand

10  what the significance -- or that difference --

11  the significance of that difference is.  So you

12  should be prepared or OWW should be prepared to

13  argue tomorrow, as well as ALPS, why this

14  distinction between your proposed claim

15  constructions is so meaningful that the Court has

16  to address it.

17       MR. STONEBROOK:  Certainly.

18       THE COURT:  Okay?  And I am particularly

19  interested in the significance of the inclusion in

20  ALPS's proposed construction as to a styrene block

21  polymer with a 2-methyle1-1,3-butadiene and

22  1,3-butadiene.  All right?

23       MR. CRISTALDI:  Yes, Your Honor.

24       Your Honor, one of the slides that

25  Mr. Stonebrook presented earlier, which was the

1    1,3-butadiene I think that illustrates a little

2    bit the distinction.

3              THE COURT:  Well, you can cover that

4    tomorrow.

5              MR. CRISTALDI:  Yes, sir.

6              THE COURT:  And I note that,

7    Mr. Stonebrook, your -- your proposed construction

8    does not include the language that I just cited.

9    And why it's not included or why -- why you have

10   chosen not to include it --

11             MR. STONEBROOK:  Certainly, Your Honor.

12             THE COURT:  -- would certainly give me

13   an understanding of the significance of why it's

14   not included.  Okay?

15             MR. STONEBROOK:  Yes, Your Honor.

16             THE COURT:  And I -- I do not understand

17   as well, Mr. Cristaldi, as to the specificity in

18   your proposed construction is derived simply by

19   the terms "isoprene/butadiene" that appears in the

20   language of the 109 patent at Claims 1, 2, 3, 4,

21   5, 6, and 12 or whether it appears elsewhere

22   either in dependent claims or the specifications

23   or where else so that it is included as language

24   in the proposed claim construction.

25             MR. CRISTALDI:  Yes, Your Honor.  And,

1   Your Honor, we would be happy to do that tomorrow

2   in the join claims construction chart that was

3   filed with the Court as Document 81.

4          You had also asked us to call out from

5   the specification references that were relevant.

6   And I just point Your Honor's attention to that

7   Document 81 has some of that information as well

8   for your reference.

9          THE COURT:  And I'd also like for you,

10  Mr. Cristaldi, and counsel for OWW to explain to

11  me the significance of the substantially aromatic

12  free processing oil.  We've covered that a little

13  bit, but to go over it again.

14         Why it should be included or opposing

15  views why it shouldn't be included.

16         MR. CHRISTALDI:  Yes, Your Honor.

17         THE COURT:  As I understand the real

18  issue in this case, at least from -- from Ohio

19  Willow Wood's position is that the recipe here is

20  not so unique so as to be entitled to protection

21  by patent.

22         And, Mr. Cristaldi, your client's

23  contending that this is an improvement of the art

24  and therefore is not obvious and is such that it

25  should be protected.

1          MR. CRISTALDI:  That's correct, Your

2     Honor.  We -- our position is that the patent

3     office was aware of what was happening in the '70s

4     and the '80s and the '90s before the patent was

5     issued and considered those things.  And we concur

6     with the patent office in issuing the patent that

7     this is unique and novel.

8          THE COURT:  All right.  Well, let me go

9     back a second since this issue may come down the

10    pike again in the motion for summary judgment.

11         Summary judgment presumes that there are

12    no disputed issues of fact.

13         MR. CRISTALDI:  Yes, Your Honor.

14         THE COURT:  And if the judge were to

15    determine that he or she cannot make a conclusion

16    based upon the record before it as to whether this

17    was obvious or not and wants testimony with

18    respect to that, that is an issue for the Court to

19    make a determination, although it -- it's also

20    potentially a jury question, is it not?

21         MR. CRISTALDI:  Yeah, we believe that it

22    is potentially a jury question, Your Honor.  I'm

23    sure Ohio Willow Wood will argue that those things

24    were obvious.  Of course, we will not.  We believe

25    that most likely there'll be disputed issues of

 1    fact when that's raised, and it'll be a question

 2    for the jury.

 3              MR SPEED:  The question though,

 4    obviously, is a mixed question.  The Fifth Circuit

 5    still struggles with that.  But in theory it's a

 6    question of law with underlying factual

 7    underpinnings which the jury decides the

 8    underpinnings and the judge ultimately decides --

 9              THE COURT:  So let's assume that you

10    would ask specific interrogatories of the jury,

11    which would be the way to go about it?

