UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| ALPS SOUTH, LLC, a Florida corporation, ) | Case No. 8:08-cv-01893-MSS-33MAP |
| Plaintiff, ) | |
| -vs- ) | |
| THE OHIO WILLOW WOOD COMPANY, ) an Ohio corporation, | |
| ) | |
| Defendant. | |

**MEMORANDUM IN OPPOSITION OF PLAINTIFF, ALPS SOUTH, LLC, TO THE OHIO WILLOW WOOD COMPANY'S RULE 60(b) MOTION**

**I.    INTRODUCTION**

In another desperate attempt to avoid the consequences of its willful infringement of U.S. Patent No. 6,552,109 ("'109 patent"), defendant, The Ohio Willow Wood Company ("OWW"), filed a motion under Rule 60(b), Fed. R. Civ. P., to argue again that plaintiff, Alps South, LLC ("Alps"), did not have standing to bring this action at the time it was filed and that, therefore, the case should be dismissed.  OWW claims that Alps lacks standing in this matter because the inventor, John Chen, allegedly did not assign his rights in the '109 patent to Applied Elastomerics, Inc. ("AEI") before AEI entered into the Patent Sale and License Agreement with Alps of August 31, 2008, or the Amended Patent Sale and License Agreement that was executed in January 2010, in which AEI granted Alps an exclusive license in numerous AEI patents, including the '109 patent.  OWW's contention that Alps lacks standing because the invention of the '109 patent had not been assigned by Mr. Chen to AEI before AEI entered into the exclusive license agreements with Alps is without merit.

The basis for OWW's claim is that Mr. Chen on September 28, 2011 executed an assignment of the '109 patent to AEI that was filed in the United Patent Trademark Office ("PTO") in October 2011. OWW conflates what is essentially a housekeeping matter into a claim that there was a serious defect in the ownership of the '109 patent when AEI granted Alps its exclusive license in the '109 patent. The evidence does not support OWW's belated effort to again raise the standing issue.

The '109 patent was assigned by AEI in 1995 and 1996, when the parent applications were assigned. The '109 patent is a continuation in part of several parent applications, including Application No. 08/280,690, filed on August 11, 1994, which is now U.S. Patent No. 5,633,286 ("'286 patent"). These parent applications were assigned to AEI, and the assignments were recorded with the PTO in 1995 and 1996. As Mr. Chen explains in the September 28, 2011 Assignment, the parent applications assigned in writing all right, title and interest in the inventions disclosed in the applications to AEI. In doing so, he also assigned the common subject matter of the '109 CIP application. But since there had never been a document filed specifically identifying the issued '109 patent by patent number or its application by application number with the PTO, Mr. Chen filed the 2011 assignment to make the public file of the '109 patent clear as to the assignment.

OWW claims to be "shocked" to learn Mr. Chen did not file an assignment of the '109 patent to AEI with the PTO until October 2011 and that he did not tell OWW about this assignment when he was deposed shortly after in November 2011. OWW repeatedly filed motions challenging Alps' standing to bring this action since this case was filed in 2008. Indeed, the Court heard arguments on the standing issue shortly before trial in April, 2012. Contrary to the impression left in its Rule 60(b) motion, OWW knew Mr. Chen had not filed an assignment

listing the '109 patent with the PTO. When Mr. Chen was deposed on April 22, 2010, counsel for OWW specifically asked him why he had not filed an assignment of the '109 patent to AEI with the PTO. At that time, consistent with the statements in the September 28, 2011 assignment, Mr. Chen testified that the assignment was effective from the earlier applications from which the '109 patent evolved. (Ex. 1 attached hereto-Chen April 22, 2010 Dep. at 16-17).

As Mr. Chen explained at trial, the '109 patent traces its priority to August 11, 1994, the date the application for the '286 patent was filed. ( Tr., April 30, 2012 p.m. at 47). For August 11, 1994 to be the priority date for the '109 patent, the application for the '286 patent must provide support for the asserted claims of the '109 patent; it must meet the written description requirements of 35 U.S.C. § 112, ¶ 1 as to those claims. OWW did not challenge the priority date for the '109 patent at trial. Thus, OWW knew no specific assignment listing the '109 patent had been filed with the PTO prior to AEI/Alps licensing agreements. It knew Mr. Chen had testified that the assignment had been made through the assignment of earlier parent applications. It knew Alps and Mr. Chen assert the '109 patent is entitled to priority as of the application date of the '286 patent. When it attacked Alps' standing to bring this action before trial, OWW never contended, as it does now, that the claims of the '109 patent are not supported by the disclosures of the application for '286 patent and other parent applications, or that Mr. Chen had not assigned the inventions claimed in the '109 patent to AEI. For OWW to suggest that it just learned an assignment of the '109 patent had not been filed with the PTO is laughable and untrue.

