## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ALPS SOUTH, LLC
a Florida Corporation,

     Plaintiff,

v.

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation;

     Defendant.

CASE NO.: 8:08-cv-01893-MSS-MAP

## THE OHIO WILLOW WOOD COMPANY'S
## RESPONSE IN OPPOSITION TO ALPS' MOTION FOR CONTEMPT

## I.      Introduction

Alps has not satisfied its heavy burden of submitting clear and convincing evidence that OWW is in violation of this Court's injunction.  The claims of the '109 Patent require a gel composite with a specified ratio of SEEPS polymer to a plasticizing oil, a ratio required for the gel to be a "SEEPS gel."  Specifically, the claims recite 100 parts by weight SEEPS block copolymer to about 300 to 1,600 parts by weight plasticizing oil.  *See* Dkt. No. 369, Tr. 05/02/2012(a) at 20:09 – 22:12.  At trial, Alps emphasized that the 100 parts per weight limitation that is recited by the claims of the '109 Patent "refers to, in its essential feature, the SEEPS polymer."  (Dkt. No. 388, Tr. 04/30/2012 (b) 7:14 – 7:20; Dkt. No. 369, Tr. 05/02/2012(a) at pp. 20 – 21).  The jury found that ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (Dkt. No. 303 Tr. 05/02/2012(a) at 37:20 – 38:13).  ████████████████████████████████████████ ████████████████████████████████████████████  ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (hereinafter the "Advanced Gel Products").

The contempt issue first considers whether the Advanced Gel Products are no more than colorably different from the adjudged infringing liners.  OWW's Advanced Gel Products utilize a gel in which the ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████ The evidence submitted by Alps

which attempts to establish that the products are no more than colorably different is highly

contested by evidence submitted herewith, including a declaration from ████████████

████████████████████████████████████████████████████████████

██████████ If there remains a question of whether OWW's Advanced Gel Products infringe the

'109 Patent, that question should be answered in a separate infringement action.  OWW has

already filed a declaratory judgment action in this District to have this Court declare that the

Advanced Gel Products do not infringe the '109 Patent.

## II.    Argument

Contempt "is a severe remedy, and should not be resorted to where there is a fair ground

of doubt as to the wrongfulness of the defendant's conduct." *Tivo Inc. v. Echostar Corporation*,

646 F.3d 869, 881 – 882 (Fed. Cir. 2011).  *Tivo* dictates the proper framework for determining

whether a party may be held in contempt for selling a product that has been redesigned from an

adjudged infringing product.  *Tivo*, 646 F.3d at 882.  The party seeking to enforce the injunction

must first prove, by clear and convincing evidence, that the newly accused product is not more

than colorably different from the product found to infringe.  *Id.*  In performing this analysis, the

Court must focus on "those elements of the adjudged-infringing products that the patentee

previously contended, and proved, satisfy specific limitations of the asserted claims." *Id.*  When

one of those features has been modified in a way that is significant, "the newly accused product

as a whole shall be deemed more than colorably different from the adjudged infringing one." *Id.*

The significance of the differences between the two products is highly dependent on the nature

of the products at issue and the court must look to the relevant prior art to determine if the

modification was nonobvious.  *Id.* at 883.  A nonobvious modification suggests more than a

colorable difference. *Id.* The analysis as to whether a redesigned product is more than colorably different from an adjudged infringing product may additionally take into consideration the policy that "legitimate design-around efforts should always be encouraged as a path to spur future innovation." *Id.*

Whether a product is merely colorably different from an adjudged infringing product is <u>not</u> determined by analyzing whether the redesigned product infringes the patent. *Id.* ("Today we reject that infringement-based understanding of the colorably different test"). The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct. *Id.* at 882. If, and only if, the party seeking contempt establishes that the redesigned product is merely a colorable variation from the infringing product, the Court then evaluates whether there is clear and convincing evidence that the redesigned product infringes the patent. *Id.* The modifying party generally deserves the opportunity to litigate the infringement question at a new trial. *Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) cited favorably by *Tivo*.