12              MR. SPEED:  That's one way to do it,

13    Your Honor.  There are a variety of methods.  You

14    can ask for an advisory opinion or specific

15    interrogatories to the jury.

16              There's also issues of anticipation here

17    as well.  Will one reference.  And the way you ask

18    the questions is do you find in the prior art, for

19    example, that the gel exists, Septon 4055 plus

20    mineral oil that creates a composite.  Do you find

21    that?  And you can ask the jury that.

22              MR. CRISTALDI:  That's the crux of the

23    case, Your Honor.  I mean that's the patent is a

24    gel --

25              THE COURT:  Have you thought about

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    submitting this case to --

2              MR. STONEBROOK:  Well, yeah.  I mean

3    my -- my partner has reminded me certainly we --

4    we could file and you can rule on summary

5    judgment.  But assuming -- I thought your question

6    was assuming there's already disputed facts.  But

7    if there's no disputed facts, you could can on

8    summary judgments.

9              THE COURT:  My -- my -- and this is not

10   meant as a criticism of -- of the lawyers in this

11   case.  You -- you know far more about the patent

12   issues than I do.  And it may be unwise of me to

13   confess my limited knowledge.  But, you know,

14   we're -- we're a Court of general jurisdiction,

15   and we don't -- we don't specialize in any one

16   thing.

17             But one of the things that -- one of the

18   things that is -- excuse me just a moment.  As I

19   said, we're Courts of general jurisdiction.  But

20   one of the -- one of the benefits of being a Court

21   of general jurisdiction is that we are very

22   practiced in how to try to resolve disputes and

23   also trying to make a determination as to who

24   is -- whose province it is to revolve it.  Whether

25   we can resolve it or whether it's a question of

1    disputed issues of fact and it's something that

2    should go to the Court -- I mean to the jury or

3    not.

4           And -- and sometimes when you get

5    involved in patent litigation you are thinking

6    about the beginning of the litigation and a Court

7    is focused at the end of -- about the end of the

8    litigation.  We have different perspectives.

9           And my eyesight has always been fixed on

10   how to move the ball to the -- to the other end of

11   the -- of the end zone.  And that's our nature.

12   And it's particularly my nature because I was a

13   trial lawyer beforehand, and a criminal trial

14   lawyer.

15          So we focus on jury instructions and we

16   focus on educating the jury as best we can so that

17   they can make some ultimate decision.  In many

18   respects your -- your -- as you can gather from

19   here, your -- your role is a teacher.

20          Now, you're going to be teaching people

21   who have perhaps some sophistication because who

22   knows what your jury pool will include, they may

23   have no sophistication.  And you're asking very

24   precise questions about -- about the state of the

25   art as it existed when -- when Mr. Chen made his

1    application.

2             Is there any thought to -- to having any

3    arbitration where you would -- you would pool

4    together a number of lawyers with chemical

5    engineering backgrounds to assess these issues and

6    to some degree reach a decision where you are no

7    longer hemorrhaging dollar bills?

8             And I'm not suggesting that you do this

9    today or that you -- that you rush to conclusion.

10   What I'm -- I'm forecasting for you is that no

11   matter what I do after tomorrow, the issue of

12   obviousness or not, the question of invalidity, is

13   the gorilla in the room.  And that's going to have

14   to be decided one way or the other.  I mean, Ohio

15   Willow Wood's position is, you know, you are

16   hammering that nail as best you can in as many

17   forms as -- as you can.

18            And I don't know.  I haven't looked at

19   the latest figures as to what the average costs of

20   a patent case is, but it's obviously significant.

21            You all are making far more money than I

22   am on an hourly basis, and your clients are -- are

23   having to expend that.  And at some point it's

24   going to be a cost analysis, a risk analysis, and

25   somebody is going to have to raise the white flag.

1              Is there any thought to structuring a

2    very sophisticated arbitration panel that you

3    would present your -- your -- your arguments and

4    either get a non binding resolution and take it to

5    your client and see where you are or you -- you go

6    on your merry way and try to resolve these issues

7    in this court or this courthouse?

8              MR. CRISTALDI:  One of the -- one of the

9    complexities, Your Honor, is that there are

10   actually six different lawsuits pending between

11   those two parties, three here in Florida, three up

12   in Ohio.  One of those is an antitrust lawsuit

13   that ALPS has filed against Ohio Willow Wood.  The

14   others are all patent lawsuits.  Some by Ohio

15   Willow Wood as plaintiff, some as ALPS as

16   plaintiff.