Furthermore, the '109 patent was undoubtedly assigned by Mr. Chen to AEI in 1999, because the subject matter of the application for the '109 patent was specifically incorporated by reference into the later applications for U.S. Patent No. 6,161,555 ("'555 patent")

and U.S. Patent No. 6,148,830 ("'830 patent"), which was also incorporated by reference into the '555 patent's application. As a result, the entire subject matter of the '109 patent became part of those applications, as if it had been fully restated in them. Assignments of the PCT and national stage applications of the '555 patent from Mr. Chen to AEI were filed with the PTO on February 3, 1999. So even assuming *arguendo* the Mr. Chen's assignments of the parent applications of the '109 patent to AEI was insufficient to assign the '109 patent, the assignment of the '109 patent to AEI was accomplished in February 1999, when Mr. Chen assigned the PCT and national stage applications for the '555 patent to AEI, more than eight years before AEI entered into the exclusive licensing arrangement with Alps.

Finally, even if one assumes *arguendo* that there was no effective written assignment of the '109 patent by Mr. Chen to AEI, as required by 35 U.S.C. § 261, it is clear from Mr. Chen's statements at his deposition and in the prosecution history of the '109 patent application that he had every intention of transferring all of his rights in the patent to AEI. As a result, Mr. Chen granted AEI a license, or at least at least an implied exclusive license, that gave it sufficient rights in the '109 patent to have constitutional standing that it could then transfer when it entered into the Patent Sale and License Agreement with Alps in 2008. Even if there was a lack of prudential standing at the time suit was filed, prudential standing defects can be cured after a case is filed as occurred in this case.

There is no merit in OWW's Rule 60(b) motion and it should be denied.

## II.   MR. CHEN ASSIGNED THE '109 PATENT TO AEI NO LATER THAN FEBRUARY 3, 1999

John Chen is an inventor, who has many inventions and patents relating to thermoplastic gels and articles made with thermoplastic gels. He is also a patent agent, who prosecutes his own patents. Many years ago he established AEI to own and hold the patents he

obtains and to license those patents to third parties. (Tr., April 30, 2012, p.m. at 43-48). As Mr. Chen has testified, it was and is his intent that AEI be the legal owner of all of his patent applications and patents. (OWW Ex. A and B-Dkt. 426-1 and 426-2). There is no evidence that Mr. Chen intended to retain ownership of any of them. AEI is the entity that licenses or sells the rights in the assigned patents. Mr. Chen's typical practice was to file a patent application in his own name as the inventor, and then assigns all right, title and interest in the subject matter disclosed in the application, as well as any patents that issue from the application, or any continuations, divisions, renewals, reissues, etc., to AEI.

Many of Mr. Chen's assignments of patent applications to AEI were filed with the PTO, but he was not entirely consistent in doing so. Mr. Chen apparently did not file an assignment listing the applications for the '109 or '253 patents with the PTO while these applications were pending. It is clear, however, Mr. Chen intended to assign the invention claimed in the '109 patent to AEI, and that he did assign it to AEI as a result of assignments of the parent applications of the '109 patent, and as a result of assignments of child and grandchild applications that specifically incorporated the subject matter of the '109 application by reference.

It is clear that Mr. Chen believed he assigned the '109 patent to AEI. When the patent issued on April 22, 2003, AEI was listed as the assignee. (Joint Tr. Ex. 1) Also, during prosecution of the patent, Mr. Chen submitted a form with his payment of the issue fee and publication fee that he signed on July 22, 2002, in which he indicates that AEI is the assignee of the patent. (Ex. 2 attached hereto). Also, in the Amended Patent Sale and License Agreement between AEI and Alps and that was executed by Mr. Chen on January 28, 2010, it specifically states that AEI owns and has the right to license the patent rights covering gels, gelatinous compositions, compositions and articles thereof. (Joint Tr. Ex. 10). While none of these

5

documents is itself a written assignment by Mr. Chen to AEI, as required by 35 U.S.C. § 261, it is evidence of Mr. Chen's intent to transfer all of his rights in the patent to AEI, and his belief he had already done so while the application for the '109 patent was pending.