### A. The Claims of the '109 Patent Require SEEPS Gel with at Least 100 Parts by Weight SEEPS to about 300 to 1,600 parts by weight Plasticizing Oil and the Advanced Gel Products have been Altered Significantly in this Regard

The claims of the '109 Patent are directed to and require SEEPS gel composites. (Dkt. No. 388, Tr. 04/30/2012(b) 59:18 – 59:23 (John Chen testifying at trial that the claims of the '109 Patent involve "a particular gel that we call SEEPS gel")). Claim 1 of the '109 Patent is illustrative of the relevant limitations:

> A composite article comprising a thermoplastic, heat formable and heat reversible gelatinous elastomer composition, G… said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s) comprising

3

> poly(styrene-ethylene-ethylene-propylene-styrene) and from (ii) about 300 to
> about 1,600 parts by weight of a plasticizing oil…

Jnt. Exhibit No. 2, attached as Exhibit A, at Claim 1.  At trial, ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ According to Alps,

the 100 parts by weight SEEPS to about 300 to 1,600 parts by weight plasticizing oil was a

required and "essential feature" of the claims.  The following testimony was given by Alps'

expert witness, Dr. Atwood, regarding the limitation (reviewing with counsel the limitations of

claim 1 of the '109 Patent):

> A: The key to this is where … (interchange with Court regarding trial
> technology) Okay. So, what I'm looking at here is at the part which starts
> with poly(styrene-ethylene-ethylene-propylene-styrene), this is the
> essential polymer component in the gels that we're discussing here.  It's
> what we call SEEPS, standing for S for styrene, E for ethylene, E for
> ethylene, P for propylene and S for styrene, or S-E-E-P-S.  This is the key
> polymer.
>     What we're stating here in – following on the 100 parts by weight, it
> could be 100 parts per weight of one, namely the SEEPS polymer, or it
> could be a mixture of two or more similar polymers.  So the 100 parts per
> weight refers to, in its essential feature, the SEEPS polymer.

(Dkt. No. 369, Tr. 05/02/2012(a) at pp. 20 – 21 emphasis added).  If there was any question

remaining as to whether the claims of the '109 Patent require a gel made from at least 100 parts

by weight SEEPS polymer to about 300 to 1,600 parts by weight plasticizing oil, it was clarified

by Dr. Atwood when he was asked to explain the differences between claims 1 and 12 of the

'109 Patent.  Claim 12 of the '109 Patent recites "a composite according to claims 1, 2, 3, or 4

wherein said one or more (i) block copolymers is made from poly(styrene-ethylene-ethylene-

propylene-styrene) and a source of said block copolymers being Septon® 4033 and Septon®

4055."  Ex. A at Claim 12.  The following testimony was given:

Q: Dr. Atwood, can you help us understand the distinctions between Claim 12 and Claim 1 that we've discussed?

A: The major difference between Claim 1 and Claim 12, certainly in both cases, as we can see on the ELMO here, we're looking at a composite according to Claim 1, but the major difference would be that one could have SEEPS polymer from a different supplier. My understanding is that the Kuraray original patent on the SEPTON series has expired, so one could purchase the SEEPS polymer from a different source, and that would be the difference between Claim 12 and Claim 1.  Claim 12 specifically states that a source being, and then it lists Septon.

(Dkt. No. 369, Tr. 05/02/2012(a) 66:12 – 66:23).  Dr. Atwood later reiterated "I think the only major difference between [claims] 1 and 11 or 12 is the source of the SEEPS polymer." Dkt. No. 369 Tr. 05/02/2012(a) 67:24 -68:01.  Notably, Dr. Atwood did not provide that in Claim 1, one or more of the "(i) block copolymers" may be a non-SEEPS.