17             And we -- I think we would -- we would

18   all -- at least my client -- I'll speak for myself

19   and my client, and my client is here today.

20   Dr. Loggi is here today.  I think we would like a

21   global resolve to these dispute.  We -- we don't

22   want to fight for fighting's sake.  And so we

23   would consider anything that Your Honor would

24   think is appropriate.  We haven't yet talked about

25   a panel of mediators -- or, I'm sorry, a panel of

1    arbitrator's as Your Honor has suggested.

2             THE COURT:  I mean this seems to be more

3    of the arbitration view than the mediation view.

4    But nonetheless, I throw that out there.  I'll be

5    ready for -- for tomorrow to listen to your

6    arguments and come what may as far as claim

7    construction.  But I'm not telling you anything

8    that you -- you do not know with respect to claim

9    construction.

10            Obviously, I'll have to make a choice.

11   You've presented -- you've presented your --

12   you'll present your arguments.  And one side is

13   not going to be particularly happy, as is the case

14   in litigation.  And I am assuming that unhappy

15   side, if they have the money, will go to the

16   Federal Circuit.  And unfortunately the state of

17   litigation in the Federal Circuit is it's a whole

18   new ball game.

19            And if you're searching for

20   predictability, you're not finding predictability

21   when you go to the Federal Circuit.  And I'm

22   not -- I'm not issuing a criticism.  It's just

23   that reading the decisions, if you read decisions

24   about certain issues long enough, you're going to

25   find positions on both sides often.

1          Lawyers commonly complain about that.

2     So I'm throwing that out there in the hopes that

3     you'll simply think about it.  I guess I've said

4     my piece.

5          MR. SPEED:  If I may, Your Honor, Ohio

6     Willow Wood will definitely take to heart what you

7     said.  The complexities are there are six cases.

8     And there's allegations of patent infringement on

9     both sides, so there's a lot of issues.

10          THE COURT:  But what I would like for

11     you to think about, frankly, there may be

12     complexities as a consequence of six cases.  But

13     those may be complexities -- and it's not meant

14     as -- as a criticism of lawyers -- but the

15     complexities are caused by lawyers either filing

16     or defending lawsuits to do the best they can for

17     their client and to put their client in the most

18     advantageous legal position and/or business

19     position.

20          Ultimately in -- in my experience in

21     these types of cases where there are two

22     businesses going at each other, the ultimate

23     fulcrum is what is palatable for one's business.

24     There may be issues of principle.  You know, that

25     is perhaps more so in patent cases because the

1   inventor feels that he or she has given birth to a

2   particular product.

3            Nonetheless, in the end, you know, we

4   are talking about money.  And with six cases if --

5   if the permutations of organic chemistry are

6   infinite, the permutations in litigation may be a

7   little less infinite if that's a mathematical

8   impossibility.

9            MR. SPEED:  Could be pretty close, Your

10  Honor.

11           THE COURT:  Might be pretty close.

12  We're talking about pie.

13           MR. SPEED:  Yes, Your Honor.  But just

14  perspective, this is -- this product is the

15  genesis of all six cases.  And the patent is

16  related to this product.  And are patents related

17  to this product that Ohio Willow Wood owns and are

18  claiming infringement of.  And there are now

19  patents that are exclusively licensed by ALPS that

20  reference the gels.

21           But it's this product -- the fact that

22  this product in the market creates large margins.

23  These two are very, very, very tight competitors.

24  Ohio Willow Wood is of the opinion that they

25  entered the market, they began the market, and

1    ALPS came in and copied.  We don't need to get

2    into that little detail.  But that's what's going

3    on.

4              That being said, I just want to give you

5    some context of why we're fighting.  I mean these

6    products are made for probably 15, $20, and they

7    can sell for as much as 200.  Big margin products.

8    So there's a lot of money at stake if you will.

9              But we will take your admonition to

10   heart.  We will discuss with our client the

11   options.

12             THE COURT:  You know the argument

13   that -- that, you know, both sides hold patents.

14             MR. SPEED:  Right.

15             THE COURT:  And -- and what can be good

16   for the goose can be bad for the gander.  I mean

17   if -- if we're talking about -- if -- if the

18   argument that -- that OWW is advancing, you say,

19   look, a gel is a gel.  And there's not a whole

20   hell of a lot of difference between one gel and

21   another gel.