As Mr. Chen has testified in his deposition and as he stated in his September 28, 2011 assignment of the '109 patent, the invention claimed in the '109 patent was disclosed in its parent applications and was assigned to AEI by virtue of the assignments of those parent applications to it. (Ex. 1 attached hereto-Chen April 22, 2010 Dep. at 16-17; OWW Ex. B, Dkt. 426-2). The application for the '109 patent is a continuation in part of several applications that matured into patents: application No. 08/288,690, filed on August 11, 1994, which became the '286 patent; application No. 08/581,191, filed on December 29, 1995, which became U.S. Patent No. 5,760,117 ("'117 patent"); application No. 08/581,125, filed on December 29, 1995, which became U.S. Patent No. 5,962,572; and application No. PCT/US 94/07314, filed on June 27, 1994, which became U.S. Patent No. 5,868,597. (Joint Tr. Ex. 1). Each of these applications was assigned by Mr. Chen to AEI, and the assignments were recorded with the PTO. (Ex. 3 attached hereto and OWW Ex. E-H, Dkt. 426-5 to 426-8). Of particular relevance are application No. 08/288,690 that matured into the '286 patent and application No. 08/581,191 that matured into the '117 patent.

The written description of the '286 patent discloses the invention claimed in claim 1 and other claims of the '109 patent. (Joint Tr. Ex. 6 and 136). The written description of the '286 patent discloses composite articles comprising a thermoplastic, heat formable and heat reversible gel material, which is formed into a composite by heat and physically interlocked with one or more of a variety of substrate materials, including fabric, in which the gel is formed from 100 parts by weight of a hydrogenated styrene isoprene/butadiene block copolymer comprising

poly(styrene-ethylene-ethylene-propylene styrene) ("SEEPS") and from about 300 to about 1600 parts by weight of plasticizing oil, which can also be made in combination with other polymers. (Joint Tr. Ex. 6 at Col. 1, ll. 63-Col. 2, ll. 51; Col. 4, ll. 37-44, 55-61; Col. 5, ll. 46-53; Col. 7, ll. 18-23).

The assignment from Mr. Chen to AEI of the application for the '286 patent, which was executed on July 14, 1995, assigns to AEI "the full and exclusive right, title and interest to said invention and all Letters Patent of the United States to be obtained therefor on said application or **any continuations**, divisions, renewals, substitute or reissue thereof for the full term or terms for which the same may be granted." (Emphasis added). The invention is described as "GELATINOUS ELASTOMER ARTICLES for which application for Letters Patents of United States having application number 08/288,690 filed August 11, 1994." (Ex. 3 attached hereto).

The '117 patent also relates to gelatinous compositions and articles, and it also discloses the invention claimed in claim 1 and other claims of the '109 patent. (Ex. 4 attached hereto, '117 patent at Col. 1, l. 34-Col., l. 8; Col. 3, ll. 26-57; Col. 4, ll. 18-37; Col. 5, ll. 50-57). The assignment from Mr. Chen to AEI of the application for the '117 patent was recorded with the PTO on April 4, 1996. This assignment assigned "any and all improvements which are disclosed in the invention entitled 'Gelatinous Composition & Articles' and which is found in U.S. application no. 08/581,191. (Ex. 5 attached hereto).

The Federal Circuit has held that the assignment of a parent application assigns an invention in a subsequent patent, if the "the written description of the Parent Application 'reasonably conveys to those skilled in the in the art…' the invention claimed." *MHL TEK, LLC v. Nissan Motor Co.*, 655 F.3d 1266, 1276 (Fed. Cir. 2011). To determine if the assignment of

the parent applications assigned the invention claimed in a later patent, the relevant comparison is between the claims of the patent and the specification of the parent applications. *Id. MHL TEK* involved the question of whether the plaintiff had standing to assert infringement of a patent the defendant contended had been previously assigned to another party by virtue of the assignment of a parent application. The court said that because the entire right, title and interest in and to the inventions and discoveries in the parent application had been assigned, the assignment included more than the just patents and applications related to the parent application. If the written description of the parent application supports the claims of the asserted patent, then the invention was assigned. *Id.*

In the present case, the assignment of the application for the '286 patent specifically states that AEI is acquiring "the entire interest in, to and under said invention and the United States Letters Patent to be obtained therefor," and the "full and exclusive right, title and interest to said invention" was to be assigned. (Ex. 3 attached hereto). Thus, Mr. Chen did not merely assign the application and the patents to be obtained; he assigned the inventions. The language of the assignment of the application for the '117 patent also assigns the inventions and any improvements on the inventions disclosed in the application. (Ex. 5 attached hereto).