At trial, Alps clarified that the claims of the '109 Patent require a gel made from at least 100 parts by weight SEEPS and from about 300 to 1,600 parts by weight mineral oil when arguing against the invalidity of the claims.   To rebut OWW's arguments regarding the obviousness of the asserted claims, Alps presented evidence of purportedly unexpected results exhibited by SEEPS gel composites.  Evidence of unexpected results must be commensurate in scope with the relevant patent claims to rebut a showing of obviousness.  *In re Peterson*, 315 F.3d 1325, 1330 – 1331 (Fed. Cir. 2003).  The evidence of purportedly unexpected results relied upon by Alps to prove the claims of the '109 Patent were not obvious was a series of test results performed by John Chen in which he compared "SEEPS gel" composites to SEBS gel composites. These test results are described in detail in the February 4, 2011 Declaration of John Chen, which was submitted by Mr. Chen during the reexamination of the '109 Patent and which was admitted as a trial exhibit.  Jnt. Ex. 133 at pp. 1625 – 1647 which is hereby attached as Exhibit B.  As explained by Mr. Chen, the SEEPS gel composites he utilized to perform his testing each had a ratio of 100 parts by weight Septon 4055 to 600 parts by weight plasticizing

5

oil. Ex. B at p. 7.  No tests were performed by Mr. Chen on composites having a gel with an amount of SEEPS which would put it outside of the 100 parts by weight SEEPS to about 300 to 1,600 parts by weight plasticizing ratio recited by the patent and no evidence has been offered by Alps indicating that such composites exhibit the claimed unexpected properties.

Mr. Chen has been questioned about the relevant limitation of his patents' claims. Deposition of John Chen taken November 10, 2011 at 241:16 – 247:09 (discussing the limitation as recited by the claims of U.S. Patent No. 7,344,568 which was asserted against OWW in related litigation), which is hereby attached as Exhibit C. According to Mr. Chen ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

███   ████████████████████████████████████████████

██████████████████████████████████████████████████

███████  The record of this case establishes that a SEEPS gel as defined by the reexamined claims of the '109 patent is a gel made from 100 parts by weight SEEPS polymer to about 300 to 1,600 parts by weight plasticizing oil.  OWW has redesigned its prosthetic liner products and the resulting Advanced Gel products ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████  OWW's Advanced Gel Products are more than colorably different from its discontinued liner products.  Therefore, OWW is not in contempt of this Court's injunction.[1]

> **B.   Alps has not established Clear and Convincing Evidence that the Advanced Gel Products are a mere Colorable Imitation of OWW's Discontinued Liners**

---

[1] OWW filed a Rule 60 Motion for Reconsideration of this Court's Injunction. Dkt. No. 435

6

**1.** ██████████████████████████████████████████

Alps' primary argument that OWW should be held in contempt for violating this Court's injunction is its allegation that ███████████████████████████████████████████ ████████████████████████████████████████████ Though the assertion is incorrect, notably absent from Alps' motion is any citation to the record of this case to support its arguments. Alps instead submits and relies on a newly executed declaration of Dr. Atwood and contends that Dr. Atwood has proven ██████████████████████████████ ███████████████████████████████████████ *See* Alps' Motion for Contempt. Alps' Motion impermissibly attempts to mask an infringement contention as a colorable difference analysis and does not even present separate colorable difference and infringement analyses. Further, Dr. Atwood's conclusions are in conflict with his own prior testimony, are wrong, and are scientifically unsound.

### a)    The record establishes the Significance of OWW's redesign

At trial, Alps showed that OWW utilized a gel of which a substantial component was the SEEPS polymer and in particular, Septon 4055. The record shows that Kuraray's identification of Septon 4055 as a SEEPS was a critical component of Alps' infringement case. Dr. Atwood testified that OWW admitted that its products were made from Septon 4055 and testified that Septon 4055 is disclosed as a SEEPS by its manufacturer and is specifically recited by certain claims of the '109 Patent. (Dkt. No. 369, Tr. 05/02/2012(a) at 30:04 – 30:11);(Dkt. No. 389, Tr. 05/02/2012(b) at 76:04 – 76:15). And while Dr. Atwood referred at trial to "testing" he performed to allegedly determine whether OWW's products utilized SEEPS gel, a review of the record shows that Dr. Atwood simply compared the polymer in OWW's prosthetic liners to Septon 4055 and determined they had the same infra red spectroscopy "fingerprint". *Compare*

Dkt. No.303 Tr. 05/02/2012(a) at 38:24 – 40:20 *with* the July 26, 2010 Declaration of Jerry Atwood ("Dr. Atwood's Expert Report"), which is hereby attached as Exhibit D , at ¶¶ 112 – 121 *with* Deposition of Dr. Jerry Atwood taken November 18, 2011, which is hereby attached as Exhibit E, at p. 29, l. 16 – p. 37, l. 7. Accordingly, Dr. Atwood's conclusion that his tests revealed that the polymer within the gel of the adjudged infringing products was SEEPS was dependent on Kuraray's classification of Septon 4055 as a SEEPS.