22             And we're just talking about cake mixes

23   here.  And Duncan Hines and Pillsbury and Betty

24   Crocker are just about all the same time.  And all

25   we're doing is adding a little bit of oil, you're

1   not going to be getting patents probably on cake

2   mixes.  And so your argument that, you know, your

3   ability to gore one side today may be used to gore

4   you tomorrow.

5           MR. SPEED:  That's absolutely true, Your

6   Honor.  And ALPS has routinely argued and filed

7   reexams that there is nothing new and novel about

8   putting gels on fabrics and creating liners.  So

9   your good for the goose, good for the gander

10  argument is very apropos in these cases.

11          THE COURT:  Sometimes you might be

12  better off talking about licensing agreements as

13  opposed to holding -- fighting about patents.

14          MR. SPEED:  Your Honor, may I address

15  something procedurally for tomorrow?

16          THE COURT:  Certainly.

17          MR. SPEED:  ALPS has indicated that they

18  may want to call two additional witnesses that we

19  didn't discuss at the pretrial on this matter that

20  weren't in the --

21          THE COURT:  You mean this is for

22  tomorrow's hearing?

23          MR. SPEED:  Yes.  They wanted to call

24  Mr. Chen by telephone.

25          THE COURT:  As I understand it, Mr. Chen

1    was just going to be listening.  He wanted to --

2    I -- I didn't take that request to be that he

3    would be participating.

4              MR. CRISTALDI:  We had originally

5    requested that he participate, but we will

6    withdraw that request.  And we don't think that he

7    will be need to listen in either.

8              THE COURT:  Okay

9              MR. CRISTALDI:  And -- and -- and so the

10   only other -- we have two witnesses tomorrow,

11   Dr. Atwood, who you've heard of, as your expert

12   witness.  And Dr. Adell Loggi (phonetic), who is a

13   Ph.D. chemical engineer and the CEO of ALPS

14   Corporation as one of ordinary skill in the art.

15             I'm a little bit surprised to hear Mike

16   suggest that he didn't know about that before.

17   He's already been deposed by Mr. Stanley and

18   Mr. Speed both as a 30(b)(6) witness and

19   individually.

20             And he has -- we -- we talked yesterday

21   about -- and I thought we had a stipulation that

22   he was qualified as one of ordinary skill in the

23   arts.  So I'm a little bit surprises to hear that

24   they're objecting to him.

25             MR. SPEED:  I -- I would -- I would say

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    that I agree that he's one of ordinary skill in

2    the art.  And we have deposed him.  But we didn't

3    hear until yesterday that he was going to testify

4    at the Markman hearing.

5              And our position, Your Honor, is there's

6    no need to have one of skill in the art testify as

7    to claim term.  It's an objective standard.  You

8    can use the intrinsic evidence.

9              To the extent that the Court wants to

10   use expert witness testimony to help elucidate

11   some of the chemical terms, that's certainly

12   appropriate.

13             But I don't believe Mr. Loggi's

14   testimony is either relevant, nor was he put on

15   the notice when we originally filed the joint

16   claim construction statement with the evidence

17   that we were going to submit.

18             MR. CHRISTALDI:  Your Honor, of course,

19   the testimony of someone of ordinary skill in the

20   art as to how they would interpret the claim

21   language and in light of the specification is

22   squarely with in the purview of a Markman hearing.

23             THE COURT:  Just a minute.

24             MR. CHRISTALDI:  Yes, Your Honor.

25             THE COURT:  How long do you anticipate

1    your side to take, Mr. Cristaldi?

2            MR. CHRISTALDI:  I'm doing some math in

3    my head, Your Honor.  Maybe two hours, two and a

4    half hours, Your Honor.  I would have expected us

5    to have gotten out of here earlier today, and I'm

6    mincing words a little bit because sometimes these

7    discussions take a little bit longer than I would

8    anticipate.

9            But I would expect maybe a half hour for

10   opening, maybe an hour to an hour and a half for

11   Dr. Atwood, and maybe a half hour for Dr. Loggi.

12           THE COURT:  I wouldn't spend so much

13   time on the opening other than to frankly spot the

14   issues and spot where you're going.  So if that's

15   any help to you.