OWW asserts that Mr. Chen's assignment of these parent applications to AEI is not sufficient to assign the invention claimed in the '109 patent, because some of the claims of the '109 patent contain new matter, and because the assignments are not broad enough to include the inventions now claimed in the '109 patent. Citing no authority in support of its position, OWW argues that the assignments in question are not sufficient to transfer rights in future continuation in part patents. OWW's position is without merit, because if the written specification of the assigned parent application reasonably conveys to a person of ordinary skill

8

in the art the claimed invention, the claimed invention is assigned irrespective of whether the later patent results from a continuation in part application that contains new matter. In fact, in *MHL TEC*, the patent that the Federal Circuit found had been assigned by the assignment of the parent application was not a continuation or continuation in part the parent application; it was unrelated. *Id.* at 1275-76. OWW's argument also finds no support in the assignments themselves, which both assign **any continuation** of the application. The phrase "any continuation" is certainly broad enough to include continuation in part applications.

The new matter OWW cites as precluding assignment is not relevant to the asserted claims, and in any event there is at least general support in the written description of the parent applications for OWW's alleged new matter. For example, OWW claims that the parent applications do not support the language in claims 1, 2,4,13,14,15,16 of the '109 patent that provides an option for a "mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer comprising poly(styrene-ethylene-ethylene-propylene-styrene)." A variation of this language appears in claim 3, 5, 9, 10, 11, and 12. The problem with OWW's argument is twofold: first, this language is optional in each of these claims. It is not a limitation, because one hydrogenated styrene isoprene/butadiene block copolymer comprising SEEPS will meet the limitations of the claim. The written description of the '286 and '117 parent applications discloses using a hydrogenated styrene isoprene butadiene block copolymer comprising SEEPS. Second, the parent applications teach that polymers may be blended. (Joint Tr. Ex 6 at Col. 5, ll. 30-53 and Col. 7, ll. 14-17). There is nothing in the written description that precludes combining two or more hydrogenated styrene isoprene/butadiene block copolymers comprising SEEPS. Claims 7, 9, and 10 of the '109 patent have a limitation that a source of SEEPS be of the group Septon 4033, Septon 4045 and Septon 4055. Claims 11 and 12 have a limitation that the source

9

of SEEPS be of the group Septon 4033 and Septon 4055. The written description of the '286 patent disclose Septon 4055 as an example of an appropriate moderate to high viscosity SEEPS block copolymer. (Joint Tr. Ex. 6 Col. 7, ll. 18-22). Septon 4055 is among the group of SEEPS block copolymers that can be a source in the above claims. Consequently, there is no merit in OWW's contention that the alleged new matter prevents the assignment of the asserted claims of the '109 patent.

Even if the Court were to find that the assignment of the parent applications was not enough to assign the '109 patent, the entire subject matter of the '109 patent itself was specifically incorporated by reference into an application and patent that were assigned by Mr. Chen to AEI on February 3, 1999. On that date, Mr. Chen filed the national stage application, application No. 09/230,940, and he assigned that application and the earlier international application, PCT/US 97/17534, to AEI and recorded the assignments with the PTO. (Ex. 6 attached hereto). U.S. Patent No. 6,161,555 ("'555 patent") issued from these applications on December 19, 2000. (Ex. 7 attached hereto). As shown at column 1, lines 8 through 22, the '555 patent is a continuation in part of co-pending application No. 08/719,817, which later issued as U.S. Patent No. 6,148,830 ("'830 patent") (Ex. 8 attached hereto), which is a continuation in part of Ser. No. 08/612,586, which later issued as the '109 patent. The specification states:

> ORIGINS OF INVENTION AND **RELATED APPLICATIONS**
>
> **This application is a continuation-in-part application of copending application No. 08/719,817 filed Sep. 30, 1996,** which is a CIP of Ser. No. 08/665,343 filed Jun. 17, 1996 and **a CIP of Ser. No. 08/612,586 filed Mar. 8, 1996** and a CIP of No. 08/581,125 filed Dec. 29, 1995, (now Pat. No. 5,962,572) and also a CIP of No. 08/581,191 filed Dec. 29, 1995, now U.S. Pat. No. 5,760,117 issued Jun. 2, 1998. This application is also a CIP of Ser. No. 08/581,188 filed Dec. 29, 1995, now abandoned and a CIP of Ser. No. 08/288,690 filed Aug. 11, 1994, now U.S. Pat. No. 5,633,286 and also a CIP of PCT/US94/07314 filed Jun. 27, 1994,

10

>and a CIP of PCT/US94/04278, filed Apr. 19, 1994.  **The subject matter contained in the related application (sic) is specifically incorporated herein by reference.**  (Emphasis added).

Whether and to what extent a patent application incorporates material by reference is a question of law.  In making this determination, the standard is whether one reasonably skilled in the art would understand the application as describing with sufficient particularity the material to be incorporated.  *Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011); *Zenon Envtl., Inc. v. US Filter Corp.*, 506 F.3d 1370, 1378-79 (Fed. Cir. 2007).  In the *Harari* case, a patent application stated the "disclosures of the two applications are hereby incorporate[d] by reference."  The Federal Circuit held that this language "incorporates the entire disclosure of the two applications," stating that "the entire '579 application disclosure was incorporated by the broad and unequivocal language:  'The disclosures of the two applications are hereby incorporate[d] by reference.'"  *Harari*, 656 F.3d at 1335.

      The language in the specification of the '555 patent is, if anything, broader and more unequivocal, stating the "subject matter contained in the related application (sic) is specifically incorporated herein by reference."  As a result, the entire application of the '109 patent, which was still pending in 2000 when the '555 patent issued, became part of the specification of the '555 applications and patent.

      The PCT application and the national stage application were assigned by John Chen to AEI on February 3, 1999, and the assignments were then filed with the PTO.  The assignments assigned "the entire right, title and interest… in and to any and all improvements which are disclosed in the invention… which is found in PCT application serial No. PCT/US 97/17534 filed on 30 Sept. 1997 and any legal equivalent thereof in a foreign country, including the right to claim priority and, in and to, all Letters Patent to be obtained for said invention by

11

the above application." (Ex. 6 attached hereto). As to the applications themselves, the PCT application lists the application for the '830 patent as a co-pending related application and specifically incorporated the subject matter of that application by reference. (Ex. 9 attached hereto). The '830 patent is a continuation in part of the application for the '109 patent, and it specifically incorporated '109 patent application by reference. (Ex. 8 attached hereto at Col. 1, ll. 6-24). The '555 patent as it issued lists the application for the '109 patent as a related application, and it specifically incorporates the subject matter of the application for the '109 patent by reference. (Ex. 7 attached hereto at Col. ll. 8-22). Thus, because the application for the '109 patent became part of the written description of the '555 applications and patent, inventions disclosed in the '109 patent application and any patents that issued on it, including the '109 patent, were assigned by Mr. Chen to AEI no later than February 3, 1999.

Consequently, at the time AEI entered into the August 31, 2008 Patent Sale and License Agreement with Alps, AEI, not John Chen, owned the '109 patent, and it had the exclusive right to convey or exclusively license it to Alps. On January 28, 2010, when the Amended Agreement was executed, AEI had the right to convey or license any rights in the '109 patent that were the not previously conveyed or licensed to Alps. OWW's new and belated standing argument is a mirage.

### III. AT A MINIMUM MR. CHEN GRANTED AEI AN EXCLUSIVE LICENSE IN THE '109 PATENT THAT CONFERRED CONSTITUTIONAL STANDING UPON IT

Even assuming *arguendo* Mr. Chen did not execute a written assignment of the '109 patent conveying ownership to AEI, as required by 35 U.S.C. § 261, the facts show that he granted it a license, or at least an implied exclusive license, which transferred substantial rights to AEI sufficient to create Article III constitutional standing before AEI entered into the Patent Sale and License Agreement in 2008 with Alps.

A patent licensee who has been granted fewer than all substantial rights in a patent (i.e., an exclusive license that is not a virtual assignment) has constitutional standing to bring an action, even if ultimately he must join the patentee, who retained rights in the patent, to have prudential standing. To have constitutional standing, the plaintiff 1) must have suffered an actual injury 2) there must be a causal connection between the injury and the conduct complained of, and 3) it must be likely that the injury will be redressed by a favorable decision. In a patent case, for example, where an exclusive licensee has fewer than all substantial rights in a patent, it will have constitutional standing, because an infringer causes actual injury by violating the licensee's exclusive right to make, use, or sell a patented technology, because the injury is "fairly traceable" to the infringer's conduct, and because if the licensee is successful in infringement suit, it is entitled to recover damages and may obtain an injunction against an infringer. *See, e.g.*, *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Ca.*, 248 F.3d 1333, 1345-46 (2001). In determining whether substantial rights have been granted, courts consider a variety of factors, including whether the licensee was granted: (1) the exclusive rights to make, use, or sell, the invention; (2) the right to independently sue for infringement; or (3) the right to make further assignments or transfers. *See id.* at 1344-46. Unlike assignments, which must be in writing, *see* 35 U.S.C. § 261, it is well-established that patent licenses may be granted orally or implied from the conduct of the parties, *see, e.g.*, *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 240-41 (1927); *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir. 2003). The Federal Circuit has held "that an exclusive license need not be in writing for the licensee to have standing if the patentee or assignee is also joined." *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 706 (Fed. Cir. 2008).

In this case, Mr. Chen granted AEI a license, and at the very least an implied exclusive license, in the '109 patent that carried with it substantial rights. Mr. Chen not only listed AEI as the assignee on the patent, but he also assigned all, or nearly all, of its related applications to AEI. Mr. Chen also acted on behalf of AEI in granting Alps an exclusive license in the patent, and later, he executed assignments to AEI that "confirm[ed] in writing that he has previously transferred to Assignee [AEI] all right, title, and interest in the Assign Patent Rights and in the underlying inventions at least as of the respective filing dates of each of the Assigned Patent Rights." (OWW Ex. A and B, Dkt. 426-1 and 426-2). As an exclusive licensee of all substantial rights the 109' patent, AEI had the right to sublicense or otherwise transfer rights in the 109' patent to Alps.

The relationship between Mr. Chen and AEI also bolsters the conclusion that he intended and did grant AEI an exclusive license in the '109 patent. Mr. Chen intended AEI to own all of the patents that he obtains and that it license or convey those patents to third parties. AEI is owned by Mr. Chen and his wife, he is the president, and they are its only employees. (Tr., April 30, 2000 12:00 PM at 46-47; Ex. 10 attached hereto-Chen 11/10/11 Dep. at 6-7). In an analogous relationship where a parent company was the exclusive user of a patent issued to a wholly owned subsidiary, it was held a parent company had constitutional standing. *See Atmel Corp. v. Authentec, Inc.*, 490 F. Supp. 2d 1052, 1055 (2007); *Steelcase, Inc. v. Smart Techs., Inc.*, 336 F. Supp. 2d 714, 718 (2004); *Ricoh Co., Ltd. v. Nashua Corp.*, 947 F. Supp. 21, 24 (1996). Further, one Federal Circuit case found that a company ("PDL") had standing to be joined as a plaintiff where: (1) the inventor/patent-owner held a 50% ownership stake in PDL; (2) the inventor had given a "tacit exclusive license" to PDL; and (3) the inventor and PDL were

14

so closely related that the parties treated them a single entity. *See Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1480 (1990). All of these factors apply in the present case.

Thus, a license existed between Chen and AEI that was sufficient to confer constitutional standing. If there was a defect in prudential standing because Chen was not a party to the suit at the time of filing, a prudential standing defect can be cured during the course of a lawsuit—**even on appeal**. *See, e.g.*, *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Ca.*, 248 F.3d 1333, 1348 & n.15 (2001); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1019 (Fed. Cir. 2001) (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310-11 (1995); *Valmet Paper Machinery, Inc. v. Beloit Corp.*, 868 F. Supp. 1085, 1089 (1994); *Hockerson-Halberstadt, Inc. v. Nike, Inc.*, 779 F. Supp. 49, 52-53 (1991). Any defect in prudential standing was cured by the September 2011 assignments from Chen to AEI.

And although OWW argues that *nunc pro tunc* agreements cannot cure standing, the cases it cites are distinguishable, because those cases involved belated attempts to confer constitutional (not prudential) standing where the plaintiff had no present rights in the patent when suit was initiated. In other words, these are cases where the plaintiff lacked Article III constitutional standing. In this case, because AEI had at a minimum an implied exclusive license in the '109 patent, it was able to convey to Alps sufficient rights for Alps to have constitutional standing.

The Supreme Court and Federal Circuit have long recognized an exception to the *nunc pro tunc* assignment rule where, as here, a subsequent written assignment expressly grants a party the right to sue for past infringement. *See, e.g., Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365-67 (Fed. Cir. 2010) (citing *Moore v. Marsh*, 74 U.S. 515 (1868)); *Arachnid,*

15

*Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 n.7, 1579 (Fed. Cir 1991).  The September 2011 assignment from Chen to AEI contains language granting the right to sue for past infringement. (OWW Ex. B, Dkt. 426-2) ("Assignor further assigns to Assignee, to the extent such right has not already been assigned to Assignee, the right to sue for and to collect damages for infringement of the Assigned Patent Rights occurring prior to the date of this Assignment.").  As a result, these assignments were effective to vest legal title in AEI and cure any standing issues that might have existed at the time the suit was filed.  There is similar language in the Patent Sale and License Agreement and the amendments thereto. (Joint Tr. Ex. 8 and 10).  *See also Valmet Paper Machinery, Inc. v. Beloit Corp.*, 868 F. Supp. 1085, 1089 (1994) (finding that a plaintiff had standing based on an assignment executed after the suit was filed where "the parties agreed to sell, assign, and transfer all rights, title and interest in [the] patent, <u>together with all claims and causes of action for past infringement</u>") (emphasis added); *Cf. Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 917 F. Supp. 305, 310-11 (1995) (finding that an initial defect in standing was remediable, and granting leave to amend the complaint rather than dismissing the case); *Hockerson-Halberstadt, Inc. v. Nike, Inc.*, 779 F. Supp. 49, 52-53 (1991) (same).

      Thus, at a minimum Mr. Chen granted AEI an implied exclusive license in the '109 patent which gave it constitutional standing that it was able to pass on when it conveyed substantial rights to Alps in the '109 patent.  Any defect in standing can be cured, because AEI and through AEI, Alps, have constitutional standing.  The Amended Patent Sale and License Agreement was a virtual assignment of all of AEI's rights in the '109 patent, and the September 28, 2011 assignment by Mr. Chen to AEI eliminated any interest Mr. Chen may have had in the '109 patent, curing any lingering prudential standing problem, because any rights he may have had passed by operation of law to Alps.

## IV. CONCLUSION

OWW's Rule 60(b) motion to set aside the judgment in this case as void is not well-taken and should be denied.

/s/ David W. Wicklund
David W. Wicklund (0012109)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604
TEL: (419) 241-9000
FAX: (419) 241-6894
dwicklund@slk-law.com

Ronald A. Christaldi, Esquire
Florida Bar No. 0087025
rchristaldi@slk-law.com
Mindi M. Richter, Esquire
Florida Bar No. 0044827
mrichter@slk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602
TEL: (813) 229-7600
FAX: (813) 229-1660

Attorneys for Plaintiff, Alps South, LLC

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 10, 2013, I electronically filed the foregoing **MEMORANDUM IN OPPOSITION OF PLAINTIFF, ALPS SOUTH, LLC, TO THE OHIO WILLOW WOOD COMPANY'S RULE 60(B) MOTION** with the Clerk of the Court by using the CM/ECF system, which will send electronic filing to the following attorneys for Plaintiffs: Patrick J. Risch, Esquire, Hill, Ward & Henderson, P.A., 101 East Kennedy Boulevard, Suite 3700, Tampa, Florida 33601-2231; Jeffrey S. Standley, Esquire, F. Michael

Speed, Jr., Esquire, and Michael Stonebrook, Esquire, Standley Law Group LLP, 6300 Riverside Drive, Dublin, Ohio 43017.

/s/ David W. Wicklund
David W. Wicklund (0012109)
SHUMAKER, LOOP & KENDRICK, LLP

Attorneys for Plaintiff,
ALPS South, LLC