████████████████████████████████████████████████

████████████████████████████████████ ██ ████████████████████

████████████████████████ Because the manufacturer's identification of the polymeric component of OWW's gel was such an integral part of Alps' infringement case, OWW's use of a polymer that is not considered SEEPS by the same manufacturer should, under the analysis outlined by *Tivo*, be considered a significant change. Alps' analysis does not give adequate deference to the record of this case to satisfy its burden of establishing that no more than colorable differences exist between the Advanced Gel Products and those which were found to infringe the '109 Patent.

Further, while expert testimony may be considered in deciding a motion for contempt, the Federal Circuit has counseled against holding "contempt proceedings of a summary nature where expert and other testimony subject to cross-examination would be helpful or necessary." *Abott Labs. V. Torpharm, Inc.,* 503 F.3d 1372, 1379 (Fed. Cir. 2007). This is especially the case where a former infringer "has made a good-faith effort to modify a previously adjudged infringing device… to remain in the market place." *Id.* There are disputed issues with regards to Dr. Atwood's analysis of ████████████████ which additionally require that Alps' Motion for Contempt be denied. First, as discussed above, Dr. Atwood has already ████████████████

███████████████████████████████ Now, with absolutely zero indication

that his prior analysis was flawed or otherwise unreliable, Dr. Atwood submits an entirely new

IR spectrum ██████████████████████████████████████████████



When the original IR spectrum which Dr. Atwood prepared for

████████████ is compared to that which he recently generated for ██████████████, it is easy

to see that there are many differences.

Analyzing whether OWW's Advanced Gel Products are more than colorably different

from the adjudged infringing liners requires consideration of the record upon which infringement

was alleged and proven. *Tivo*, 646 F.3d at 882.  Here, Alps not only ignores record evidence

which shows that ███████████████ but substitutes an entirely new IR spectrum for the

material of record in the case.  Alps' failure to utilize test results that are already of record in this

case is suspect and questions exist regarding why Dr. Atwood's original test results for ████

████████████████████████████████████████████████ But, IR

spectroscopy is not a method by which it can even be determined whether ████████████

because the resulting charts merely indicate the chemical groups that are incorporated in the

polymer.  The differences of the block copolymer structures, which substantially affect the

performance of the polymer, cannot be identified using IR. ████ ██ ████████████

████████████████████████ Dr. Atwood's IR analysis does not amount to clear and

convincing evidence that ██████████████████.

Similarly, the record establishes that Alps' attempt to prove that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ During reexamination of the '109 Patent, John Chen submitted

arguments to the USPTO attempting to establish that the MSDS for Septon 4055 did not render

his invention obvious in combination with various other pieces of prior art including the

Hammond PCT application.  The April 25, 1991 MSDS for Septon 4055 is hereby attached as

Exhibit H.  In one such argument Mr. Chen explained:

> There is a high degree of ambiguity and a great amount of uncertainty in the prior
> art as to the precise structure of the hydrogenated styrene-isoprene/butadiene
> block copolymers in Hammond and identified in Kuraray's MSDS of April 25,
> 1991.  This is because indefinite numbers of block copolymer types (tapered,
> branched, linear, and the like) are possible from the designation of a hydrogenated
> styrene-isoprene/butadiene block copolymer...There is no information provided
> in Hammond or MSDS as to the specific initiator(s), structural modifiers, if any,
> that may have been used or coupling agents added during any of the processing
> steps of polymerization.

Response to Office Action of February 8, 2010, which is hereby attached as Exhibit I, at p. 116.

Mr. Chen admits that there are "indefinite numbers" of hydrogenated styrene isoprene/butadiene

block copolymers that are not SEEPS. *Id.* And, Alps asserted in the underlying litigation that the prior art MSDS disclosures for Septon 4055, which disclosed the material as a hydrogenated SIBS and many of which included CAS No. 132778-07-5 and which even depicted the basic structure of Septon 4055, did not resolve all factual disputes regarding whether Septon 4055 had always been the same polymer. *See* Dkt. No. DE S-9 at pp. 9 – 10. According to Alps "just because a material may have a consistent chemical structure does not mean that no changes have been made to it." *Id.* The significant structural differences between ██████████████ ██████████████████████ but it is telling that even if they had the same chemical structure, under Alps' analysis it could not be concluded that no significant changes existed between the two materials. But, it is also the case that other types of polymers, including prior art SEBS polymers, have CAS No. 132778-07-5. *See* Exhibit G. ████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████ Exhibit F, at ¶13.

b) ███████████████████████████

Not only should Alps' Motion for Contempt be denied because it is at odds with the record of this case, but also because there is substantial evidence which indicates ██████████ ████████████ *Arbek Mfg.*, 55 F.3d at 1570; *See BASF Agro B.V. v. Cipla Ltd.*, 2012 U.S. Dist. LEXIS 78216 (M.D. Ga. June 5, 2012) (in light of the high burden on the party attempting to prove contempt, the motion for contempt had to be denied in light of conflicting evidence); *Petter Invs., Inc. v. Hydro Eng'g, Inc.*, 2011 U.S. Dist. LEXIS 77646 (W.D. Mich. July 18, 2011).

SEEPS is an A-B-A triblock copolymer, where the "A" terminal ends are styrene (S) and the "B" midlblocks are poly(ethylene-ethylene-ethylene) (EEP)█████████████████

11





that renders the Advanced Gel Products more than colorably different from its discontinued liners. *Tivo*, 646 F.3d at 883. Alps' motion for contempt should be denied.

2. █████████████████████ **does not Alter the Conclusion that OWW has changed the gel of its Products in a significant way**

As already discussed, the asserted claims of the '109 Patent require a SEEPS gel. In its Motion for Contempt, Alps asserts that as long as OWW's Advanced Gel Products are made using 100 parts by weight of one or more hydrogenated SIBS polymers, any amount of which is SEEPS, to about 300 to 1,600 parts by weight plasticizing oil, they infringe the claims of the '109 Patent and should be considered no more than colorably different from the adjudged infringing products. Alps again urges this Court to engage in the type of infringement-based

13

contempt analysis that was specifically rejected by the Federal Circuit in *Tivo*.  OWW's discontinued liner products utilized gel made with 100 parts by weight Septon 4055 to 400 parts by weight plasticizing oil.  (Dkt. No. 369, Tr. 05/02/2012(a) at 20:09 – 22:12).  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ such a drastic reduction and near elimination of the "essential" component of the invention (SEEPS), must be considered a significant alteration.  *See Tivo*, 646 F.3d at 882 (the significance of the differences between the two products is much dependent on the nature of the products at issue).  And as discussed *supra* in section II(A) of this response, the Advanced Gel is not a "SEEPS gel" as required by the '109 patent.  Alps has not met its heavy burden.

### 3. Alps has not established that the Advanced Gel Products are Not More than Colorably Different Based on Equivalency

Though comparing a redesigned device to the adjudged infringing device and determining whether the products are equivalents under the doctrine of equivalents ("DOE") is one way courts have determined whether the redesigned product is "merely colorably different," Alps has not argued DOE as a basis for contempt and even more importantly does not have clear and convincing evidence of equivalency.  Under the DOE, "if two devices do the same work, in substantially the same way, and accomplish the same result, they are the same, even though different in name, form or shape." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). Establishing the equivalency requires "particularized testimony and linking argument.... Generalized testimony as to the overall similarity between the claims and the

accused infringer's product or process will not suffice." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

In the "Facts" section of its Motion for Contempt, Alps states that ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Alps' Motion for Contempt at p. 8. Alps never addressed (or even mentioned) this purported fact in its argument and accordingly, Alps has not properly raised equivalency as a basis upon which contempt should be granted in this case (this is likely because Alps is not able to assert DOE in this matter as is discussed below). But, a review of Dr. Atwood's declaration which has been cited to by Alps in support of its equivalency "fact" shows that Dr. Atwood has offered no comparisons of the properties exhibited by the Advanced Gel Products with those exhibited by OWW's discontinued liners and that he has simply utilized the type of generalized equivalency testimony which has been rejected in establishing equivalency. *See Texas Instruments Inc.*, 90 F.3d at 1567. It simply cannot be said that OWW's Advanced Gel Products do substantially the same work, in substantially the same way and accomplish substantially the same result as its discontinued liner products (for at least the reasons provided throughout this Response and corresponding exhibits). Alps has not established that the Advanced Gel Products are "merely colorably different" based on equivalency.

### C.    Alps Does Not have Clear and Convincing Evidence of Infringement

Assuming *arguendo* that Alps had established clear and convincing evidence that OWW's Advanced Gel Products are not more than colorably different from the adjudged infringing liners, Alps' Motion for Contempt should still denied because Alps does not have

clear and convincing evidence that OWW's redesigned products infringe the '109 Patent. As has

been discussed at length, there are numerous flaws with the evidence offered by Alps to establish

██████████████████████████ Alps' evidence is highly disputed. Alps does not have

evidence that the Advanced Gel Products comprise 100 parts by weight SEEPS in relation to

about 300 to 1,600 parts plasticizing oil as claimed. Further, Alps' attempt to construe claims 1

– 3 of the '109 Patent such that "there is no specific proportion of SEEPS required" is without

merit.[2]

The claims of the '109 Patent clearly require that <u>each</u> of the one or more hydrogenated

SIBS which forms the 100 parts by weight polymer component of the gel <u>must</u> comprise SEEPS.

In this definition, the "comprising SEEPS" language of the claim modifies the immediately

preceding hydrogenated SIBS element. This interpretation of the claims flows most naturally

from the way in which they are written. Alps' proposed construction would violate the all

elements rule and cannot be adopted. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*

567 F.3d 1314, 1323 (Fed. Cir. 2009) (all elements rule bars patentee from asserting "a theory of

equivalence [that] would entirely vitiate a particular claim element). The claims all require 100

parts by weight of SEEPS, and 100 parts by weight is the only amount discussed in the

specification as well as shown in the examples. (*See e.g.,* Exhibit A, col. 1, ll. 58 – 61; col. 2, ll.

30 – 33; col. 3, ll. 11 – 13, Examples I, II). Moreover, Mr. Chen makes clear in the specification

that the **invention** comprises gels made from 100 parts by weight of SEEPs to 300 to 1600 parts

---

[2] To properly construe a claim term, a court first considers the intrinsic evidence, starting with the language of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Terms should be construed consistently with their ordinary and customary meanings, but the court must also examine the specification to determine whether the patentee used the claim term consistently with its ordinary meaning or acted as his own lexicographer in defining the term. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1988). The prosecution history may also be useful in determining the meaning and scope of claims because it may clarify what the application sought and what had to be added or deleted to overcome rejections of the United States Patent and Trademark Office in order to issue. *Vivid Tech, Inc. v. American Science & Eng'g. Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999).

by weight of plasticizing oil.  Exhibit A Col.  2, ll. 30-38.  Statements that describe the invention

generally or as a whole are limiting.  *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d

858 (Fed. Cir. 2004).  Additionally, Mr. Chen neither describes, claims or otherwise enables any

gel made in ratios outside the range of what he called his invention.   To allow a far less amount

of SEEPS to satisfy these claims would completely vitiate this claim element.

Additionally, OWW's is the only interpretation which can be adopted in light of the

prosecution history of the '109 Patent.  Mr. Chen added the "comprising SEEPS" limitation to

the claims during reexamination.  Mr. Chen solidified what he meant by "SEEPS gel" and the

"comprising SEEPS" language when attempting to rebut the USPTO's conclusion that his

patent's claims were invalid as obvious over U.S. Patent No. 3,827,999 ("Crossland") in

combination with U.S. Patent No. 3,676,387 ("Lindloff").  Importantly, the USPTO had asserted

that Crossland taught hydrogenated styrene isoprene/butadiene block copolymers and thus

rendered Mr. Chen's invention obvious.  Mr. Chen argued in response:

> The Official conclusion regarding Crossland is contrary to the reasoned
> common sense of a person of ordinary skill in the art, because "it" [the gel
> composition] did not exist and Crossland did not place "it" in the possession of
> one of ordinary skill in the art with any degree of common sense certainty to be
> able to go and make "it" with the expectation of success that "it" will have the
> molecular structure of **the hydrogenated styrene isoprene/butadiene block
> copolymer comprising SEEPS of claims 1 and 2**.
>     For the sake of argument, even if a hydrogenated styrene
> isoprene/butadiene block copolymer can be achieved from Crossland's "a mixture
> thereof" a person of ordinary skill in the art using common sense and Crossland's
> teachings as a whole would have had no expectation of success of making **a
> hydrogenated styrene isoprene/butadiene block copolymer comprising
> SEEPS of the composite articles… of claims 1 and 2 that would be
> compatible with and capable of containing at least 300 parts oil**.

Ex. I, at p. 74 (emphasis added).  Mr. Chen additionally criticized the USPTO's rejection

because "It's unknown and impossible to predict if any block copolymer derived from "a mixture

thereof" would be operable and compatible with at least 300 parts oil as required by claims 1 and

2. The Office has not established to a reasonable certainty that Crossland's "mixture thereof" is the SEEPS block copolymer recited in claims 1 and 2 as asserted by the Office." *Id.* at p. 71. Based on this exchange, it is clear that Mr. Chen intended for the reexamined claims of the '109 Patent to be directed to gels made from 100 parts by weight SEEPS to about 300 to 1,600 parts by weight plasticizing oil.

Even if Alps' proposed construction could be considered a reasonable interpretation of the language of claims 1 – 3 of the '109 Patent and even if the construction was not completely at odds with the patent's prosecution history, it should be rejected because it almost certainly renders the claims invalid. When there are two possible interpretations of a patent claim, one of which would result in the claim being declared invalid, the interpretation of the claim which upholds validity should be adopted. *See ACS Hosp. Sys. Inc., v. Montefiore Hosp.*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984). As discussed, the claims of the '109 Patent only survived reexamination because Mr. Chen submitted evidence of purportedly unexpected results that are exhibited by SEEPS gels. The USPTO specifically noted that it was allowing the patent's claims based on "the unexpected resistence to sheer of poly(styrene-ethylene-ethylene-propylene-styrene) (SEEPS) gel" composites in head-to head comparison with the prior art SEBS gel composites… *See* Notice of Intent to Issue Reexamination Certificate hereby attached as Exhibit K. It is nonsensical to find that the purportedly unexpected results of "SEEPS gel" would be exhibited by the product regardless of the amount of the "essential" polymer that it contains. Because unexpected results must be commensurate in scope with the claims, and because there is absolutely no evidence that a gel having very little SEEPS continues to exhibit the "revolutionary" results that are imported via the SEEPS polymer, under Alps' proffered construction in which there is "no specific proportion of SEEPS required" claims 1 – 3 of the

18

'109 Patent would certainly be invalid.  Alps has not established direct infringement by clear and convincing evidence.

Nor should infringement be found based on the DOE in this case.  First, Alps did not assert infringement under the DOE in the underlying litigation.   During trial, the Court recognized that Alps never had a DOE claim and the jury was not asked to consider DOE.  (Dkt. No. 379, Tr. 05/10/2012(a) 88:9-16).  Alps cannot now ask the Court to find contempt based upon infringement under the DOE. Allowing Alps to advance a DOE argument for the first time during a contempt proceeding will result in the impermissible broadening of the scope of the asserted claims, which is discussed more fully below.  *KSM Fastening Sys. v. H.A. Jones Co.,* 776 F.2d 1522, 1529 (Fed. Cir. 1985) (overruled in part on other grounds).  Additionally, any new infringement argument by Alps, such as an assertion of DOE, would necessarily raise new validity defenses that were not pertinent to Alps' earlier infringement allegations and which did not have to be alleged in the earlier action.  It would be inequitable to apply the DOE to the Advanced Gel Products in a contempt proceeding under these circumstances.

Further, prosecution history estoppel prevents a patentee from claiming that subject matter originally claimed but then narrowed in response to a rejection by an Examiner is unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent.  *Festo*, 535 U.S. at 733-734.  Prosecution history estoppel can be triggered in two different ways, "either (1) by making a narrowing amendment to the claim ('amendment-based estoppel') or (2) by surrendering claim scope through argument to the patent examiner ('argument-based estoppel')."  *Conoco Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006).   The manner in which John Chen has surrendered claim scope through argument he submitted during the reexamination of the '109 Patent has already been discussed.

19

Alps is precluded from asserting the DOE against the Advanced Gel Products as it would require capturing subject matter that was previously surrendered by Mr. Chen during the prosecution of the '109 Patent.

Even if Alps could argue DOE, the Advanced Gels Products possess more than "insubstantial" differences with the claimed products. These differences have already been discussed. In light of this evidence, it cannot be concluded that the Advanced Gel Products are an equivalent to what is claimed by the '109 Patent. But, Alps has not established infringement under the DOE for the additional reason that it has not compared the Advanced Gel Products to the actual claims at issue. In *KSM Fastening Sys. v. H.A. Jones Co.*, 776 F.2d 1522 (Fed. Cir. 1985) (overruled on other grounds), the Court explained that in deciding contempt, the redesigned product must be compared to the claims of the patent - and not the prior product – in determining whether it infringes under the DOE. *See id.* This is because "in determining equivalents, things equal to the same thing may not be equal to each other. So too, things equal to each other may not be equal to the same thing." *Id.* at 1528. Alps has provided a mere statement in its Motion for Contempt that the Advanced Gel Products are a substantial equivalent to its discontinued liner products and therefore Alps concludes that they infringe the '109 Patent. *See* Alps' Motion for Contempt at p. 8. This is a rejected means by which to establish infringement under the Doctrine of Equivalents.

## III.    Conclusion

OWW believes that the briefs unambiguously show that there is no contempt and asks that Alps' Motion for Contempt be denied. OWW asks that any remaining questions regarding whether the Advanced Gel Products infringe the '109 Patent be answered in the declaratory judgment action which has been filed in this Court.

20

Date:   June 10, 2013                    Respectfully submitted,


/s/F. Michael Speed, Jr.
Jeffrey S. Standley
F. Michael Speed, Jr.
Michael Stonebrook
**STANDLEY LAW GROUP LLP**
6300 Riverside Drive
Dublin, Ohio 43017
Tel.: 614-792-5555
Fax: 614-792-5536
jstandley@standleyllp.com
mspeed@standleyllp.com
mstonebrook@standleyllp.com
litigation@standleyllp.com

Benjamin H. Hill, III
Florida Bar No. 094585
William C. Guerrant, Jr.
Florida Bar No. 516058
Patrick J. Risch
Florida Bar No. 0165603
HILL WARD & HENDERSON P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, FL 33601-2231
(813) 221-3900
(813) 221-2900 (Fax)
bhill@hwhlaw.com
wguerrant@hwhlaw.com
prisch@hwhlaw.com

COUNSEL FOR
DEFENDANT/COUNTERCLAIMANT,
THE OHIO WILLOW WOOD COMPANY

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing, with its confidential

exhibits, has been served on all counsel of record via electronic mail on this the 10th day of June,

2013.  The redacted motion and exhibits filed publicly will be served via the Court's CM/ECF

system, which will send notification of such filings to registered counsel electronically, on this

10th day of June, 2013.

/s/F. Michael Speed, Jr.
An attorney for Defendant The Ohio Willow
Wood Company

22