16           MR. CRISTALDI:  And, Your Honor, it

17   wasn't clear to me if you wanted to hear

18   argumentation tomorrow on the average molecular

19   weight issue and the indefinite issue --

20   indefiniteness issue.

21           THE COURT:  Well, I thought there'd been

22   essentially a stipulation as to the weight issue.

23           MR. SPEED:  As the average molecular

24   weight issue?  No, Your Honor.

25           THE COURT:  You're not contending there

1    is a dispute; you just don't like it?

2          MR. SPEED:  We're contending that it's

3    indefinite, Your Honor.

4          THE COURT:  All right.  But that's not a

5    -- that's not a Markman issue for me.

6          MR. SPEED:  If -- if we're -- if we're

7    preserving our right to -- to argue a different

8    day the indefiniteness, then we're okay not

9    discussing it tomorrow.

10          THE COURT:  So that eliminates that.

11          Just a moment.

12             (PAUSE IN PROCEEDING.)

13          THE COURT:  Just a minute, please.

14          MR. CRISTALDI:  Yes, sir.

15             (PAUSE IN PROCEEDING.)

16          THE COURT:  Well, as to whether ALPS's

17    additional witness should testify or not I don't

18    see any particular prejudice.  He'll be subject to

19    cross-examination.

20          I'll give it such weight as I think

21    appropriate.  Understanding, of course, as

22    essentially a party in this case the credibility

23    issues inure to the benefit or to the disadvantage

24    of the witness.  So --

25          MR. SPEED:  Understood, Your Honor.

1           THE COURT:  How much time do you think

2     you'll take, Mr. Speed?

3           MR. SPEED:  No more than an hour and a

4     half, Your Honor.

5           THE COURT:  Okay.  So we should be done

6     by mid afternoon?

7           MR. SPEED:  Yes, Your Honor.

8           THE COURT:  All right.  There was some

9     confusion about what props we need in the

10    courtroom and what equipment we need in the

11    courtroom.  I suggest that if you have any needs

12    you discuss that with Mr. Gordon, my deputy clerk.

13          MR. CRISTALDI:  Yes, Your Honor.  I

14    think we've got this worked out from our side.

15          THE COURT:  And I can't -- I can't

16    stress enough -- I know that Ohio Willow Wood's

17    principals aren't here, but I can't stress enough

18    that this is essentially a Texas death match

19    between these two -- between your companies.  And

20    both are going to be blooded and there may be no

21    particular winner.

22          And, seriously, you should give some

23    consideration as to some format that may be a

24    quicker way to resolve the bleeding that is

25    occurring during this litigation.  Because if

1    you're there's -- if -- if you're looking for

2    pretrial rulings in this case to narrow the issues

3    for alternative dispute resolution, okay.  That's

4    fine.  I understand that.

5         But if either side is set that no matter

6    what happens this is only the initial forum and

7    the case is going to be litigated until its

8    ultimate conclusion at the Federal Circuit, then

9    the dollar cost at this point is at the low end.

10        And I -- I'm sure -- I think probably if

11   your clients were here and they heard that they --

12   they probably already know it.  But hearing it

13   from me just only confirms what they may have

14   already been told.  And, obviously, it's --

15   it's -- it's significant.

16        So I -- I'd ask you to continue to

17   discuss settlement in a -- in a -- in a meaningful

18   way and consider not necessarily the merits of any

19   lawsuits but the merits of the business associated

20   with the product, the important products that --

21   that your firms are manufacturing and designing.

22        I mean given the amount of earthquakes

23   and calamities that we have had in our nation's

24   history and -- and the world, these products are

25   extremely important.  The market probably is -- is

```
 1    even more significant given the recent turn of

 2    events.

 3              But, nonetheless, there should be

 4    some -- I'm not talking about how the world was

 5    carved up between Spain and Portugal in the 1400s

 6    by the Pope.  But, nonetheless, you're talking

 7    about global issues because I'm assuming that your

 8    products are international products.  So you might

 9    think about those things.

10              MR. STONEBROOK:  Yes, Your Honor.  Thank

11    you, Your Honor.

12              THE COURT:  Thank you.

13                  (Proceeding adjourned.)

14              I CERTIFY that the foregoing is a true

15    and accurate transcription of my stenographic

16    notes.

17    Dated:  05/21/2010.

18

19                   ___s/ Sandra K. Lee_____
                        SANDRA K. LEE, RPR
20                      Official Court Reporter

21

22

23

24

25
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER